# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| STEAMFITTERS LOCAL 449 PENSION PLAN, Individually and on Behalf of All Others Similarly Situated, | ) Case No. ) ) CLASS ACTION ) |
| Plaintiff, | ) ) |
| vs. | ) **COMPLAINT FOR VIOLATIONS OF** ) **THE FEDERAL SECURITIES LAWS** ) |
| MAXIMUS, INC., RICHARD MONTONI, RICHARD NADEAU, and BRUCE CASWELL, | ) ) **DEMAND FOR JURY TRIAL** ) |
| Defendants. | ) ) ) |

Plaintiff Steamfitters Local 449 Pension Plan ("Steamfitters 449" or "Plaintiff"),

individually and on behalf of all others similarly situated, alleges the following based on

personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as

to all other matters based upon the investigation conducted by and through Plaintiff's attorneys,

which included, among other things, a review of Securities and Exchange Commission ("SEC")

filings by MAXIMUS, INC. ("Maximus" or the "Company"), as well as conference call

transcripts and media and analyst reports about the Company.  Plaintiff believes that substantial

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity

for discovery.

## INTRODUCTION

1.      This is a class action brought on behalf of all persons or entities who purchased

or otherwise acquired Maximus common stock between October 30, 2014 and February 3,

2016, inclusive (the "Class Period").  The action is brought against Maximus and certain of the

Company's senior executives (collectively, "Defendants") for violations of Sections 10(b) and

20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule l0b-5

promulgated thereunder.

2.      Defendant Maximus provides business process services ("BPS") to government

health and human services agencies in the United States, Australia, Canada, Saudi Arabia, and

the United Kingdom ("UK").  Maximus is headquartered in Reston, Virginia and the

Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker

symbol "MMS".

3.      On October 29, 2014, the UK Department for Work and Pensions ("DWP")

awarded Maximus a significant contract to carry out health and disability benefits, called the

Health Assessment Advisory Service ("HAAS"), over a period of three and a half years.

Maximus would be paid approximately £595 million (US $900 million) although the exact amount depended on how close Maximus would get to its target of a million assessments per year.  If the firm underperformed, it would earn less; if it exceeded its target, it would earn more.

4.      Beginning on October 30, 2014, and continuing through the Class Period, Defendants assured investors that Maximus was meeting targets concerning the HAAS contract. In part because of the purported success that Maximus was slated to achieve during fiscal 2015 in the HAAS contract, Defendants also provided the Company's shareholders with strong financial and operational guidance for fiscal 2015.

5.      Maximus' HAAS contract, however, encountered problems from the start. When Maximus' HAAS results began to underperform investors' expectations, Defendants made a series of reassuring statements about the contract.  These statements included reassurances regarding: (1) the Company's progress in meeting assessment targets; (2) the Company's progress in recruiting healthcare professionals; and (3) the Company's overall outlook and prospects for the HAAS contract.

6.      As a result, throughout the Class Period, Defendants made false and/or misleading statements and/or failed to disclose that: (i) in obtaining the HAAS contract, Maximus set an unattainable target number of healthcare professionals to recruit and an unattainable target number of assessments; (ii) throughout the HAAS contract, Maximus was struggling to recruit, train and ramp-up new health care staff to perform the assessments; (iii) the inability to meet its target number of healthcare recruits and target number of assessments, meant Maximus would not earn the performance-based incentive fees from the HAAS contract; and (iv) consequently, Defendants' statements about the Company, its financial

condition, and the outlook for its business, including statements about the HAAS contract and the amount of revenue the Company expected the contract to contribute, lacked a reasonable basis when made.

7.     On August 7, 2015 Maximus announced its results for the third quarter of 2015, including, "some start-up challenges" with the HAAS contract.  On this news, Maximus' stock price declined by $9.57 per share over two trading sessions, or 13.8 percent.

8.     Before the market opened on November 12, 2015, Maximus released downbeat results for the fourth quarter of 2015, including news that the HAAS contract delivered an operating loss of $4 million.  On this news, Maximus' stock price declined $15.03 per share that day, or 21.9 percent.

9.     Finally on February 4, 2016, Maximus issued a press release announcing its earnings for the first quarter of fiscal 2016, again missing expectations and confirming its inability to meet HAAS contract assessment targets.  The Company reported that its Health Services Segment operating margin fell from 15.5 percent the prior year to 9.2 percent for the first quarter of fiscal 2016.  The reduced earnings were based in part on weak performance of the HAAS contract, which "tempered operating margin."

10.     On this news, shares of Maximus common stock dropped $5.53 per share over two trading sessions, or 10.5 percent, wiping out approximately $356 million in market capitalization.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

12.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange

Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC, 17

C.F.R. § 240.10b-5.

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and

28 U.S.C. §1391(b) as the Company is headquartered within this District, Defendants conduct

business in this District, a significant portion of Defendants' actions, and the subsequent

damages, took place within this District.

15.     In connection with the acts alleged in this complaint, Defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications, and the facilities of the national

securities markets.

**PARTIES**

16.     Plaintiff Steamfitters 449, as set forth in the accompanying Certification, which

is incorporated by reference herein, purchased Maximus common stock during the Class Period

and was damaged as the result of Defendants' wrongdoing as alleged in this complaint.

17.     Defendant Maximus is an administrator providing business process management

to government health and human services agencies in the United States, Australia, Canada,

Saudi Arabia, and the UK.  Maximus focuses on administering government-sponsored benefit

programs, such as the Affordable Care Act, Medicare, Medicaid, as well as welfare-to-work and

child support programs.  Maximus' primary customer base includes federal, provincial, state,

county, and municipal governments.  Maximus is incorporated in Virginia and maintains its

principal executive offices in Reston, Virginia.  The Company's stock is listed on the NYSE where it trades under the ticker symbol "MMS."

18.     Defendant Richard Montoni ("Montoni") was the Company's Chief Executive Officer ("CEO") throughout the Class Period.  Montoni certified the Company's periodic financial reports filed with the SEC and communicated with investors, participating in the Company's periodic conference calls.

19.     Defendant Richard Nadeau ("Nadeau") was the Company's Chief Financial Officer ("CFO") throughout the Class Period.  Nadeau certified the Company's periodic financial reports filed with the SEC and communicated with investors, participating in the Company's periodic conference calls.

20.     Defendant Bruce Caswell  ("Caswell") was the Company's President throughout the Class Period.  Caswell communicated with investors, participating in the Company's periodic conference calls.

21.     Defendants Montoni, Nadeau, and Caswell are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Maximus' reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive

representations which were being made were then materially false and/or misleading.  The

Individual Defendants are liable for the false statements pleaded herein, as those statements

were each "group-published" information, the result of the collective actions of the Individual

Defendants.

22.     Maximus and the Individual Defendants are referred to herein, collectively, as

"Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

23.     Maximus provides BPS to government health and human services agencies in the

United States, Australia, Canada, Saudi Arabia, and the UK.  Maximus focuses on

administering government-sponsored benefit programs, such as the Affordable Care Act,

Medicare, Medicaid, as well as welfare-to-work and child support programs.  Maximus'

primary customer base includes federal, provincial, state, county, and municipal governments.

24.     The Company operates through three segments: U.S. Federal Services, Health

Services, and Human Services.  The Health Services segment provides a range of BPS, as well

as related consulting services, for state, provincial, and national government programs.  These

programs include the HAAS contract in the UK.

### Maximus Awarded UK HAAS Contract

25.     On October 29, 2014, the UK DWP awarded Maximus the HAAS contract to

carry out health and disability benefits over a period of three and a half years.  The DWP

provides a range of social welfare benefits for people who are currently out of work due to a

long-term health condition or are unable to work as a result of a disability or health condition.

The government decided that the best way to assess eligibility is through independent health

assessments.  The assessments distinguish people who could not work due to health-related

6

problems from people who were fit for work.  The results from each assessment are then used

by the DWP to determine the level of support for different benefits.

26.     Under the HAAS contract, Maximus would be paid approximately £595 million

(US $900 million) although the exact amount depended on how close Maximus would get to its

target of a million assessments per year.  If the firm underperformed, it would earn less; if it

exceeded its target, it would earn more.  Specifically, the target of one million assessments was

to be achieved between March 1, 2015 and February 28, 2016

27.     Atos Healthcare ("Atos") previously administered the HAAS contract but

terminated the contract early following widespread public and political protests over the

assessments.  Atos agreed to continue conducting the assessments until March 1, 2015 on which

date Maximus would take over the assessments.  Prior to March 1, 2015, as part of the

transition, most of Atos's health care professionals would transfer to Maximus and Maximus

agreed to recruit and train additional health care professionals to clear a backlog of at least

600,000 claims.

### Materially False and Misleading Statements Issued During the Class Period

28.     The Class Period begins October 30, 2014, when Maximus issued a press release

in which it announced that the Company had been awarded the HAAS contract to provide

health-related assessment services for the DWP.  The press release further stated that the

"Company will begin work immediately with a four-month transition and mobilization period,

followed by 36 months of operations that are expected to launch on March 1, 2015 and run

through February 28, 2018."  Commenting on the HAAS contract, CEO Montoni stated the

following, in pertinent part:

> Assessments for people who apply for disability and long-term ill health benefits
> should be timely, respectful and fair. Our goal is to improve the overall customer
> experience by addressing certain challenges that exist today.

First, we want to reduce long waiting times without compromising quality by bringing in more health care professionals. Second, we want to improve the quality of the assessment through a number of initiatives, such as expanding the number of medical professionals who specialize in mental health and understand how fluctuating conditions can be better reflected in assessments. Finally, we want to make the assessment process less intimidating and more straightforward by introducing new ways to help customers complete forms and access sources of independent advice.

29.     On the same day, the Company filed a Form 8-K with the SEC, stating that "[t]he Company expects this [HAAS] contract to contribute revenue of approximately $140 million to $165 million during its seven months of operations in fiscal year 2015.  The [HAAS] contract is expected to be accretive in fiscal 2015."

30.     On November 13, 2014, Maximus issued a press release in which it announced its fourth quarter and full year 2014 financial results.  In the press release, Montoni stated that "[t]he horizon for fiscal 2015 and beyond is bright, with several large, new contracts that will serve as the underpinnings for growth over the next few years as they ramp into their full run-rate. For fiscal 2015, MAXIMUS is forecasting top-line growth in the range of 12% to 18% and we estimate that approximately 90% of our forecasted 2015 revenue, based upon the midpoint of our revenue guidance range, is already in the form of backlog or option periods."

31.     On November 13, 2014, Maximus held a conference call with analysts to discuss the Company's fourth quarter and full year 2014 financial results.  The Company reiterated that the HAAS "contract will contribute approximately $140 million to $165 million in revenue over the seven months of operations beginning in March 2015."

32.     On November 17, 2014, the Company filed its annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the fiscal year ended September 30, 2014 ("2014 10-K").  The 2014 10-K contained signed certifications pursuant to

the Sarbanes-Oxley Act of 2002 by Defendants Montoni and Nadeau, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

33.     On February 5, 2015, Maximus issued a press release in which it announced its first quarter 2015 financial results.  In connection with this press release, CEO Montoni stated the following regarding the HAAS contract, in pertinent part:

> In our Health Services Segment, the second open enrollment period under the Affordable Care Act has proved to be smoother, with call volumes that were in-line with our expectations. At the same time, ***we are making good progress as we ramp up our new health contracts in the United Kingdom*** and the United States. We are also pleased with the growth coming from new work and expansion of existing contracts within our Human Services Segment.[1]

34.     On the following day, Maximus filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarterly period ended December 31, 2014 and fiscal year ("2015 1Q 10-Q").  The 2015 1Q 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Montoni and Nadeau, stating that the financial information contained in the 2015 1Q 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

35.     During the Company's related earnings call, Defendant Caswell responded to a question concerning Maximus' preparations for the HAAS contract, by stating "we feel very much that it's going as expected."

36.     On May 7, 2015, prior to the trading session, Maximus issued a press release announcing its second quarter 2015 financial results, first reporting on the performance of the

---

[1] Unless otherwise noted, all emphasis is added.

9

HAAS contract after it took over the assessments.  The press release stated the following, in pertinent part:

> For the second quarter of fiscal 2015, revenue increased 10% (12% on a constant currency basis) to $481.8 million, compared to $439.0 million reported for the same period last year. The increase in revenue was driven by organic growth from new work and the expansion of existing contracts, primarily in the Health Services Segment. Both revenue and earnings were better than expected in the second quarter of fiscal 2015 due to contract amendments that were larger than previously anticipated in the Health Services Segment.

> * * *

> MAXIMUS has experienced many recent positive developments as we continue to grow the business and execute on our existing portfolio. On March 1, 2015, we successfully launched the new U.K. Health Assessment Advisory Service.

37.     On May 8, 2015, Maximus filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarterly period ended March 31, 2015 and fiscal year ("2015 2Q 10-Q").  The 2015 2Q 10-Q stated that "[d]uring the second half of the fiscal year 2015, we anticipate the benefits of . . . the United Kingdom Health Advisory and Assessment Services contract, which commenced in March 2015."  The 2015 2Q 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Montoni and Nadeau, stating that the financial information contained in the 2015 2Q 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

38.     On August 6, 2015, prior to the trading session, Maximus issued a press release in which it announced its third quarter 2015 financial results.  The Company reported poor results for its second quarter ending June 30, 2015 and lowered its 2015 sales guidance.  In addition, the Company announced that for its Health Services Segment, which includes the

financial details for the HAAS contract, operating margin fell from 14.2 percent from the prior

year to 13.7 percent in the third quarter of 2015.

39.     During the Company's related earnings call, Nadeau acknowledged the

difficulties the Company was experiencing regarding the HAAS contract, nevertheless, the

Company sought to alleviate said concerns by projecting profitability for the HAAS contract in

both fiscal 2015 and fiscal 2016, stating in pertinent part:

> ***The Health Services Segment had some recent positive developments***. We
> recently picked up some scope expansion on a couple of existing domestic health
> contracts but we expect margin levels to be lower initially. In addition, we were
> also awarded a new subcontract in our U.S. federal business for an existing client
> under a relatively new program. Under the contractual terms, we cannot provide
> any additional details, but we can tell you that we have already started work on
> this health-related contract.
>
> Revenue will materialize from these contracts in the fourth quarter and it is the
> principal reason for the increase to revenue guidance. This additional revenue will
> be offset by start-up challenges that we are experiencing with the Health
> Assessment Advisory Service contract in the UK. In March, we took over the
> contract from the prior provider. And at the time of takeover, it was a very
> troubled program. Many things are going well with the contract and we remain
> confident that we can bring about positive change to the program over time.
>
> Since our last earnings call, ***the recruiting and retaining of healthcare
> professionals has proved to be tougher than we had anticipated***. As a result, we
> are experiencing volume and, to a lesser extent, quality variances from our plan.
> ***This means lower revenue and profit contributions from the contract at this
> time. The project is still expected to be profitable for both [fiscal 2015] and
> [fiscal 2016].***

40.     During the question and answer portion of the conference call, CEO Montoni

engaged in the following exchange:

> [ANALYST]: I'm curious why you think you're having trouble recruiting on the
> HAAS contract? Does it have anything to do with the contract's reputation from
> the previous vendor? And if not, what do you think the issue is as you see it?
> And/or the plan to fix that issue.
>
> MONTONI: []I think the challenges on recruiting health care professionals, and
> we recruit two types of health care professionals, one happens to be doctors and

the other one's nurses and this is across the United Kingdom. So, finding the right number of those health care professionals, as we know here in the U.S., there's not a surplus of such professionals in our economy. The same condition exists in the United Kingdom. So, we are looking for individuals, the majority of which are gainfully employed, so recruiting them is tougher than some other types of professionals. And the geographic factors also play into it. As it relates to the nature of the program and the work that we do, I think there are individuals that are actually passionate about it and care about it very, very much, and I think we've managed to manage the program such that it is attractive to many, many individuals. So, I think it's really just a matter of supply and demand, not so much the nature of the program itself.

[ANALYST]:  Okay. And then the follow up, I guess, then is if it's supply and demand, how long do you expect it might take to get this contract's revenue, profitability and head count to the path that you originally thought?

MONTONI: *[O]ur original thought was that all of [fiscal 2015] would be a ramp period.* We took this over in the spring. And all of [fiscal 2015] and throughout a good portion of 2016, our original plan this would be in ramp mode. *So, our plan was that this would stabilize in [fiscal 2016] and that's still our plan*. So, we're a bit behind where we wanted to be.

41.     On August 7, 2015, Maximus filed a quarterly report on Form 10-Q with the

SEC, announcing the Company's financial and operating results for the quarterly period ended

June 30, 2015 ("2015 3Q 10-Q").  The 2015 3Q 10-Q contained signed certifications pursuant

to the Sarbanes-Oxley Act of 2002 by Defendants Montoni and Nadeau, stating that the

financial information contained in the 2015 3Q 10-Q was accurate and disclosed any material

changes to the Company's internal control over financial reporting.

42.     On this news, shares of Maximus common stock dropped $9.57 per share over

two trading sessions, or 13.8 percent, to close at $59.65 per share on August 7, 2015.

43.     On November 12, 2015, Maximus issued a press release in which it announced

its fourth quarter and full year 2015 financial results, including the Company's Health Services

Segment:

Health Segment revenue for the fourth quarter of fiscal 2015 increased 29% (32% on a constant currency basis) to $296.2 million, compared to $230.5 million

reported for the same period last year. Operating income for the fourth quarter of fiscal 2015 totaled $30.5 million (10.3% operating margin), compared to $31.2 million (13.5% operating margin) for the same period last year.

For the full fiscal year, Health Segment revenue increased 22% (25% on a constant currency basis) to $1.1 billion, compared to $906.7 million for the same period last year. All growth was organic. Fiscal 2015 operating income totaled $154.3 million (13.9% operating margin), compared to operating income of $115.6 million (12.7% operating margin) for fiscal 2014.

The increases in revenue for the fourth quarter and the full fiscal year 2015 were driven by new work and the expansion of existing contracts. Operating margins for the fourth quarter and full fiscal year 2015 were tempered by new programs in start-up, most notably the U.K. Health Assessment Advisory Service contract, which is not performing to the Company's previous expectations.

44.     On the same day, during the related earnings call, Nadeau stated that the reduced 2016 earnings guidance was "a result of a single program, the U.K. Health Assessment Advisory Service [HAAS contract]."  Nadeau also detailed the fiscal year performance of the HAAS contract, stating, in part:

> ***For [fiscal year 2015], the U.K. Assessment contract delivered approximately $105 million in revenue, and an operating loss of $4 million. Revenue was short of our initial projected range of $140 million to $165 million.*** The shortfall has two primary elements. First, our staffing levels are running lower than our plan, and therefore, billable costs are lower than forecast. As a result, revenue and operating income are lower on the cost reimbursable piece of the contract. Second, we are not achieving certain performance metrics, most notably volume targets. As a result, we are not earning the performance-based incentive fees.

45.     Despite the shortfall, CFO Nadeau insisted that this was no different from standard contract launches, characterizing struggles with the HAAS contract as a "slower ramp."

46.     Later, on the same call, CEO Montoni similarly discussed the lack of progress with the HAAS contract while simultaneously instilling optimism that Maximus would meet its contractual targets by the summer of 2016, stating in pertinent part:

> You may recall that this is a hybrid contract that is predominantly cost-reimbursable. However, it also has significant performance incentives, with the

largest being tied to volumes. While we have increased volumes during the start-up phase, *we are falling short of achieving the initial volume targets*. Our ability to hit the volume targets is tied directly to three areas: the number of health care professionals that we recruit; the number that complete training and graduate; and the productivity of these new recruits. In order to get the program better aligned with our contractual targets, we need to have the right number of qualified health care professionals; that goal hasn't changed. What has changed is the amount of time it is taking us to recruit, graduate and ramp-up the new staff, but we feel confident that, over time, *we can achieve our goals*. We have modified our forecast to account for the slower than expected staffing ramp. In order to meet these, *we believe that we will have staffing resources in place to meet volume demand and contractual targets by the end of summer 2016*.

Let me now walk you through the three main areas where we are aggressively working to address the challenges. The first area is recruitment. We launched a comprehensive recruitment campaign to ensure that we have a continued flow of qualified candidates in the appropriate locations. We have expanded our network of recruitment partners and enhanced our employee referral program. We implemented an advertising and social media campaign, launched a recruitment portal website and have been exhibiting at a number of recruitment fairs across the country. Through these efforts, we have seen a sizable uptick in the number of new recruits.

The second area is improved training and support, which leads to better graduation rates. It's important to recognize that once hired, candidates must then complete rigorous training, pass a series of competency tests and graduate to become fully accredited. To increase the graduation rates, we have some key initiatives underway. We have increased our engagement and coaching efforts with new candidates during the entire training period. This is already yielding results in keeping more candidates in the process. We are also working with those recruits who struggle with the initial competency tests and are providing them with individualized training support. With this extra support, we expect that more candidates will successfully graduate to full accreditation.

The third area is productivity. Once new staff begin performing assessments there is a learning curve, and it may take between six and eight months for them to achieve full productivity levels. In the meantime, we have efforts underway to increase productivity with our current workforce. We have optimized the work schedules of our staff and offered voluntary overtime incentives, including weekend shifts, to increase the number of assessments we can complete each day. This has a direct influence on our ability to reduce the significant backlog that we inherited at the time of contract takeover.

We expect that the increased recruiting efforts, supplemented by the enhanced training and optimization of our current workforce will help US to increase our productivity, meet volume targets and reduce wait times over the coming months.

Over the past eight months, we've already made significant progress and realized several early accomplishments that I'd like to share. These demonstrate that, over time, we can bring about the necessary changes to put this program on the path to

14

success. The first is addressing the current backlog. This was a top priority for the Department for Work and Pensions. At the time of contract takeover, we inherited a significant caseload of more than 550,000 outstanding assessments. Today, we have eliminated more than a third of that backlog. We are making concerted progress to continue to reduce the backlog of cases and shorten wait times.

47.     On this news, shares of Maximus common stock dropped $15.03 per share, or 21.9 percent, to close at $53.61 per share on November 12, 2015.

48.     On November 16, 2015, the Company filed its annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the fiscal year ended September 30, 2015 ("2015 10-K").  The 2015 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Montoni and Nadeau, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

49.     On January 8, 2016, the UK's National Audit Office published a report detailing Maximus' performance under the HAAS contract.  According to the National Audit Office, Maximus was only completing 37,000 face-to-face assessments a month compared to a target of 57,000.  Maximus still faced a backlog of at least 280,000 claims and the average person was waiting 23 weeks instead of the target wait of seven weeks.  Only half of all the doctors and nurses hired to carry out the assessments completed their training against a target of 95 percent. The report also revealed that one in 10 of Maximus' assessments were rejected on appeal— more than twice as bad as Atos.

50.     On January 14, 2016, a UK news outlet, the *Mirror*, reported that a former Maximus PR manager filed a complaint to the SEC revealing that Maximus "directors knew of serious problems just months into the contract."  The *Mirror* also reported that the former employee revealed that Maximus admitted in meetings that their target of employing 1,000 new healthcare professionals to carry out assessments was "unrealistic and unworkable."

51.     The statements and omissions contained in ¶¶ 28-41, 43-46, and 48-50 were

materially false and/or misleading when made because Defendants failed to disclose that: (i) in

obtaining the HAAS contract, Maximus set an unattainable target number of healthcare

professionals to recruit and an unattainable target number of assessments; (ii) throughout the

HAAS contract, Maximus was struggling to recruit, train and ramp-up new health care staff to

perform the assessments; (iii) the inability to meet its target number of healthcare recruits and

target number of assessments, meant Maximus would not earn the performance-based incentive

fees from the HAAS contract; and (iv) consequently, Defendants' statements about the

Company, its financial condition, and the outlook for its business, including statements about

the HAAS contract and the amount of revenue the Company expected the contract to contribute,

lacked a reasonable basis when made.

### The Full Truth Emerges

52.     On February 4, 2016, prior to the trading sessions, Maximus issued a press

release in which it announced its first quarter 2016 financial results.  The Company reported

that its Health Services Segment operating margin fell from 15.5 percent the prior year to 9.2

percent for the first quarter of fiscal 2016 and blamed the poor results on the HAAS contract.

53.     On the same day, Maximus held a conference call with analysts regarding the

first quarter 2016 financial results.  On the call, in his prepared remarks, CEO Montoni

discussed the HAAS contract, stating, in part:

> During the quarter, we made steady operational progress on the [HAAS] contract.
> It is still too early to make any adjustments to our forecast since we expect that it
> will take some time for improving trends to materialize in the financial model.
>
> At this time, we are still running below our volume targets but making progress
> each month. We continue to expect to have our productivity at the appropriate
> levels by late summer.

54.     Also on the conference call, CEO Montoni stated, in part, as part of his prepared

remarks:

> I'll start my comments this morning with an update on the U.K. Assessment contract. Getting the contract in the right path to success remains a top priority for the management team, and we've made meaningful progress. I first want to acknowledge a report issued last month from the U.K. National Audit Office as well as the Public Accounts Committee meeting yesterday that discussed this report.
>
> The NAO published findings from an August 2015 audit of all the assessment contracts across the country. This included our U.K. Assessment contract. The audit only covered effectively five months of our operations. As a reminder, when we took over this contract we acknowledge that it would take 12-18 months before we could improve many aspects of the operations.
>
> The NAO report echoed what we said in our November call as it relates to certain performance metric, including volumes and quality.
>
> Let me bring you up to speed on our progress since the NAO audit and our last quarter's call. Recall that the U.K. assessment contract is predominantly cost reimbursable with significant performance incentives. The largest is tied to volume, so I'll share an update on our progress in this area.
>
> As a reminder, our ability to hit the volume targets is tied directly to three areas – one, the number of health care professionals that we recruit, two, the number that complete training and graduate, and three, the productivity of these new recruits. As I mentioned last quarter, we launched several initiatives to help drive our recruitment numbers, which have brought in a solid stream of well qualified candidates. During the autumn timeframe, we were hiring approximately 100 new health care professionals each month. We currently have the required staff in the pipeline to meet our production requirements, and we are now turning our attention to simply managing attrition and filling in the gaps in key locations. So real progress here in our recruitment efforts are at the appropriate run rates.
>
> In the area of training and graduation rates, it's fair to ask why is it so difficult for a new health care professional to complete training? Performing functional assessments is a new skill for many health care professionals, especially if they were previously working in a clinical setting or providing direct patient care. The training program is rigorous, and the competency tests are challenging.
>
> We amended certain aspects of our training to help increase success. Our smaller training classes are giving new recruits more access to experienced staff. This individualized support has yielded solid improvements in retention rates. These changes have made a marked difference, and our most recent monthly data shows

17

that graduation rates are north of 80%, so meaningful improvement in this area, as well.

From a productivity perspective, it does take time for new health care professionals to be working at full capacity. Once they begin performing assessments, the learning curve to full productively can take between six and eight months. Our new recruits are becoming more experienced and are reaching increased levels of productivity, and as they ramp up, the seasoned health care professionals who were previously serving as mentors will return to fully productive status. All of this has helped to increase our overall productivity, which has allowed us to make additional progress towards our volume targets. In fact, we delivered the highest number of assessments to date in January.

In addition, we've also made significant headway on the more than 0.5 a million cases of backlog that we inherited at the time of contract takeover. To date, we've cut that figure down to 110,000 cases. Recall, at the time of our last call, we'd been through about a third of the backlog, so I'm very pleased with this ongoing steady progress, both with the new incoming assessments and the cases in backlog.

We believe that the trends are indicative of the ongoing steady progress we're making to increase our capacity and boost the number of assessments we complete. We remain cautiously confident that we will have all the pieces in place to get our productivity where it needs to be by the end of the summer 2016.

The NAO audit report also touched upon the areas of quality and cost.  Delivering quality assessment reports is essential. The client uses our reports to make a determination about benefit levels, and we recognize the importance of delivering high quality reports.

The report indicated that we were not achieving one of the quality metrics at the time of the audit in August. To put this in context, we are meeting or exceeding 10 out of 11 service level metrics for quality. We've implemented several measures that continue to strengthen the quality of our assessment reports.

The NAO report also compared the cost for assessment under MAXIMUS versus the previous provider. This comparison is misleading as the two contracts are fundamentally different. Our contract requires a much greater proportion of face-to-face assessments, which simply cost more to perform.

And while we've made meaningful progress on all fronts, we still have a ways to go; therefore, we believe it's premature to make any modifications to our estimates for this fiscal year. Nevertheless, we're on track to meet our volume targets that underpin our fiscal 2016 guidance.

55.     On this news, shares of Maximus common stock dropped $5.53 per share, or 10.5 percent, over the following two trading sessions to close at $46.92 per share on February 5, 2016.

56.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## CLASS ACTION ALLEGATIONS

57.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired Maximus common stock between October 30, 2014 and February 3, 2016, inclusive (the "Class").  Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Maximus, and the directors and officers of Maximus and their families and affiliates at all relevant times.

58.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Maximus common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Maximus and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

59.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

60.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

61.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act was violated by Defendants as alleged herein;

(b)     whether statements made by Defendants misrepresented material facts about the business, operations and management of Maximus; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

62.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**UNDISCLOSED ADVERSE FACTS**

63.     The market for Maximus common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Maximus common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired

Maximus common stock relying upon the integrity of the market price of the Company's

common stock and market information relating to Maximus, and have been damaged thereby.

64.     During the Class Period, Defendants materially misled the investing public,

thereby inflating the price of Maximus common stock, by publicly issuing false and/or

misleading statements and/or omitting to disclose material facts necessary to make Defendants'

statements, as set forth herein, not false and/or misleading.   These statements and omissions

were materially false and/or misleading in that they failed to disclose material adverse

information and/or misrepresented the truth about Maximus' business, operations, and prospects

as alleged herein.

65.     At all relevant times, the material misrepresentations and omissions

particularized in this Complaint directly or proximately caused or were a substantial

contributing cause of the damages sustained by Plaintiff and other members of the Class.  As

described herein, during the Class Period, Defendants made or caused to be made a series of

materially false and/or misleading statements about Maximus' financial well-being and

prospects.  These material misstatements and/or omissions had the cause and effect of creating

in the market an unrealistically positive assessment of the Company and its financial well-being

and prospects, thus causing the Company's common stock to be overvalued and artificially

inflated at all relevant times.  Defendants' materially false and/or misleading statements during

the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's

common stock at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

66.     During the Class Period, as detailed herein, Defendants made false and

misleading statements and engaged in a scheme to deceive the market and a course of conduct

that artificially inflated the prices of Maximus common stock, and operated as a fraud or deceit

on Class Period purchasers of Maximus common stock by misrepresenting the value and prospects for the Company's business, growth prospects, and accounting compliance.  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of Maximus common stock fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of Maximus common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## ADDITIONAL SCIENTER ALLEGATIONS

67.     During the Class Period, as alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

68.     The Individual Defendants permitted Maximus to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's stock.

69.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Maximus, their control over, receipt, and/or modification of Maximus' allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Maximus, participated in the fraudulent scheme alleged herein.

70.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Maximus common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme deceived the investing public regarding Maximus' business, operations, and management and the intrinsic value of Maximus common stock and caused Plaintiff and members of the Class to purchase Maximus common stock at artificially inflated prices.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

71.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Maximus who knew that the statement was false when made.

## PRESUMPTION OF RELIANCE

72.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's stock traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)     Plaintiff and other members of the Class purchased Maximus common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

73.     At all relevant times, the markets for Maximus common stock were efficient for the following reasons, among others:

(a)     as a regulated issuer, Maximus filed periodic public reports with the SEC;

(b)     Maximus regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)     Maximus was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)     Maximus common stock is actively traded in an efficient market, namely the NYSE, under the ticker symbol "MMS."

74.     As a result of the foregoing, the market for Maximus common stock promptly digested current information regarding Maximus from all publicly available sources and reflected such information in Maximus' stock price.  Under these circumstances, all purchasers of Maximus common stock during the Class Period suffered similar injury through their purchase of Maximus' common stock at artificially inflated prices and the presumption of reliance applies.

75.     Further, to the extent that the Exchange Act Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## COUNT  I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

76.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

77.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

78.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Maximus common stock during the Class Period.

79.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Maximus common stock.  Plaintiff and the Class would not have purchased Maximus common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

80.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Maximus common stock during the Class Period.

## COUNT  II

### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

81.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

82.     The Individual Defendants acted as controlling persons of Maximus within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about Maximus, the Individual Defendants had the power and ability to control the actions of Maximus and its employees.  By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding rescission or a rescissory measure of damages; and

E.      Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  August 4, 2017            Respectfully submitted,

*/s/ Susan R. Podolsky*
Susan R. Podolsky
Virginia Bar No. 27891
**LAW OFFICES OF**
**SUSAN R. PODOLSKY**
1800 Diagonal Road, Suite 600
Alexandria, Virginia 22314
Telephone: (571) 366-1702
Facsimile: (703) 647-6009
spodolsky@podolskylaw.com

Christopher J. Keller (*pro hac vice* forthcoming)
Eric J. Belfi (*pro hac vice* forthcoming)
Francis P. McConville (*pro hac vice* forthcoming)
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile:  (212) 818-0477
ckeller@labaton.com
ebelfi@labaton.com
fmcconville@labaton.com

*Counsel for Plaintiff Steamfitters Local 449*
*Pension Plan*