**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| IN RE MAXIMUS, INC. SECURITIES LITIGATION | Case No. 1:17-cv-00884-AJT-IDD<br><br>CLASS ACTION<br><br>**CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

A. Defendants Made False Statements About the Company's Performance Under the HAAS Contract ..... 5

B. As the Falsity of Defendants' Statements Came Out, the Company's Share Price Declined, Harming the Class ..... 8

II. JURISDICTION AND VENUE ..... 9

III. PARTIES ..... 10

A. Lead Plaintiff ..... 10

B. Defendants ..... 11

C. Relevant Non-Parties ..... 12

IV. SUBSTANTIVE ALLEGATIONS ..... 14

A. Background ..... 14

1. Overview of Maximus's Business ..... 14

2. Atos Had Numerous Problems with Its Contract with the DWP Before Maximus's HAAS Contract ..... 16

B. The HAAS Contract: from October 29, 2014 to the Transition of Services from Atos to Maximus on March 1, 2015 ..... 17

1. DWP Awarded Maximus the HAAS Contract ..... 17

2. Maximus Fully Understood Atos's Problems with Its DWP Contract Because Maximus, Atos, and the DWP Worked Closely Together During the November 1, 2014--February 28, 2015 Transition ..... 20

C. Throughout the Class Period, Defendants Assured Investors of Maximus's Successful Performance and Profitability of the HAAS Contract and Failed to Disclose Maximus's Problems in Meeting Key Performance Targets ..... 23

1. February 5, 2015 – Earnings Announcement ..... 23

2. May 7, 2015 – Earnings Announcement ..... 24

3. May 8, 2015 – Maximus Filed a Form 10-Q Containing False and Misleading Risk Warnings and Actionable Omissions ........................... 25

4. August 6, 2015 – Maximus Partially Disclosed Problems with the Contract Affecting Profitability but Falsely Reassured Investors ........... 26

(a) Maximus's First Partial Corrective Disclosure ........................... 26

(b) Maximus's False and Misleading Reassurances .......................... 27

(c) Market Reactions to the Disclosures, Misstatements and Omissions ........................................................................ 28

(d) The Market Continued to React to Maximus's First Partial Corrective Disclosure ..................................................... 29

5. August 7, 2015 – Maximus Filed Another Form 10-Q Containing False and Misleading Risk Warnings and Actionable Omissions ........... 29

(a) August 7, 2015 – Maximus's False and Misleading Statements ........................................................................ 29

(b) Market Reactions to the Disclosures, Misstatements and Omissions ........................................................................ 29

6. November 12, 2015 – Maximus Partially Disclosed the Negative Financial Impact of the Contract, But Falsely Reassured Investors ........ 30

(a) Maximus's Second Partial Corrective Disclosure ....................... 30

(b) Maximus's False and Misleading Reassurances .......................... 32

(c) Market Reactions to the Disclosures, Misstatements and Omissions ........................................................................ 33

7. January 8, 2016 – The U.K. National Audit Office Released Its Audit Report Adding Details to the Above Disclosures .......................... 34

8. February 4, 2016 – The Truth Was Fully Revealed ................................ 34

D. The HAAS Contract: Maximus Begins Performance on the Contract ................ 38

1. Maximus's Performance, Revenues, and Profits from the HAAS Contract Were Tied Primarily to Volume and Quality Targets ............... 38

(a) Incentives and Penalties Under the Contract Were Assessed Monthly ........................................................... 39

(b) Maximus's Volume Target Was Substantially Larger Than the Annual Number of Assessments Conducted by Atos ............ 39

(c) Maximus's Quality Target Under the Contract ............ 39

2. Maximus's Ability to Meet Its Assessments Volume Targets Depended on Its Ability to Meet Internal Targets for Recruiting, Retention and Training, and Productivity ............ 40

(a) To Meet Its Volume Assessments Target, Maximus Needed to Recruit Enough HCPs ............ 41

(i) First, Maximus Needed to Transfer Sufficient Atos Personnel to Maximus ............ 41

(ii) Second, After the Transfer, Maximus Had to Recruit and Train 1,000 New HCPs ............ 41

E. Multiple CWs, the Government Audit Report, Defendants' Admissions, and Other Sources Show That Defendants Misrepresented the Progress and Profitability of the HAAS Contract ............ 42

1. Maximus Did Not Come Close to Meeting Its Internal Recruiting Targets ............ 43

(a) Not Enough Atos HCPs Transferred Over to Maximus ............ 43

(b) Maximus Failed to Recruit Enough New HCPs and Repeatedly Missed Its Recruitment Targets ............ 44

(i) Per the Government Audit Report, Maximus Knew in April 2015 That Recruitment of HCPs Was "High Risk" and It Would Not Be Able to Achieve Its Recruitment Targets ............ 45

(ii) Internal Maximus Documents Confirm the Government Audit Report ............ 46

[1] Per Internal Risk Registers, Maximus Identified "Recruitment Capacity and Candidate Availability" as a High Risk by April 28, 2015 ............ 46

(iii) Maximus Was Not Meeting Its Recruitment Targets In the Spring of 2015 as It Took Over the HAAS Contract ............ 49

[1] Weekly Resource Report Shows that Maximus Was Missing Internal Recruiting Targets.......... 49

[2] Recruitment Workstream Report Confirms that Initial Recruiting Results Were Below Targets.......... 50

(iv) Maximus Continued to Miss Its Increased Recruitment Targets in the Summer of 2015.......... 52

[1] Weekly Resource Report.......... 52

[2] Recruiting Workstream Report: Maximus Raised Its Recruiting Target to 211 in July 2015.......... 53

[3] Recruiting Workstream Report: Increased Monthly Recruiting Target of 211 Was a "Significant Challenge" in August 2015.......... 54

[4] CW1: Maximus Never Came Close to the 211 Recruiting Target.......... 55

(v) CWs 2-4 Confirmed That Maximus Missed Its Recruiting Goals Throughout the Class Period.......... 56

[1] CW2.......... 56

[2] CW3.......... 57

[3] CW4.......... 57

(c) Defendant Caswell Discussed Maximus's Recruiting and Other Contract Performance Problems on a Teleconference Soon After the Contract Start in March 2015.......... 57

(d) Defendants' Later Admissions Confirmed that Maximus Was Still Missing Its Monthly Recruiting Targets in the Fall of 2015, Contrary to Their Statements at the Time.......... 59

2. Maximus Suffered From an Extremely High Attrition Rate Starting in March of 2015 and Could Not Successfully Train Enough HCPs to Meet Its Assessment Targets.......... 59

(a) Per CWs and Internal Maximus Documents, in the First Few Months of the Contract, Maximus's Training Passage Rate Was, at Best, Only 44% Rather than 95% .......... 59

(i) CW1: Training Passage Rate Was Only 44% After Maximus Took Over the Contract .......... 60

(ii) CW2 Corroborated the 44% Training Passage Rate .......... 61

(iii) The Government Audit Report Confirmed the CWs' Statements Regarding Maximus's Low Training Passage Rate and Revealed That Its *Target* Passage Rate Was 95% .......... 61

(iv) Internal Documents Further Corroborate the Low Training Passage Rate .......... 62

[1] The Weekly Resource Report Shows a Similar Passage Rate in the First Months of the Contract .......... 62

[2] The Risk Register Shows that "Higher Attrition Rate and Absence Rate" Was a Known, Substantial Risk No Later than April 2015 .......... 64

(b) Maximus's Training Passage Rate Was So Low Due to Widely-Known and Widespread Recruitment and Training Problems .......... 65

(i) CW1 Statements Revealed Severe Recruitment and Training Problems .......... 65

(ii) CW2's Statements Confirmed that Defendants Knew of Severe Recruitment and Training Problems that Contradicted Their Positive Public Statements .......... 67

(c) Internal Documents Confirm the CWs' Statements Regarding Maximus's Training and Attrition Problems .......... 68

(i) Per the Risk Register, "Training Capacity for New HCP Recruits" Was a Substantial Risk Known in April 2015 .......... 68

(ii) Per the Training Workstream Report, Training "Remain[ed] the Critical Challenge and Risk" in August 2015 .......... 69

(d) Maximus's Statements at the End of the Class Period Confirmed the Severity of Its Attrition and Training Problems .......... 70

3. Maximus Also Failed to Achieve Its Productivity Targets .......... 71

(a) Maximus Was Underperforming Its Target of 6 Daily Assessments Per HCP .......... 71

(i) Maximus's Internal Target Was 6 Daily Assessments Per HCP .......... 71

(ii) Multiple CWs Revealed That This Target Was Unreasonable and Was Not Being Achieved .......... 72

[1] CW1 .......... 72

[2] CW2 .......... 72

[3] CW4 .......... 73

[4] Wolfe Confirmed the CWs' Statements at the February 3, 2016 Hearing .......... 74

(iii) Based on Caswell's VideoLink Teleconference and Risk Register, Defendants Knew that HCP Productivity Was a High Risk No Later than May 2015 .......... 75

[1] Caswell's VideoLink Teleconference .......... 75

[2] Risk Register: Substantial Productivity Risk Identified No Later than May 2015 .......... 75

(b) New HCPs Were Not Fully Productive Until 6-8 Months After Completing Training and Experienced HCPs Were Mentoring, Rather than Performing Assessments .......... 76

(i) Defendants Admitted This Information in the November 12, 2015 Partial Disclosure .......... 76

(ii) The Risk Register Confirms that Maximus Knew That Lack of Sufficient Training Resources Affected Productivity No Later than April 2015 .......... 77

4. Maximus Was Failing to Meet Its "Number One" Target of Assessments Volume .......... 78

(a) The Government Audit Report and Other Parliament Documents Revealed That Maximus Was Not "On Track" to Achieve Its First-Year 1 Million Target ....... 78

(i) The Government Audit Report's Findings ....... 79

(ii) Maximus's Monthly Assessments Volumes Compared to Its Targets Only Grew Worse as the First Contract Year Went On ....... 81

(iii) Government Audit Report Revealed That the DWP Twice Reduced Maximus's First-Year Assessments Target ....... 84

(b) CWs and Internal Documents Confirmed that Defendants Knew Maximus Was Missing Assessment Volume Targets Early On ....... 85

(i) CW2: Caswell's VideoLink Teleconference ....... 85

(ii) Maximus Documents Show It Knew of High Risks Jeopardizing Ability to Meet Volume Target No Later than April ....... 85

(iii) CW1 Confirmed Maximus's Inability to Meet Volume Targets During the Class Period ....... 86

5. Defendants Admitted They "Always Knew" that the HAAS Contract Was "Risky" and Would Take 12-18 Months to "Turn Around" ....... 86

6. Maximus Also Failed to Achieve Its Quality Targets ....... 87

(a) Per the Government Audit Report, Maximus's Quality Failure Rate Was Twice as Bad as Its 5% Contract Target ....... 87

(b) Maximus Documents Confirm That Defendants Knew of Substantial Quality Problems No Later Than April 2015 ....... 89

(i) The Risk Register: That "Quality Score" Was "Reduced" Was Known Internally in April 2015 ....... 90

(ii) August 2015 Quality Workstream Report: "Quality Outcomes Are a Major Concern" ....... 91

(iii) CW2: Caswell Discussed Quality Problems in His VideoLink Teleconference ....... 92

F. Post-Class Period Revelations ........ 92

1. Later Reports by Parliament Committee Further Criticized Maximus's Performance Under the HAAS Contract........ 92

2. After the Class Period, the DWP Once Again Reduced Maximus's Annual Assessment Volume Target, Confirming that Maximus Could Not Achieve the Initial Targets in the Contract ........ 94

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD, AND ANALYST AND MARKET REACTIONS THERETO ........ 97

A. February 5, 2015 – Earnings Announcement ........ 97

1. Misstatement and Omission No. 1 – Caswell's February 5, 2015 False and Misleading Statement Regarding the Transition ........ 97

2. Market Reactions to the Misstatement and Omission........ 99

B. May 7, 2015 – Earnings Announcement........ 99

1. May 7, 2015 Misstatements and Omissions by Montoni........ 99

(a) Misstatement and Omission No. 2: Montoni's May 7, 2015 Statement Regarding the Transfer of Atos HCPs ........ 100

(b) Misstatement and Omission No. 3: Montoni's May 7, 2015 Statement Regarding Recruitment Targets ........ 101

(c) Misstatement and Omission No. 4: Montoni's May 7, 2015 Statement Regarding Assessment Volumes........ 101

2. Market Reactions to the Misstatements and Omissions ........ 102

C. May 8, 2015 – Form 10-Q ........ 103

1. Misstatement and Omission No. 5: May 8, 2015 Risk Factors Regarding Recruitment and Retention of New HCPs, and Other Contractual Assumptions ........ 104

2. Misstatement and Omission No. 6: May 8, 2015 Item 303 Omission ........ 106

(a) Maximus Did Not Satisfy Its Duty to Disclose Under Item 303........ 106

D. August 6, 2015 – Earnings Announcement ........ 108

1. Partial Corrective Disclosure ........ 108

2. Market Reactions to the Partial Corrective Disclosure ........ 111

3. Misstatement and Omission No. 7: Nadeau's August 6, 2015 False and Misleading Reassurance ........ 111

4. Misstatement and Omission No. 8: Montoni's August 6, 2015 False and Misleading Reassurance Regarding Size of Shortfall ........ 114

5. Market Reactions to Defendants' False and Misleading Reassurances ........ 115

E. August 7, 2015 – Form 10-Q ........ 116

1. Misstatement and Omission No. 9: August 7, 2015 Risk Factors Regarding Recruitment and Retention of New HCPs, and Other Contractual Assumptions ........ 117

2. Misstatement and Omission No. 10: August 7, 2015 Item 303 Omission ........ 119

(a) Maximus Did Not Satisfy Its Duty to Disclose Under Item 303 ........ 119

F. November 12, 2015 – Earnings Announcement ........ 121

1. Second Partial Corrective Disclosure ........ 121

2. Market Reactions to the Partial Corrective Disclosure ........ 124

3. Misstatement and Omission No. 11: Caswell's November 12, 2015 False and Misleading Reassurance Regarding Recruiting Rates ........ 125

4. Market Reactions to Defendants' False and Misleading Reassurances ........ 128

VI. ADDITIONAL SCIENTER ALLEGATIONS ........ 129

A. Montoni, Nadeau, and Caswell Knew About Maximus's Underperformance on the HAAS Contract, and the True Reasons Therefor ........ 130

1. Caswell Closely Followed the HAAS Contract, Spent "A Lot of Time On" It, and Was Designated to Focus on It ........ 130

(a) Caswell Knew, or Was Severely Reckless in Not Knowing, That an Insufficient Number of HCPs Transferred From Atos .......... 131

(b) Caswell Knew, or Was Severely Reckless in Not Knowing, That Maximus Was Recruiting an Inadequate Number of HCPs .......... 132

(c) Caswell Knew, or Was Severely Reckless in Not Knowing, That Maximus Was Training an Inadequate Number of HCPs .......... 133

(d) Caswell Knew, or Was Severely Reckless in Not Knowing, That Maximus's HCP Productivity Was Inadequate .......... 134

(e) Caswell Knew, or Was Severely Reckless in Not Knowing, That Maximus Was Not "On Track" to Meet Its First-Year Assessments Target .......... 134

(f) Caswell Knew, or Was Severely Reckless in Not Knowing, That Maximus's Assessment Quality Was Inadequate .......... 135

2. Montoni Closely Followed the HAAS Contract and Knew, or Was Severely Reckless in Not Knowing, About Maximus's Problems with the Contract .......... 136

(a) Montoni Knew, or Was Severely Reckless in Not Knowing, That an Insufficient Number of HCPs Transferred From Atos .......... 137

(b) Montoni Knew, or Was Severely Reckless in Not Knowing, That Maximus Was Recruiting an Inadequate Number of HCPs .......... 138

(c) Montoni Knew, or Was Severely Reckless in Not Knowing, That Maximus Was Training an Inadequate Number of HCPs .......... 139

(d) Montoni Knew, or Was Severely Reckless in Not Knowing, That Maximus's HCP Productivity Was Inadequate .......... 140

(e) Montoni Knew, or Was Severely Reckless in Not Knowing, That Maximus Was Not "On Track" to Meet Its First-Year Assessments Target .......... 141

(f) Montoni Knew, or Was Severely Reckless in Not Knowing, That Maximus's Assessment Quality Was Inadequate .......... 142

(g) Montoni's False SOX Certifications Further Support His Scienter .......... 143

3. Nadeau Likewise Made His Statements With Scienter .......... 143

(a) Nadeau Closely Followed the HAAS Contract and Knew, or Was Severely Reckless in Not Knowing, About Maximus's Problems with the Contract .......... 143

(b) Nadeau's False SOX Certifications Further Support His Scienter .......... 145

B. The Company Had Scienter for Defendants' Misstatements and Omissions Regarding the HAAS Contract .......... 146

1. The Individual Defendants' Knowledge of Maximus's Underperformance on the HAAS Contract, and the True Reasons Therefor, Are Imputed to the Company .......... 146

2. Wolfe's Knowledge of Maximus's Underperformance on the HAAS Contract, and the True Reasons Therefor, Are Imputed to the Company .......... 146

(a) Wolfe Knew Maximus Could Not Achieve Its Volume and Quality Targets Under the HAAS Contract, Including Its Recruiting, Training/Attrition, and Productivity Targets .......... 146

(b) Wolfe's Scienter Is Imputable to the Company .......... 147

C. Core Operations Allegations: The HAAS Contract Was a Critical Endeavor for Maximus and Was Followed Closely by the Individual Defendants .......... 147

VII. LOSS CAUSATION .......... 149

VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE .......... 153

IX. NO SAFE HARBOR .......... 155

A. Defendants' False and Misleading Statements and Omissions Were Not Forward-Looking .......... 155

B. The False and Misleading Statements Were Not Properly Identified as "Forward-Looking" ........ 156

C. Any Forward Looking Statements Were Not Accompanied by Meaningful Cautionary Language ........ 156

D. Defendants Knew That Any Forward-Looking Statements Were False or Misleading When Made ........ 157

X. CLASS ACTION ALLEGATIONS ........ 158

COUNT I For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants ........ 160

COUNT II For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants ........ 162

PRAYER FOR RELIEF ........ 164

JURY DEMAND ........ 165

Lead Plaintiff Amalgamated Bank, as Trustee for the LongView Collective Investment Funds ("Amalgamated Bank" or "Lead Plaintiff"), individually and on behalf of all others similarly situated, alleges the following against Defendants Maximus, Inc. ("Maximus" or the "Company") and Richard Montoni, Richard Nadeau, and Bruce Caswell (collectively, the "Individual Defendants," described more fully below) (together with Maximus, the "Defendants"), based on personal knowledge as to Lead Plaintiff and its own acts, and upon information and belief as to all other matters.

Lead Plaintiff's information and belief as to allegations concerning matters other than itself and its own acts is based upon, among other things, a review and analysis of (i) press releases, news articles, transcripts, and other public statements issued by or concerning Maximus and the Individual Defendants; (ii) research reports issued by financial analysts concerning Maximus's business; (iii) reports filed publicly by Maximus with the Securities and Exchange Commission (the "SEC"); (iv) an investigation conducted by and through Lead Plaintiff's attorneys, which included interviews of numerous former employees of Maximus on a confidential basis and review of internal Maximus documents; (v) news articles, media reports, and other publications concerning Maximus and the government business services industry and markets; and (vi) other publicly available information and data concerning Maximus, its securities, and the markets therefor. Lead Plaintiff believes that substantial evidentiary support exists for the allegations herein and will continue to be revealed after Lead Plaintiff has a reasonable opportunity for discovery.

## I. INTRODUCTION

1. Lead Plaintiff brings this federal securities class action on behalf of itself and all persons or entities who purchased or otherwise acquired Maximus common stock between February 5, 2015 and February 3, 2016, inclusive (the "Class Period"), and were damaged

thereby. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Individual Defendant; (iii) any person who was an officer or director of Maximus during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Maximus's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person. Lead Plaintiff seeks remedies under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a et seq. (the "Exchange Act"), specifically, Section 10(b), 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, and Section 20(a), 15 U.S.C. § 78t(a).

2. Defendant Maximus contracts with government agencies in the United States, Australia, Canada, Saudi Arabia, and the United Kingdom ("U.K.") to operate certain health and human services programs. It is headquartered in Reston, Virginia and the Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "MMS".

3. On October 29, 2014, the U.K. Department for Work and Pensions ("DWP") awarded Maximus a major, three-year contract to carry out health assessments, called the Health Assessment Advisory Service ("HAAS"), related to DWP determinations as to whether applicants were entitled to health and disability benefits, (the "Contract" or the "HAAS Contract"). In a health assessment, a healthcare professional ("HCP") evaluates an individual's physical and mental needs and capabilities against defined criteria by reviewing relevant evidence and often conducting a face-to-face assessment. Such face-to-face assessments—*i.e.* in-person evaluations—are more time-consuming and difficult to do than "paper" assessments,

which are conducted based solely on documentary evidence. Maximus had extensive prior experience in providing similar health assessment services under numerous other contracts,[1] including in the U.K., *e.g.*, under another contract for the DWP awarded in July 2014.

4. Maximus took over responsibility for the services under the Contract on March 1, 2015, from Atos Healthcare, Inc. ("Atos"), which had been working for the DWP under a similar contract.

5. As analysts recognized, the HAAS Contract was one of Maximus's largest contracts, and also represented a crucial step in Maximus's business strategy of expanding its presence in the important U.K. market. Accordingly, as the Individual Defendants themselves acknowledged, they closely monitored its progress from the start.

6. Specifically, under the HAAS Contract, Maximus would be paid approximately **£595 million** (approximately **US $919 million**) and potentially as much as **£650 million** (approximately **US $1 billion**) over three years.[2] On October 30, 2014, Maximus told investors that it would record $140 – $165 million in revenues from the Contract in fiscal 2015 (ending September 30, 2015) and that it would be profitable in fiscal 2015.

7. However, the exact amount of Maximus's revenues from the Contract primarily depended on how close Maximus would get to its targets of 1 million assessments in the first year, and 1.2 million assessments in each subsequent year, as well as whether it met certain quality targets. If Maximus underperformed, it would earn less; if it exceeded its targets, it would earn more. Indeed, as Defendants repeatedly told investors, **assessments volume** was

[1] For instance, in its fiscal 2014 Form 10-K (filed on November 17, 2014), Maximus stated that it was the "largest provider of government-sponsored health benefit appeals and assessments in the U.S."

[2] The statements made by Defendants that are ***bolded and italicized*** are the statements alleged to be false and misleading. All other emphasis is in **bold**.

the "**number one driver**" of its revenues and profits from the Contract, with quality being another important but secondary performance metric. Moreover, per the Contract, at least 70% of the 1 million assessments had to be conducted face-to-face while paper assessments represented the remaining 30% of Maximus's total target. Importantly, if Maximus did not meet its targets for **face-to-face** assessments, it would not earn its incentive fee under the Contract even if it met its targets for paper assessments. Thus, meeting its face-to-face assessment targets was crucial to Maximus's bottom line on the Contract.

8. In order to meet its first-year 1 million assessments target, Maximus needed to achieve its internal performance targets in **three underlying** "**main areas**," as Defendants repeatedly told investors: **(1) recruitment, (2) training and (3) productivity**. Specifically, Maximus set internal targets to (i) transfer almost all of the HCPs previously employed by Atos to Maximus; (ii) recruit an additional 1,000 new HCPs; (iii) successfully train these new HCPs with an attrition rate of only 5% (*i.e.* a 95% training passage rate); and (iv) obtain a high productivity level from the HCPs so they would each average six assessments per day.

9. Additionally, to achieve its projected revenues from the contract, Maximus also needed to perform well on its second main driver of profits under the Contract -- meeting the DWP's quality standards for assessments, notably that no more than 5% of audited assessment reports would fail DWP's standards.

10. In the first year of the Contract, however, Maximus failed in every category. Hundreds of Atos HCPs did not transfer to Maximus; recruitment levels were as much as **50%** below targets; the attrition rate was initially as high as **56%**-- **11 times** its target of 5% (and, according to the Company's spokesperson, was **70%** when Maximus started the Contract**--14 times** its target); and productivity was closer to four assessments per day rather than to six.

11. Although Maximus's performance in some of these areas improved over the course of the first contract year, they remained grossly deficient, and resulted in Maximus missing its original 1 million assessment target for year-one by **more than 200,000**. Indeed, as a report by the U.K. government later revealed, Maximus was missing its monthly assessment targets starting in the first few months of the Contract, including missing its April 2015 target for the crucial face-to-face assessments by over 5,500. According to this report, Maximus "identified that **volume targets were not being met** as fewer staff than expected completed training requirements" by no later than "**late spring 2015**." Maximus's performance was so bad that the DWP put Maximus on "a performance improvement plan just weeks later in **early July 2015**"—only four months into the Contract. Further, given Maximus's problems in meeting its quantity of assessments and related Contract targets, the DWP twice reduced its 1 million assessments requirement for the first year—first to 980,000 in July 2015, and then to 911,000 in September 2015.

12. Moreover, as the same report showed, the quality of Maximus's assessment reports was far worse than DWP's target and Atos's prior performance. Specifically, 9-10% of Maximus's reports did not meet DWP's quality standards, which was **double** its 5% maximum target and **more than double** Atos's 4% rate in 2014.

### A. Defendants Made False Statements About the Company's Performance Under the HAAS Contract

13. On February 5, 2015, at the end of the transition period between Atos and Maximus, President Caswell stated with respect to the transition that "we feel very much that ***it's going as expected***." This statement was false and misleading because the transition was **not** going as Maximus expected in February 2015 given that Maximus had not successfully achieved its "biggest" "key" goal of the transition, and a primary driver to achieve successful

performance of the Contract: the transfer of a sufficient number of HCPs from Atos, as was later revealed.

14. Despite its multiple failures to reach contract targets, on May 7, 2015, during the Company's Second Quarter Earnings Call, CEO Montoni falsely represented to investors that:

(1) "***Nearly all of the employees transferred over from their previous provider [Atos]***";

(2) "***early indications are that we are meeting our recruitment targets for healthcare professionals***"; and

(3) "***we are also on track to meet our requirements for assessment volumes***."

Each of these statements was false and misleading, as shown by Maximus internal documents, the statements of five Maximus confidential witnesses ("CWs"), the findings of the U.K. government report and other public government documents, and later admissions by Maximus officers, including Defendants.

15. On May 8, 2015, Maximus filed its Second Quarter 2015 Form 10-Q ("2Q 2015 Form 10-Q"), which stated in relevant part: "***<u>If</u> we fail to accurately estimate the factors upon which we base our contract pricing, we <u>may</u> generate less profit than expected or incur losses on those contracts***;" and "***We <u>may</u> be unable to attract and retain sufficient qualified personnel to sustain our business.***" But these purported risk warnings were false, because the risks that Maximus said "***may***" occur had already occurred. (Maximus repeated these same false statements in its Third Quarter 2015 Form 10-Q.)[3]

16. In its 2Q 2015 Form 10-Q, Maximus also violated its duties under Item 303(a)(3) of Regulation S-K, 17 C.F.R. §229.303, by failing to disclose the following known trends,

[3] These Risk Factors were initially made in Maximus's fiscal 2014 Form 10-K, filed on November 17, 2014, but were incorporated by reference and reiterated in its 2Q 2015 Form 10-Q and its Third Quarter 2015, filed on August 7, 2015.

events or uncertainties that Defendants knew were having, and were reasonably likely to have, a material impact on the Company's continuing operations: (i) diminishing monthly assessments that it conducted from March 2015 to April 2015, particularly its failure to meet the DWP contractual target for the monthly face-to-face assessment in April 2015 (*see* Section IV.E.4, *infra*); and (ii) that Maximus was falling substantially short of the HAAS Contract's performance targets for recruitment, training, productivity, and assessment quality described in Sections IV.E.1.-3. & IV.E.6., *infra*.

17. On Maximus's August 6, 2015 Third Quarter Earnings Call, CFO Nadeau falsely stated that "***the [HAAS] project is still expected to be profitable for*** . . . ***[fiscal year] '15***," which was scheduled to end on September 30, 2015 – *i.e.*, in less than two months (when the Company had missed its face-to-face assessment targets for each of the last four months). On the same call, Montoni also said "***we're a bit behind where we wanted to be***" when the Company was missing its recruitment, training, productivity and quality targets by approximately 30% to 50%, and, as a result was behind its total assessment volume targets by over 7,400 assessments, at that point. Such statements were false and misleading because they lacked a reasonable basis and omitted these facts, which would conflict with what a reasonable investor would understand from the statements themselves.

18. Maximus again violated Item 303 in its Third Quarter 2015 Form 10-Q filed on August 7, 2015. At that time the known trend, event or uncertainty of diminishing monthly assessments was getting even worse: the Company was falling behind its contractual targets by over 7,400 assessments, and its pace was slowing such that it would be behind an additional **28,000** by the end of the month. Likewise, Maximus failed to disclose the known trends, events or uncertainties that it was falling far short of the HAAS Contract's performance targets for

recruitment, training, productivity, and assessment quality, as described in Sections IV.E.1.-3. & IV.E.6, *infra*.

19. Finally, on November 12, 2015, President Caswell was asked to explain the factors that were causing the drag in recruiting. He responded: "[W]e feel like we've made very good progress in recruiting and ***we are now reaching a level of recruiting that, from a rate perspective, is an appropriate level***." This was false. At that time, Maximus was trying to recruit 211 new HCPs per month but could not hire more than 100 candidates, as Defendants later admitted. Thus, in November 2015, Maximus was not recruiting at an "appropriate level" given that it was actually recruiting **fewer than half** of its targeted HCPs per month.

### B. As the Falsity of Defendants' Statements Came Out, the Company's Share Price Declined, Harming the Class

20. As a result of Defendants' misrepresentations and omissions, Maximus's stock traded at artificially inflated prices during the Class Period, reaching a high of $70 per share in intraday trading on August 5, 2015, the day before Maximus made its first partial corrective disclosure.

21. The inflation caused by the fraud came out of the Company's stock price through two partial corrective disclosures before a final one on February 4, 2016. First, on August 6, 2015 Maximus announced its results for the third quarter of 2015, including, "some start-up challenges" with the HAAS Contract. Maximus' stock price declined by $9.57 per share over two trading sessions, or 13.8%, with heavy trading.

22. Before the market opened on November 12, 2015, Maximus released disappointing results for the fourth quarter and fiscal year of 2015, including news that the HAAS Contract delivered an operating loss of $4 million for the year, and disclosed that the

recruitment, training, and productivity problems with the Contract were continuing. On this news, Maximus' stock price declined $15.03 per share that day, or **21.9%,** with heavy trading.

23. Finally on February 4, 2016, Maximus issued a press release announcing its earnings for the first quarter of fiscal 2016, again missing analysts' expectations and confirming its continuing inability to meet HAAS Contract assessment targets. In particular, the Company reported that the operating margin for its Health Services Segment (which included the HAAS Contract) fell to 9.2% for the first quarter of fiscal 2016, from 15.5% over the same quarter the prior year. The reduced earnings were based, in large part, on weak performance of the HAAS Contract, which "tempered operating margin."

24. On this news, shares of Maximus common stock dropped $5.53 per share over two trading sessions, or 10.5%, wiping out approximately $356 million in market capitalization.

25. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Lead Plaintiff and other Class members have suffered significant damages.

## II. JURISDICTION AND VENUE

26. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5.

27. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

28. Venue is proper in this district pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) as the Company is headquartered within this district, Defendants conduct business in this district, a significant portion of Defendants' actions, and the subsequent damages, took place within this district.

29. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Lead Plaintiff

30. On June 28, 2016, this Court appointed Amalgamated Bank, as Trustee for the LongView Collective Investment Funds, to serve as the Lead Plaintiff in this action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA") (ECF No. 40).

31. Amalgamated Bank is a New York State chartered, FDIC insured, commercial bank that was established in 1923 by the Amalgamated Clothing Workers of America and remains the largest majority union-owned bank in the United States. Amalgamated founded the LongView Funds in 1992, and through its Trust Committee, serves as trustee to the LongView Funds. Collectively, the LongView funds manage about $8.6 billion in assets for institutional investors, primarily employee benefit funds. Amalgamated Bank uses its investments via these funds to encourage corporate boards to pursue sound governance policies, hold portfolio companies to high standards of social and environmental practices, and enhance shareholder value.

32. As set forth in its PSLRA certification previously filed with the Court (ECF No. 12-1), which is incorporated by reference herein, Amalgamated Bank, as trustee, purchased Maximus common stock for the benefit of two LongView funds (LongView Midcap 400 Index Fund and LongView Quantitative Midcap Fund) during the Class Period and was damaged as the result of Defendants' wrongdoing as alleged in this complaint.

**B. Defendants**

33. Defendant Maximus is a public company that focuses on administering government-sponsored benefit programs, such as the Affordable Care Act, Medicare, Medicaid, as well as welfare-to-work and child support programs. Its primary customer base includes federal, provincial, state, county, and municipal governments. Maximus is incorporated in Virginia and maintains its principal executive offices in Reston, Virginia.

34. Defendant Richard "Rich" Montoni ("Montoni") was the Company's Chief Executive Officer ("CEO") throughout the Class Period. Montoni certified the Company's periodic financial reports filed with the SEC and communicated with investors, participating in the Company's periodic conference calls.

35. Defendant Richard "Rick" Nadeau ("Nadeau") was the Company's Chief Financial Officer ("CFO") throughout the Class Period. Nadeau certified the Company's periodic financial reports filed with the SEC and communicated with investors, participating in the Company's periodic conference calls.

36. Defendant Bruce Caswell ("Caswell") was the Company's President throughout the Class Period. Caswell communicated with investors, participating in the Company's periodic conference calls. He also traveled to the U.K. during the Class Period on multiple occasions to monitor the Company's work on the HAAS Contract.

37. Defendants Montoni, Nadeau, and Caswell are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the ultimate power and authority to control the contents of Maximus's statements, including whether and how to communicate them, in reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the

Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

### C. Relevant Non-Parties

38. The allegations made herein are based, in part, upon information and belief and are supported by the first-hand knowledge of five confidential witnesses ("CWs") who have direct, first-hand knowledge about the facts attributed to them as alleged herein, as follows.

39. CW1 was employed by Maximus in CHDA's Clinical Training department from June 2015 until after the end of the Class Period. CW1 was responsible for managing a variety of clinical learning and development programs for Maximus's CHDA—i.e. training of newly recruited HCPs to enable them to conduct the assessments under the HAAS Contract. CW1 had multiple supervisors during his/her tenure at the Company, including Dr. Paul Williams, who was then the Chief Medical Officer and reported directly to Wolfe.

40. CW2 was employed with Maximus U.K. as a Learning and Disability Training Manager for CHDA from March 2015 until after the end of the Class Period. CW2 had previously worked for Atos as a U.K. Medical Training and Development Manager from July 2010 until February 2015. CW2 had seven different managers during his/her tenure at Maximus, including Djamel Mahdjoub, Director of Learning and Development in CHDA's training department.

41. CW3 was employed with CHDA from June 2015 until after the end of the Class Period as a Human Resources Rewards (Benefits) Analyst. CW3 worked on the compensation packages for the HCPs that Maximus was hiring to perform disability assessments for the contract, and had access to Maximus's internal HR reporting systems which tracked the number of employees hired each month, the monthly attrition rates, and the benefits paid to the employees. In addition, CW3 wrote monthly attrition and on-boarding reports for Maximus executives.

42. CW4 was employed by Maximus at CHDA from the outset of the HAAS Contract until after the end of the Class Period, and had previously worked for Atos since 2009. Starting in early 2012, CW4 worked as an Atos Service Delivery Lead, managing 5-8 Atos health and disability assessment centers under the previous contract with the DWP. CW4 was later hired by Maximus during the HAAS Contract transition phase in November 2014 as a Service Delivery Lead, managing 5-8 Maximus CHDA assessment centers in Southwest England. In addition to managing these centers and being responsible for their operation and performance, CW4 was also responsible for meeting targets and key performance indicators. S/he reported to Lucy Bowering, a Service Delivery Manager, who in turn reported to a Regional Director. CW4 remained in that position until after the end of the Class Period.

43. CW5 was employed by Maximus U.K. as a Clinical Recruiter from October 2015 until after the end of the Class Period, responsible for recruiting HCPs and nonclinical professionals for CHDA.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background

#### 1. Overview of Maximus's Business

44. Maximus operates through three business segments: U.S. Federal Services, Health Services, and Human Services. The Health Services segment provides a range of business services, for state, provincial, and national government programs. These services include performance of the HAAS Contract in the U.K. Typically, this Health Services segment is the Company's largest, responsible for over half of Maximus's total revenue (*e.g.*, 56% in fiscal year 2017, 54% in fiscal year 2016, and 53% in fiscal year 2015).

45. Maximus was founded in 1975. Originally providing management and consultancy services to federal, state, and local governments in the United States, Maximus quickly expanded into administering governmental programs and went public in 1997. At the time, Maximus operated predominantly in the U.S. with over 90% of revenues earned domestically.

46. Montoni took over as CEO in 2006. During his tenure as CEO, Maximus faced numerous problems with government contracts in the U.S. For example, in 2007, Maximus agreed to pay the federal government $30.5 million for engaging in a Medicaid fraud scheme.

47. Maximus began to focus on expanding its business internationally in or about 2008 by conducting mergers and acquisitions of smaller foreign companies to acquire footholds abroad. For example, in that year, "the company acquired Westcountry Training and Consultancy Service (WTCS), a privately-owned employment and training company in the UK in order to establish a presence in the UK market and to expand the company's workforce services business."

48. In an interview published on December 7, 2012, Montoni discussed this strategy as follows:

> M&A can provide us with an opportunity to move into a new geography where we don't have a presence. For instance, we often times will acquire a small company to gain a foothold in a particular area. Once we have established ourselves, we then look for opportunities to propose work to the government in a very sizable fashion. We did this in Canada, Australia and in the U.K. We have looked to use M&A to establish that geographic foothold and in helping with knowing their culture, their government, and having an established reputation. Acquiring an existing company in a country is one of the ways we do that.[4]

49. To that end, on July 1, 2013, Maximus announced its acquisition of U.K.-based Health Management Ltd. ("HML"). HML was an independent provider of occupational health care services in the U.K., and was already providing health assessment services for both U.K. public and private sector clients. In a press release announcing the acquisition that day, the Company stated: "The acquisition establishes a foothold for MAXIMUS Health Services in the UK and expands the Company's independent medical review business. . . ."

50. Indeed, on July 25, 2014, Maximus announced that it was awarded a £132,900,000 contract (for a period of a little over 5 years) with the DWP to operate the new Health and Work Service ("HWS") program through its HML subsidiary. Under that program, Maximus would provide medical assessments, similar to the health assessments conducted under the HAAS Contract, and return-to-work plans for employees who have been absent from work for four consecutive weeks due to illness. As a result of this acquisition of HML, and particularly this HWS contract, Maximus gained extensive experience in providing health assessment services in the U.K., including specifically for the DWP.

[4] http://blog.executivebiz.com/2012/12/executive-spotlight-richard-montoni-maximus-ceo-on-international-expansion-and-drivers-of-growth/

51. In announcing this U.K. government contract, Montoni confirmed Maximus's business strategy to expand into the U.K. market: "The Health and Work Service program is a natural opportunity to demonstrate Health Management's expertise as the UK's largest occupational health care provider and **an important step in our long-term goal of expanding in this important market**."

### 2. Atos Had Numerous Problems with Its Contract with the DWP Before Maximus's HAAS Contract

52. The U.K. government provides a range of social welfare benefits for people who are currently out of work due to a long-term health condition, or who are unable to work as a result of a disability or health condition. One such entitlement is the Employment and Support Allowance ("ESA") for those unable to work for health or disability reasons. The DWP is the government agency that has responsibility for making decisions for awarding these benefits, and uses health and disability assessments to inform those decisions. The U.K. government's policy is that the best way to assess eligibility is through independent health assessments, and the DWP has contracted out most assessments to third-party providers. Generally, the assessments distinguish people who could not work due to health-related problems from people who were fit for work. The results from each assessment are then used by the DWP to determine the level of support (if any) for different benefits.

53. In 2008, DWP awarded a contract to Atos to conduct work capability assessments of people who were applying for the ESA. However, as time went on, DWP and Atos faced increasing public anger over the program. For example, assessments were reportedly criticized by members of Parliament, including as finding people to be fit for work (hence, ineligible for public support) too often.[5]

[5] https://www.theguardian.com/society/2014/feb/17/atos-fit-for-work-tests-contract

54. Another problem was Atos's mounting backlog of assessments, which totaled approximately 724,000 by early 2014. On March 27, 2014, *The Guardian* reported that rather than complete the contract with DWP through August 2015, Atos would forego £500 million in revenue and pay a substantial penalty to DWP to exit the contract early.

55. A 7-week procurement or bidding process ensued to find a replacement for Atos. DWP set a non-negotiable number of assessments to be performed on the contract at **1 million** for the first contract year, though multiple bidders raised concerns with DWP about that number. One experienced bidder withdrew from the process because it knew that it could not meet the required number of assessments. Ultimately, only two companies – including Maximus – placed bids. None of this information was publicly known until January 8, 2016, shortly before the end of the Class Period, when the U.K. government's National Audit Office ("NAO") released a public audit report, titled "Contracted-out Health and Disability Assessments" (the "Government Audit Report"), containing the above information and criticizing Maximus's performance under the HAAS Contract, as detailed further below.[6]

### B. The HAAS Contract: from October 29, 2014 to the Transition of Services from Atos to Maximus on March 1, 2015

#### 1. DWP Awarded Maximus the HAAS Contract

56. On October 29, 2014, the DWP awarded Maximus the HAAS Contract to carry out health and disability benefits over a period of three years, starting on March 1, 2015. On October 30, 2014, before markets opened, Maximus announced the news that it had secured the HAAS Contract.

[6] Sir Robert Devereux, Permanent Secretary of the DWP, later publicly testified to Parliament's Public Accounts Committee on February 3, 2016 that he "ended up with two bidders above the line to choose from" – Maximus and one other.

57. As part of its negotiations with the DWP, Atos agreed to continue conducting the assessments until March 1, 2015 on which date Maximus would take over the assessment services.

58. Maximus decided to operate the HAAS Contract under a different brand name, the Centre for Health and Disability Assessments ("CHDA"), due to the reputational damage Atos suffered as a result of its contract with DWP. In an interview with *The Guardian*, Maximus's Leslie Wolfe – identified as "programme director of the company's fitness assessment programme," and who would later run the CHDA during the Class Period as General Manager of Maximus UK and is currently a member of Maximus's Executive Committee – explained that Maximus wanted "a more 'neutral name'" given the "headlines criticising Atos's performance [which] make the company nervous about the potential for brand damage to Maximus."[7]

59. Under the HAAS Contract, Maximus would be paid approximately £595 million (**US $919 million**) and possibly as much as £650 million (**US $1 billion**) over three years, although the exact amount depended on how close Maximus would get to the contractual targets of 1 million assessments in the first Contract year (March 1, 2015--February 28, 2016) and then 1.2 million assessments in subsequent years. If the Company underperformed, it would earn less and accrue "service credit" penalties; if it exceeded its target, it would earn more.

60. On October 30, 2014, the Company further announced that this Contract would be profitable in fiscal 2015, unlike many of Maximus's other new contracts that typically experienced losses during the initial ramp-up phase, according to Defendants: "The Company expects this [HAAS] contract to contribute revenue of approximately **$140 million to $165**

[7] https://www.theguardian.com/society/2015/jan/18/after-hated-atos-quits-will-maximus-make-work-assessments-less-arduous

**million** during its seven months of operations in fiscal year 2015. The [HAAS] contract is expected to be **accretive in fiscal 2015**."

61. The HAAS Contract was **one of Maximus's largest contracts** ever as a percentage of its revenue, according to analysts. For example, a December 3, 2015 analyst report from Avondale Partners stated: "The Health Assessment Advisory Services contract will likely be MAXIMUS's **largest** as a percentage of revenue in 2016 (roughly 9-10%)." Compared to its revenues over the three years for which the Contract would last, the expected value of the HAAS Contract ($919 million) would represent over 13.2% of all revenue. As to its first seven months of operating the HAAS Contract (fiscal 2015), Maximus expected to receive approximately $140-165 million in revenue from it, with an operating (profit) margin of 10-15%. This represented approximately 7% to 8.6% of Maximus's expected revenue for its fiscal year, notwithstanding the fact that the Contract would be contributing revenue for only seven months of that fiscal year. Further, the Company's expected profit from the Contract would be responsible for even more in the next two years. Compared to the Company's actual revenues from international business, the HAAS Contract would represent approximately 25.9% to 30.6% of its international revenue in 2015.

62. Moreover, given its size, the HAAS Contract represented a key step in Maximus's expansion strategy into the lucrative U.K. market. As Montoni had stated in announcing Maximus's prior HWS contract with the DWP, Maximus had a "long-term goal of expanding in this important [U.K.] market."

63. As *The Guardian* reported, the second reason this contract was so important to Maximus (in addition to the high revenues) was that "**it's a gateway for a large American company to expand into Europe**. The company has a global staff of 14,000, with 10,000 in the

US." It quoted Wolfe as explaining that Maximus wanted to specifically increase its U.K. presence: "'We have a presence in US, Canada, Saudi, **but we didn't have a UK presence**.'"

### 2. Maximus Fully Understood Atos's Problems with Its DWP Contract Because Maximus, Atos, and the DWP Worked Closely Together During the November 1, 2014--February 28, 2015 Transition

64. The events during the transition period between Atos to Maximus from November 1, 2014 to February 28, 2015 were largely undisclosed at the time. Later, the January 8, 2016 Government Audit Report revealed that Maximus worked closely with Atos and the DWP to facilitate the transition: "After signing the ESA contract, CHDA developed detailed transition plans. In November 2014, all three parties signed a legal agreement to work together. Success factors included tripartite governance arrangements, shared goals and reporting arrangements across specific work streams with clear deadlines."

65. In particular, before it took over the contract on March 1, 2015, Maximus performed extensive due diligence regarding its anticipated performance on the contract, including receiving all necessary information from the DWP and Atos relevant to its recruitment, training, and productivity assumptions. For instance, in executing the HAAS Contract, Maximus acknowledged that it received all "information and documents that [Maximus] consider[ed] necessary or relevant for the performance of its obligations," and "made its own enquiries to satisfy itself as to the accuracy and adequacy of the Due Diligence information."

66. Under Schedule 2.1 of the Contract, Maximus was required to provide DWP with a "recruitment timetable, assumptions, risks and risk management strategy for recruitment" within 10 working days after the Contract was signed, and was further obligated to "ensure that sufficient numbers of suitably qualified HCPs are in place to deliver the Services" for the entirety of the contract.

67. Per the Contract, Maximus was also required to maintain detailed records of its recruitment, training, and assessment quality metrics and other assumptions underlying its successful performance of the Contract. For example, it agreed to "**develop and maintain databases that collect and report information in relation to recruitment, training, monitoring, audit and approval and revocation of approval**," and provide this information to DWP upon request. Maximus was further required to "produce a single report covering all aspects of quality, including performance and complaints, on **a monthly basis**," as well as to "retain a comprehensive portfolio of information and evidence for each HCP and auditor."

68. Schedule 6.1 further required Maximus to have a Resource Plan covering the period from one month before the start of the contract through the end, in which Maximus would ensure it "identifies appropriate numbers and categories of HCPs necessary to carry out the agreed target number of assessments and such resources otherwise needed to provide the Services (including the recruitment and training of individuals)." This Plan was to be updated monthly and delivered to the DWP. In fact, during the Class Period, Maximus did so on a **weekly** basis and also communicated its progress to the DWP through a "Weekly Resource Report," as detailed by CWs below.

69. Thus, throughout the Class Period, Maximus maintained detailed reports about its recruitment, training and attrition performance (or lack thereof) on at least a monthly basis.

70. Schedule 7.1 provided for a "Stability award fee" of £1,250,000 to be paid in month 4 of the Contract (June 2015) if Maximus met certain metrics compared to Atos. For example, Maximus had to complete more average daily assessments than Atos did in its last two months, meet all quality service levels, and achieve "a gross attrition rate of Healthcare Professional FTEs [full-time equivalents] transferred at the Operational Service

Commencement Date of no more than 80% of the average gross attrition rate in the two months immediately prior." Thus, Maximus would have to have known both Atos's "average daily Completed Assessments" (and, necessarily, Atos's daily productivity rate), as well as Atos's attrition rate, as of the start of its performance of the Contract. Thus, Maximus would have known that its performance on these factors during the Class Period was below Atos's, undermining any basis to believe its own assessment results would be any better, much less reach the **1 million assessment** level required by the HAAS Contract.

71. Schedule 7.1 sets out how Maximus would receive any profit on the contract. Defendants described it as a "cost-plus" contract (*e.g.* described by Montoni in a November 13, 2014 earnings call), meaning Maximus would be reimbursed for expenses (up to a predetermined ceiling) and receive profit in the form of an "Award Fee" for having exceeded the agreed number of assessments, as set out in this part of the Contract. Paragraph 6.2 stated that the actual number of completed assessments would be evaluated each month by Maximus and reported to DWP. Paragraphs 6.3.1 and 6.13 provided that these metrics would be broken down between monthly paper-based and face-to-face requirements. Paragraph 6.5 explained that **paper-based award fees would be forfeited if the face-to-face volume targets for the month were not met**.

72. Schedule 17 set out further provisions Atos and Maximus had to follow as part of the transition. Section 6.3 provided:

> The Parties shall negotiate in good faith to agree a list of Transferring Employees **within two (2) weeks of the date of execution of this Agreement** (and in any event no later than 28 days prior to the Retender Cutover Date) which shall be based on the Preliminary Prescribed Particulars previously provided to the REPLACEMENT CONTRACTOR [Maximus].

Accordingly, by November 13, 2014 at the latest, Maximus would have known how many "Transferring Employees" Atos would be providing, including HCPs.

73. Schedule J to Schedule 17 listed "Key Transition Staff" that included Wolfe. These "Key Transition Staff" members, including Wolfe, thus would have known about any shortfalls in HCPs carrying over from Atos by November 13, 2014.

### C. Throughout the Class Period, Defendants Assured Investors of Maximus's Successful Performance and Profitability of the HAAS Contract and Failed to Disclose Maximus's Problems in Meeting Key Performance Targets

74. During the Class Period, Defendants made the following false and misleading statements and omissions about Maximus's problems performing the HAAS Contract. As a result, the market did not learn the full truth regarding Maximus's inability to meets its first-year requirements under the HAAS Contract, and thus earn the expected revenue and profit from the Contract, until February 4, 2016.

#### 1. February 5, 2015 – Earnings Announcement

75. On February 5, 2015, Maximus announced its first quarter 2015 financial results. During the Company's related earnings call, Defendant Caswell responded to a question concerning Maximus' preparations for the HAAS Contract, by stating "***we feel very much that it's going as expected***."

76. Caswell's statement was false and misleading because the transition was **not** going as Maximus expected in February 2015 given that Maximus had not successfully achieved a key goal of the transition and a primary driver of its successful performance of the Contract— the transfer of a sufficient number of HCPs from Atos. Per the Government Audit Report, Maximus concluded a secret negotiation with the DWP in July 2015 to reduce its annual assessment target volumes by 20,000 on the sole basis that "**fewer staff transferred from the previous provider [Atos] than the contractual assumption agreed by the Department and**

**CHDA**." Per the Contract, Maximus knew of this shortfall by November 13, 2014. Further, Maximus had to officially report that shortfall to the DWP in its first monthly "Resource Plan" by February 1, 2015, just days before this misstatement. ¶68.

**2. May 7, 2015 – Earnings Announcement**

77. On May 7, 2015, prior to the trading session, Maximus announced its financial results for the second quarter of 2015, the first quarter that included the HAAS Contract operations. In a conference call with analysts later the same day, Montoni discussed Contract operations as "progressing well" in ways that "allow[] us to meet our assessment volume requirements and lower the backlog so people can be assessed in a timely manner," stating in particular as follows:

> ***Nearly all of the employees transferred over from their previous provider*** and ***early indications are that we are meeting our recruitment targets for healthcare professionals.*** This is key in helping us bring about positive change and, although it is early days, ***we are also on track to meet our requirements for assessment volumes***.[8]

78. However, as discussed below, the first statement was false and misleading because at this time the Company knew "nearly all" of the Atos employees had **not** transferred over, as it was negotiating with the DWP to decrease its annual assessment target on the ground that not enough Atos employees transferred over. *See* Section IV.E.1.(a), *infra*.

79. Further, the second statement was false and misleading because Maximus was **not** "meeting [HCP] recruitment targets." For instance, Maximus had internally recorded as a high risk, on April 28, 2015, that "[r]ecruitment results may be below requirements and impact . . . assessment volumes." *See* Section IV.E.1.(b), *infra*.

---

[8] A presentation accompanying Montoni's statements on the same day contained substantially similar statements, which were false and misleading for the same reasons detailed herein.

80. Finally, Maximus was also **not** "on track" to meet its assessment volume targets given it had failed to achieve its face-to-face assessment volume target in April and was missing its key underlying targets for **recruitment, training, and productivity** from the start of the Contract in March 2015. *See* Sections IV.E.1.-3., *infra*.

81. Over the course of the day, Maximus's stock increased 4%, from a May 6, 2015 closing price of $62.00 per share to a May 7, 2015 closing price of $65.55 per share.

82. Stock analysts also were buoyed by Montoni's statements regarding the HAAS Contract. For example, a May 7, 2015 analyst report by Avondale Partners maintained its "Outperform" rating and raised its price target from $71 to $74 per share, noting that "[i]n Q3 the company expects an increase in revenue and profit as the HAAS Contract will be providing a full quarter of contribution." The report also discounted a $0.10 earnings per share "FY [fiscal year] '15 drag" from two other start-up contracts because they "will be offset by a positive $0.18 [earnings per share] contribution from HAAS." (Emphasis in original.)

### 3. May 8, 2015 – Maximus Filed a Form 10-Q Containing False and Misleading Risk Warnings and Actionable Omissions

83. On May 8, 2015, Maximus filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2015, the second quarter of its fiscal year. The filing generically warned investors, as it had even before the HAAS Contract was signed: "***If* we fail to accurately estimate the factors upon which we base our contract pricing, we *may* generate less profit than expected or incur losses on those contracts**" and "***We may be unable to attract and retain sufficient qualified personnel to sustain our business.***" Maximus, however, failed to inform investors that the Company had **already** failed to achieve its recruitment, training, productivity, assessment

volume, and quality targets for the HAAS Contract, and **already** failed to attract and retain sufficient HCPs to meet the Contract's required first-year assessments.

84. Moreover, the filing failed to advise investors of known trends, events or uncertainties regarding its slipping performance on monthly assessments, as well as falling short of targets for recruitment, training, productivity, and assessment quality by 30-50%. Maximus had a duty to disclose this information pursuant to Item 303. *See* Section V.C.2.(a), *infra*.

85. Montoni and Nadeau acknowledged the accuracy of the filing by certifying that they have reviewed the report and confirmed its accuracy pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") and by personally signing it.[9]

#### 4. August 6, 2015 – Maximus Partially Disclosed Problems with the Contract Affecting Profitability but Falsely Reassured Investors

##### (a) Maximus's First Partial Corrective Disclosure

86. On August 6, 2015, prior to the trading session, Maximus issued a press release to announce its financial results for its third fiscal quarter of 2015 (ending June 30, 2015). The release announced that its Health Services Segment had a lower than expected operating (profit) margin of 13.7% (compared to 14.2% for the same quarter in 2015). The HAAS Contract was a primary contributor to this segment.

87. During the Company's related earnings call later the same day, Defendants explicitly connected its disappointing profitability with underperformance on the HAAS Contract. Further, Nadeau partially disclosed that the Company was experiencing "start-up challenges" with the HAAS Contract, including specifically problems with "recruiting and

[9] For example, Montoni's and Nadeau's SOX certifications stated: "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." The SOX certifications accompanying the Company's other SEC filings during the Class Period contained substantially similar language.

retaining" HCPs, that caused "**volume and, to a lesser extent, quality variances from our plan**." He made clear that "**[t]his means lower revenue and profit contributions from the contract at this time**."

88. On this news, Maximus's share price declined approximately 6.4%, to close the day at $64.78 per share.

**(b) Maximus's False and Misleading Reassurances**

89. However, Defendants minimized the problems and falsely reassured investors that the HAAS Contract would be profitable within two months.

90. Specifically, Nadeau stated that "[m]any things are going well with the contract and we remain confident that we can bring about positive change to the program over time," insisting that "***the [HAAS] project is still expected to be profitable for** . . . **[fiscal year] '15***," which would end on September 30, 2015 – *i.e.*, in less than two months. This statement was false and misleading because Maximus was falling significantly short of its key recruitment, training, productivity, assessment volume, and quality targets at the time this statement was made, as discussed below. Thus, the HAAS Contract was not on a path to being profitable within two months' time, when the fiscal year would end. Nadeau's statement, therefore, lacked a reasonable basis when made and omitted these material facts regarding the full extent of Maximus's failure to meet its key HAAS Contract targets—facts which would conflict with what a reasonable investor would understand from the statement itself. Indeed, ultimately, Maximus lost $4 million on the Contract in fiscal year 2015.

91. During the question and answer portion of the conference call, an analyst asked some follow-up questions about Maximus's underperformance on the Contract. In response, Montoni falsely minimized Maximus's problems: "[O]ur plan was that this would stabilize in [fiscal 2016] and that's still our plan. ***So, we're <u>a bit behind</u> where we wanted to be*** but we

have actions in place such that we think we can stay on course and get this stabilized in [fiscal 2016]." To the contrary, Maximus was much more than "***a bit***" behind. At this time, it was falling far short, by 30-50%, of its recruitment, training, productivity, and quality targets, and had also failed to meet virtually all of its assessment targets for the last five months, and was falling further behind on its annual assessment requirement each month. Montoni's statement thus lacked a reasonable basis when made and omitted these material facts regarding the full extent of Maximus's failure to meet its key HAAS Contract targets—facts which would conflict with what a reasonable investor would understand from the statement itself.

#### (c) Market Reactions to the Disclosures, Misstatements and Omissions

92. Analysts reacted negatively to the partial disclosures revealing that Maximus was underperforming on the HAAS Contract, but were reassured by Defendants' statements. For example, on August 6, 2015, Wells Fargo published a report noting that "MMS [was] having some difficulty hiring and retaining healthcare professionals, which has resulted in quality variances and therefore lower incentive fees." It highlighted the negative news that Maximus "missed" its expected gross profit margin as being specifically "due to challenges ramping the new health assessment contract in the United Kingdom." However, the analyst also reacted positively to Defendants' false and misleading reassurances that the contract would generate the promised revenues and profits in FY 2015. The report maintained his "Outperform" rating and specifically echoed Nadeau's reassurance by reiterating that "**management still expects the project to be profitable for both FY2015** and FY2016."

#### (d) The Market Continued to React to Maximus's First Partial Corrective Disclosure

93. On the following day, August 7, 2015, Jefferies lowered its price target for Maximus on this news. Maximus common stock declined by an additional 7.9% to close at $59.65 per share on August 7, 2015.

### 5. August 7, 2015 – Maximus Filed Another Form 10-Q Containing False and Misleading Risk Warnings and Actionable Omissions

#### (a) August 7, 2015 – Maximus's False and Misleading Statements

94. On August 7, 2015, Maximus filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarterly period ended June 30, 2015, the third quarter of its fiscal year. Montoni and Nadeau acknowledged the accuracy of the filing by certifying that they have reviewed the report and confirmed its accuracy pursuant to SOX and by personally signing it. The filing contained the same generic risk warnings described above. It thus again failed to inform investors that the Company had **already** failed to attain its recruitment, training, productivity, assessment volume, and quality targets for the HAAS Contract, and **already** failed to attract and retain sufficient HCPs to satisfy the contract.

95. Moreover, the filing failed to advise investors of known trends, events or uncertainties regarding its slipping performance on monthly assessments, as well as falling short of targets for recruitment, training, productivity, and assessment quality by 30-50%. Maximus had a duty to disclose this information pursuant to Item 303. *See* Section V.E.2.(a), *infra*.

#### (b) Market Reactions to the Disclosures, Misstatements and Omissions

96. A later analyst report, issued by Jefferies on September 30, 2015, confirmed that "the biggest factor driving the sell-off post 2Q results was the slower ramp of the UK disability

assessment contract." However, the analyst reiterated its "Buy" rating after Defendants' reassurances, stating: "This issue, slower than expected hiring of doctors/nurses to perform assessments (a pay point), seems solvable. A more aggressive recruiting plan is already in place."

### 6. November 12, 2015 – Maximus Partially Disclosed the Negative Financial Impact of the Contract, But Falsely Reassured Investors

#### (a) Maximus's Second Partial Corrective Disclosure

97. On November 12, 2015, Maximus issued a press release to announce its fourth quarter and full fiscal year 2015 financial results. It included disappointing operating income (profit) and margin for its Health Services Segment, which the Company attributed directly to the underperformance of the HAAS Contract: "Operating margins for the fourth quarter and full fiscal year 2015 were tempered by new programs in start-up, **most notably the U.K. Health Assessment Advisory Service contract, which is not performing to the Company's previous expectations**." In the same press release, the Company lowered its earnings per share guidance for the fiscal year 2016, and attributed the change exclusively to the HAAS Contract, stating: "**The lowered earnings outlook is attributable to a slower ramp and hence a reduced contribution from the U.K. Health Assessment Advisory Service contract.**"

98. During the Company's related earnings call later the same day, Nadeau reiterated that the reduced 2016 earnings guidance was "**a result of a single program, the U.K. Health Assessment Advisory Service** [HAAS]" contract, because "**the ramp-up to contract volume targets has been slower than originally planned**." He further disclosed that the HAAS Contract would not be profitable in FY 2015 as Defendants had previously assured, but instead would operate at a **loss of $4 million** while generating **significantly less revenue** than the Company initially told investors it would: "**$105 million**" instead of the original **"$140 million**

**to $165 million**" range. He added that "[r]evenue in the fourth quarter was lower than expected, **principally due to the UK Assessment contract**." Nadeau also disclosed that shortfalls in the Company's overall financial performance were directly attributable to its inability to maintain proper HCP "**staffing levels**" or achieve "**performance metrics, most notably volume targets**" as assumed and required by the HAAS Contract. He concluded: "**As a result, we are not earning the performance-based incentive fees.**"

99. A presentation accompanying these remarks further stated, in pertinent part: "**Progress remains short of initial targets & original projections for operating income.**"

100. Montoni elaborated on the extent and causes of Maximus's shortfalls. He admitted: "**[W]e are falling short of achieving the initial volume targets.**" He reiterated that the Company's "ability to hit the volume targets is tied directly to three areas: the number of healthcare professionals that we recruit, the number that complete training and graduate, and the productivity of these new recruits." Focusing on the third area, Montoni admitted for the first time that the Company's shortfalls were also being caused by problems with HCP productivity:

> The third area is productivity. Once new staff begin performing assessments, **there is a learning curve, and it may take between six and eight months for them to achieve full productivity levels**. In the meantime, we have efforts under way to increase productivity with our current workforce. . . . We expect that the increased recruiting efforts, supplemented by the enhanced training and optimization of our current workforce, will help us to increase our productivity, meet volume targets, and reduce wait times over the coming months.

101. Further, during the question and answer portion of the earnings call, Caswell related additional detail about the Company's underperformance on the HAAS Contract, by adding: "**The real issue that we've been facing is our ability to graduate those trainees that we bring into the system on a timely basis and ensure that we have a high level of graduation rate, and obviously a correspondingly low attrition**." He also echoed Montoni's revelation that it was taking Maximus "up to six to eight months" to bring HCPs up "to reach

full productivity after they graduate," adding "that's why we're seeing the lag in the uptake of production."

102. On this news, Maximus's share price declined approximately **21.9**%, to close the day at $53.61 per share.

### (b) Maximus's False and Misleading Reassurances

103. However, Defendants continued to minimize the problems and falsely reassure investors that Maximus had overcome these problems, and was now "***at the right rate for recruiting***" HCPs under the HAAS Contract.

104. Specifically, Caswell discussed the news of "lower than expected" revenue from the HAAS Contract but represented that Maximus had already "made very good progress." During the question and answer portion of the conference call, an analyst inquired about the HAAS Contract underperformance, asking defendants "if you could just talk about what factors are causing the drag in **recruiting**." Montoni invited Caswell to field this question due to Caswell spending "**a lot of time on**" the HAAS Contract and his "**great insight in terms of what's been done and what we will do to move this forward**." Caswell responded: "[W]e feel like we've made very good progress in recruiting and ***we are now reaching a level of recruiting that, from a rate perspective, is an appropriate level***."

105. Shortly thereafter, another analyst followed up by asking for details: "[H]ow many healthcare professionals do you have on that contract, the assessments contract, right now and what does the current workload require?" Caswell responded that he could not give "detailed metrics" due to "client confidentiality," but he reiterated that "***we feel that we are at the right rate for recruiting***."

106. However, Maximus was **not** at the right rate of recruiting by November 12, 2015. Maximus had internally identified the "appropriate" number of monthly recruits to be

**211 HCPs** per month, but Maximus never achieved this target in any month during the Class Period. As the Company later admitted on February 4, 2016, it was only able to recruit **approximately 100 HCPs** per month during the Fall of 2016. *See* Section IV.E.1.(b)(iv)-(v) & IV.E.1.(d), *infra*.

#### (c) Market Reactions to the Disclosures, Misstatements and Omissions

107. Analysts reacted negatively to the disclosures revealing the negative effect on profit, revenue, and guidance caused by the Company's underperformance on the HAAS Contract so far. However, they were also reassured by Defendants' false and misleading statements and omissions.

108. For example, on November 12, 2015, Jefferies published an analyst report titled "4 Key Insights from [F]3Q15: Buying Opportunity On the Sharp Sell-Off," which lowered its price target for Maximus to $65 from $75 per share, and noted that the "UK disability contract is taking longer to ramp **and is the driver behind today's pressure**" driving the share price down. The report noted that because "hiring and retaining doctors/nurses to perform the health & disability assessments ha[d] been challenging . . . the company is missing revenue milestones that fall straight to the bottom line." However, the analyst was also comforted by Defendants' reassurances, specifically echoing Caswell's misstatements regarding improved recruiting rates: "Management ha[d] been aware of this issue for several months and **corrective action plans are in place to accelerate hiring**. MMS tells us recruiting has shown a significant uptick in the last couple months and it **believes it will reach full run-rate earnings potential during FY16**." As a result, the report maintained its positive "Buy" rating and concluded that the outlook for the year was "intact."

### 7. January 8, 2016 – The U.K. National Audit Office Released Its Audit Report Adding Details to the Above Disclosures

109. On January 8, 2016, the NAO published its Government Audit Report detailing Maximus' performance under the HAAS Contract. The Government Audit Report contained information about Maximus's missed assessment targets in first six months – *i.e.*, through August of 2015 – as described in further detail below. *See* Section IV.E.4.(a), *infra*.

110. Among other details, the Government Audit Report concluded that Maximus still faced a backlog of at least 280,000 claims as of August 2015. It also found that the average claimant waited 23 weeks for an assessment instead of the target wait time of seven weeks. The report also revealed that one in 10 of Maximus' assessments were rejected on appeal—more than twice as bad as Atos.

111. Notably, the Government Audit Report also revealed that Maximus had to achieve **95%** success in training in order to meet its first-year assessment target, but was failing to do so by a wide margin as only "about **half**" of its new HCP recruits completed training.

112. Regarding Maximus's underperformance on multiple metrics for the HAAS Contract, the Government Audit Report concluded that, as of August 2015, the Company was "**not on track**" to complete its target assessment volumes for 2015. It also reported that Maximus's staffing, training, and quality shortfalls were interrelated:

> CHDA is **not on track** to complete the expected number of ESA assessments for 2015. **This is largely due to problems reaching the full staff complement**, particularly in London and the Home Counties. **It is facing significant challenges with staff failing to complete training requirements.** One possible consequence of capacity shortages is that assessment report **quality** is lower as staff may be less experienced.

### 8. February 4, 2016 – The Truth Was Fully Revealed

113. On February 4, 2016, prior to the trading sessions, Maximus issued a press release in which it announced its first quarter 2016 financial results. The Company reported

that its Health Services Segment operating margin fell from 15.5% in the corresponding quarter from the previous year to 9.2% for the quarter The Company attributed the poor results to the HAAS Contract, specifically describing the profit shortfall as being "due to programs in the start-up phase . . . including the Health Assessment Advisory Service." The press release further described the HAAS Contract as having "tempered operating margin in the quarter."

114. On the same day, Maximus held a conference call with analysts regarding the first quarter 2016 financial results. In his prepared remarks, Montoni discussed the HAAS Contract, disclosing that Maximus was "**still running below [its] volume targets**":

> During the quarter, we made steady operational progress on the [HAAS] contract. It is still too early to make any adjustments to our forecast since we expect that it will take some time for improving trends to materialize in the financial model.
>
> **At this time, we are still running below our volume targets** but making progress each month. We continue to expect to have our productivity at the appropriate levels by late summer.

115. Also on the conference call, Montoni addressed the Government Audit Report's negative findings about Maximus's performance on the HAAS Contract, which, he reiterated, only "echoed" Defendants' prior disclosures on the November 12, 2015 call:

> I first want to acknowledge a report issued last month from the U.K. National Audit Office as well as the Public Accounts Committee meeting yesterday that discussed this report.
>
> . . .
>
> **The NAO report echoed what we said in our November call as it relates to certain performance metrics, including volumes and quality.** Let me bring you up to speed on our progress since the NAO audit and our last quarter's call.

116. Montoni reminded investors that Maximus's "ability to hit the volume targets is tied directly to three areas – one, the number of healthcare professionals that we recruit; two, the number that complete training and graduate; and three, the productivity of these new recruits."

Montoni then made revelations about problems with each of these three areas before concluding: "while we've made meaningful progress on all fronts, **we still have a ways to go**" in successfully performing this contract, contrary to prior assurances.

117. Starting with recruitment, Montoni disclosed that "[d]uring the **autumn** timeframe, we were hiring **approximately 100 new healthcare professionals each month**." As noted above, this was less than half the monthly 211 HCP recruiting target at the time.

118. Turning to training, Montoni revealed that "our most recent monthly data shows that graduation rates are **north of 80%**," still falling significantly short of the 95% rate assumed in the HAAS Contract. During the question and answer portion of the conference call, an analyst asked Montoni for further detail regarding "the improvements that you have made" in performing the HAAS Contract. Montoni then directed the question to Caswell, on the grounds that he "has been spending an awful lot of time, as you might imagine, on this HAAS Contract." Caswell, in turn, disclosed that "**our graduation rate is now about 82% for staff through the first three months, whereas when we inherited the contract it was at about 30%**." These revelations further confirmed to the market that Maximus had not been meeting its training targets as it initially claimed.

119. Finally, on the subject of productivity, Montoni revealed that Maximus's HCPs were still not performing at the level the HAAS Contract required: "From a productivity perspective, it does take time for new health care professionals to be working at full capacity." In fact, "**the learning curve to full productivity can take between six and eight months**" **after** the point when an HCP "begin[s] performing assessments." Thus, Montoni confirmed that there would still be a significant lag time before many of Maximus's HCPs would be able to conduct assessments at the expected rate.

120. Montoni also touched on other information contained in the Government Audit Report, including Maximus's failure to meet quality standards required by the HAAS Contract, and the increasing costs per assessment DWP was experiencing under Maximus's stewardship of the contract as compared to Atos. After vaguely mentioning "measures that continue to strengthen the quality of our assessment reports," Montoni disclosed that "**we still have a ways to go**" in meeting the requirements of the HAAS Contract.

121. On this news, shares of Maximus common stock dropped $5.53 per share, or 10.5 percent, over the following two trading sessions to close at $46.92 per share on February 5, 2016. Starting on February 4, 2016, Maximus's stock fell $2.04 per share, or almost 3.9%, on unusually heavy trading to close at $50.41. The following day, Maximus common stock continued to decline and closed at $46.92 per share on February 5, 2016 – a decline of $3.49 per share, or approximately 6.9%.

122. Analysts also reacted negatively to these disclosures. For example, on this news, a February 4, 2016 analyst report from Maxim Group lowered its price target for Maximus from $80 to $71 per share, and reported that "more progress has to be done on HAAS to get to breakeven. While MMS made huge progress from November to January in volumes and graduation for training, the record volumes in January are still not enough to get the program profitable, in our view. Furthermore, it takes about 6 months to make a trainee productive and therefore we expect breakeven will likely be in 2H:F16 [the second half of fiscal year 2016]." The report stated "that investors are clearly not overly confident that management can achieve its full potential."

123. Similarly, a Jefferies analyst report the same date noted that the company was "not out of the woods" in terms of assessment volume.

124. Also on that day, Avondale Partners published a report titled "MMS: Change Order Impacts 1Q but Story Remains on Track." It stated, "On the first quarter call, management disclosed they had made steady improvements and that contract execution was moving in the right direction." The report further noted, "The company has focused on improving recruitment practices, training procedures, and overall productivity. Execution of the contract is moving in the right direction and management expects to have the contract fully ramped by summer of 2016." Thus, the report specifically acknowledges that that there was a disclosure on the February 4, 2016 earnings call that Maximus was not previously where it needed to be on HCP recruiting.

**D. The HAAS Contract: Maximus Begins Performance on the Contract**

**1. Maximus's Performance, Revenues, and Profits from the HAAS Contract Were Tied Primarily to Volume and Quality Targets**

125. As Defendants informed the public on a November 13, 2014 earnings call, shortly after the HAAS Contract award was announced, "performance under this program is tied to quality, timeliness, and the number of assessments completed." In particular, Defendants knew from the beginning that there were two "main drivers" of revenue for the HAAS Contract for Maximus, the primary one being assessment volumes, and the secondary being quality metrics.

126. CEO Montoni further explained on an August 6, 2015 earnings call: "there are performance-based incentives that will create performance billing points or revenue for us. And while there are many of them, it's a complex contract, as you would expect, **the number one driver is volume.** The number two driver is quality."

127. On the same call, Bruce Caswell reiterated that Montoni was "absolutely correct that the **two major drivers are the assessments completed and the quality of those**

**assessments**," clarifying that "timeliness [was] a very tertiary one." He stressed again that "**[v]olume's the number one thing**."

128. Similarly, on a November 12, 2015 earnings call, Montoni confirmed that the HAAS Contract "had significant performance incentives, **with the largest being tied to volumes**."

129. Accordingly, Defendants knew throughout the Class Period that to achieve their revenue guidance and profitability from the HAAS Contract in its first year, they had to deliver the 1 million assessments, as well as meet their quality metrics.

#### (a) Incentives and Penalties Under the Contract Were Assessed Monthly

130. In addition, Maximus would incur financial penalties called "service charges" under the HAAS Contract if it failed to meet certain performance requirements, including underperformance on meeting pre-arranged monthly targets on assessment volume and quality.

131. The incentives and penalties were assessed monthly. As Nadeau confirmed on February 4, 2016: "we actually get assessed any penalties or any awards or any incentives on a month-to-month basis. . . ."

#### (b) Maximus's Volume Target Was Substantially Larger Than the Annual Number of Assessments Conducted by Atos

132. As noted above, the initial targets that the DWP set for Maximus was 1 million assessments for the first year of the contract, and 1.2 million starting in the second year. This number was substantially greater than the volume Atos had achieved in the last year of its contract—820,000 assessments, as stated in the Government Audit Report.

#### (c) Maximus's Quality Target Under the Contract

133. With respect to the quality metric, according to the Government Audit Report, both Maximus and the DWP were required to audit the quality of Maximus's assessment

reports. Assessment reports could fail quality standards by being poorly written and presented, by containing apparent contradictions, or by containing conclusions unsupported by evidence, among other factors. A failed report would typically require DWP personnel to contact the HCP who conducted the assessment and resolve the shortcomings before reaching a decision. As a result, low quality assessment reports would cause delays in benefits decisions.

134. The HAAS Contract set Maximus's target quality rate at **5%**, meaning that Maximus would incur financial penalties if over 5% of its reports were found not to meet quality standards.

### 2. Maximus's Ability to Meet Its Assessments Volume Targets Depended on Its Ability to Meet Internal Targets for Recruiting, Retention and Training, and Productivity

135. Defendants knew from the time Maximus signed the HAAS Contract that three primary factors would determine Maximus's ability to meet its "number one" assessment volume targets. As Montoni explained on the August 6, 2015 earnings call:

> And when you look at volume, the volume is a function of, I think, three main areas. One is **recruiting** of healthcare professionals. The second point is the **retention** of those healthcare professionals. And the last one is the **productivity**.

136. Likewise, on the November 12, 2015 earnings call Montoni explained:

> Our **ability to hit the volume targets is tied directly to three areas**: the number of healthcare professionals that we **recruit**, the number that **complete training and graduate**, and the **productivity** of these new recruits. In order to get the program better aligned with our contractual targets, we need to have the right number of qualified healthcare professionals.

137. With respect to the second area, he elaborated that "[i]t's important to recognize that, once hired, candidates must then complete rigorous training, pass a series of competency tests, and graduate to become fully accredited." He went on: "The third area is productivity. Once new staff begin performing assessments, there is a learning curve, and it may take between six and eight months for them to achieve full productivity levels."

**(a) To Meet Its Volume Assessments Target, Maximus Needed to Recruit Enough HCPs**

**(i) First, Maximus Needed to Transfer Sufficient Atos Personnel to Maximus**

138. Defendants knew from the outset that one of the three primary drivers of successful performance on the HAAS Contract was recruitment, which consisted of transferring enough HCPs from Atos and then recruiting additional HCPs, to meet its first-year 1 million assessments target and related financial incentives. Indeed, Defendants repeatedly identified such transfer and recruiting efforts as likely the most important factor in achieving its performance targets and revenue guidance for the contract. For example, on the November 13, 2014 earnings call, Caswell stated that the "**key elements** of the ramp-up of the program" were as follows:

> **The biggest one is really the conversion of the existing staff over from Atos** as the incumbent provider as we ramp-up to the March launch. **Then the hiring of additional staff**, so that we can hit the peak requirement for healthcare professionals and related staff to meet the volume targets and objectives for the first year of the program.… The **key driver is really the staffing plan and the conversion** over from the prior contractor in terms of staff and facilities.

**(ii) Second, After the Transfer, Maximus Had to Recruit and Train 1,000 New HCPs**

139. Likewise, a January 18, 2015 article in *The Guardian* reported on the Contract based on an interview with Wolfe, stating that "[t]he key thing the company will do differently [from Atos] is increasing the number of staff, by roughly **an extra 1,000 people**, bringing the **total employed on the contract to around 1,500** to help clear the backlog of approximately 600,000 people waiting to be assessed and to allow them to treat claimants with greater sensitivity."

140. Further, in a February 24, 2015 *BBC* article titled "Work capability assessments: One million disability checks planned," Wolfe emphasized Maximus's need to recruit

"**hundreds**" of new HCPs as one of its "first priorities" to achieve the first-year 1 million assessments target, as follows:

> Part of what Atos didn't have was a [big] enough team to keep up with the wait times.
>
> **That's one of our first priorities**. We need to clear about one million [work capability assessment] claims this year.
>
> **We'll actually need hundreds of new healthcare professionals** across the UK in order to clear the backlog that's there, which is about 500,000-600,000 people, and also to keep up with the ongoing new volume of claims that customers are putting in.

141. At the February 3, 2016 Hearing, where Wolfe was questioned on Maximus's behalf, several committee members noted that Wolfe was "on the record saying that MAXIMUS needed to recruit 1,000 new healthcare professionals," adding that "[t]hat figure of 1,000 was widely reported at the time, including in the print media" and referencing the January 18, 2015 *Guardian* article described above. Wolfe initially responded that "what I said was that I needed to recruit hundreds [of HCPs] to reach the number" of annual assessments, but when pressed further, she confirmed that "[a]t the end of the day it would be **over 1,000, yes**."

### E. Multiple CWs, the Government Audit Report, Defendants' Admissions, and Other Sources Show That Defendants Misrepresented the Progress and Profitability of the HAAS Contract

142. As discussed above, Defendants understood that for Maximus to achieve "the number one" volume target, they needed to perform well on the three main underlying metrics of recruitment, retention and training, and productivity. But, as CWs, the Government Audit Report, Defendants' own later admissions and other sources reveal, Defendants were failing by wide margins on all three from the start of the Contract in March 2015 and thus knew that they could not achieve the performance targets, and thus, the promised revenue benefits from the Contract.

### 1. Maximus Did Not Come Close to Meeting Its Internal Recruiting Targets

#### (a) Not Enough Atos HCPs Transferred Over to Maximus

143. As noted above, Caswell specified the "key elements of the ramp up" for the HAAS Contract, and confirmed that the "[t]he **biggest one** is really the conversion of the **existing staff over from Atos** as the incumbent provider." ¶138. However, the Government Audit Report revealed that Maximus failed in this "key" respect.

144. First, it showed that **fewer** HCPs transferred from Atos to Maximus than Maximus expected. Second, it disclosed that the shortfall was significant enough that the DWP agreed to a **reduction** of the Contract's required assessmfent volumes for year one. Specifically, the Government Audit Report explained that the lack of sufficient HCPs transferring from Atos was the **sole grounds** on which DWP agreed to reduce Maximus's first-year assessment requirement **from 1 million to 980,000**:

> In July 2015, the Department and CHDA agreed [to] changes to the latest ESA contract. An 'allowable assumptions' clause allowed them to agree the accuracy of certain assumptions, but only once up to ten days after the start of the service. This reduced the number of assessments required in the first year from 1 million to 980,000 **as fewer staff transferred from the previous provider [Atos] than the contractual assumption** agreed by the [DWP] and CHDA.

145. Further, Note 1 to Figure 4 in the Government Audit Report confirmed that the reduction may even have begun a month earlier: "In **June** 2015, the Department and CHDA agreed to reduce the expected annual target volume from 1 million to 980,000 given **a lower number of healthcare professionals** transferred from the previous provider [Atos] than the contractual assumption agreed by the Department and CHDA."

146. As noted above, the HAAS Contract required Atos and Maximus to finalize "a list of Transferring Employees," including HCPs, by **November 13, 2014** at the latest. ¶72. It further required Maximus to produce a monthly "Resource Plan" to DWP starting February 1,

2015 "identif[ying] appropriate numbers and categories of HCPs necessary to carry out the agreed target number of assessments." ¶68. Thus, Maximus knew that it was not going to have sufficient transferring HCPs – by a significant enough margin to merit reduction in its first-year contractual assessment requirement – by November 13, 2014, and would have officially communicated this to DWP no later than February 1, 2015.

147. Accordingly, when Caswell later discussed Maximus' preparations for the HAAS Contract on February 5, 2015, and stated "we feel very much that ***it's going as expected***," his statement was knowingly misleading. It failed to disclose that the transition was **not** going as expected with regard to significant shortfalls in the **expected** number of Atos employees transferring over, which Caswell himself had labeled the "**biggest one**" of the "**key elements** of the ramp up."

148. Further, the Government Audit Report thus shows that Montoni's statement on May 7, 2015 that "***[n]early all of the employees transferred over from their previous provider [Atos]***" was false and misleading. The Company knew for months before then that "nearly all" of the Atos employees had **not** transferred over. In fact, at this time, it was already negotiating with the DWP to decrease its annual assessment target on the ground that not enough Atos employees transferred over: that negotiation was required to begin "no later than" March 13, 2015 under Schedule 7.1 of the HAAS Contract, and was not concluded until after this statement was made, in June or July of 2015.

### (b) Maximus Failed to Recruit Enough New HCPs and Repeatedly Missed Its Recruitment Targets

149. Contrary to Defendants' public statements during the Class Period, *e.g.*, CEO Montoni's May 7, 2015 statement that "***we are meeting our recruitment targets for healthcare***

***professionals***," Maximus struggled with recruiting of HCPs from the outset of the contract and was far below its monthly recruiting targets.

### (i) Per the Government Audit Report, Maximus Knew in April 2015 That Recruitment of HCPs Was "High Risk" and It Would Not Be Able to Achieve Its Recruitment Targets

150. Multiple CWs, internal Maximus documents, and the Government Audit Report demonstrate that Defendants knew as early as April 2015 that there was a "high risk" that it would not be able to meet its recruiting targets in the first year, and thus its annual 1 million assessments volume target. However, Defendants repeatedly failed to disclose this information and falsely assured investors the opposite—*e.g.*, that Maximus was "***meeting [its] recruitment targets for healthcare professionals***" and that it was "***from a rate perspective, [at] an appropriate level***" for recruiting of HCPs.

151. First, the Government Audit Report stated that in April 2015, the DWP discussed with Maximus and its other contract providers the need to increase substantially the total number of HCPs by November 2016 and that this would be "particularly challenging given market pressures," – *i.e.* the extremely low number of available, qualified HCPs at the time. According to the Government Audit Report, Maximus acknowledged to the DWP at that time that "they identified healthcare professional capacity as **high risk**," as follows:

> In **April 2015**, the Department estimated providers [of assessments under its various programs, including Maximus,] would need to increase the number of healthcare professionals by **84%** from 2,200 in May 2015 to 4,050 in November 2016 based on its current plans. This will be **particularly challenging given market pressures**. In the Department's analysis of the wider healthcare professional market, **only 3%** of 3,970 vacancies are advertised for more than 30 days, suggesting there are relatively few long-term vacancies. Along with the Department, **all providers told us they identified healthcare professional capacity as high risk.**

Defendants thus knew, but failed to disclose, that as of April 2015, they had determined that recruiting the needed number of HCPs was "high risk," which was inconsistent with Defendants' positive statements about recruiting, *e.g.*, that "we are meeting our recruitment targets for healthcare professionals" and Maximus's performance on the contract, *e.g.*, that it was "on track to meet our requirements for assessment volumes," at the time.

#### (ii) Internal Maximus Documents Confirm the Government Audit Report

152. Multiple CWs and internal Maximus documents corroborate the Government Audit Report's statements on this point.

##### [1] Per Internal Risk Registers, Maximus Identified "Recruitment Capacity and Candidate Availability" as a High Risk by April 28, 2015

153. One type of internal Maximus document uncovered during Lead Plaintiff's investigation was an Excel spreadsheet titled the "Risk Register." One of the CWs stated that s/he had access to this document from the start of his/her employment at Maximus.[10] This CW explained that the Risk Register identified and tracked various risk issues facing CHDA's performance on the HAAS Contract.

154. According to this CW, the Risk Register was compiled and maintained by CHDA's Project Management Office ("PMO"), which would send these Risk Registers to this CW and other Maximus employees who were expected to update them in their relevant areas. Multiple Risk Registers from July 2015 reveal that the first risk identified in these documents, which listed 18 different risks, was titled "Recruitment Capacity and Candidate Availability." This risk included the following "Risk Description:" "**We will not be able to source and process sufficient recruits of appropriate quality to meet the demand profile**. Impact:

[10] Lead Plaintiff can identify this CW through an *in camera* submission to the Court, if necessary.

Recruitment results may be below requirements and **impact on assessment volumes**." The Risk Register stated that the "Risk Raised Date" for this risk was **April 28, 2015**, which this CW explained was the date the risk was first identified by Maximus.

155. The Risk Register also included columns titled "Likelihood" and "Impact," which contained numbers on a scale from 1 to 5. The Likelihood column for this recruitment risk was rated 4 and the Impact column was rated 5. Accordingly, this document demonstrates that as of April 28, 2015, at the latest, Maximus knew that there was a **high likelihood that it would not meet its recruiting goals**, which would have a severe impact on Maximus's ability to meet its contracted assessment volumes targets.

156. Further, the Risk Register contained another column titled "Risk Profile." This column included numbers that were a multiple of the numbers in the Likelihood and Impact columns, and was color-coded red, amber, yellow, or green (or was left blank where there were no numbers assigned to the Likelihood and Impact columns). Only risks that had a Risk Profile of 16 or above were coded red. Risks that had Risk Profiles of 10-15 were coded amber; those with Risk Profiles of 6-9 were coded yellow; and those with Risk Profiles below 6 were coded green. Of the approximately 18 different risks listed in this Risk Register, 7 were coded red; 4 were coded amber; 3 were coded yellow; and only 2 were coded green (2 are not color-coded).

157. The Risk Profile for the "Recruitment Capacity and Candidate Availability" risk was listed as **20** and was coded **red**.

158. The CW above explained that the color coding system reflected in this Risk Register was "similar to" the "Delivery Confidence Ratings" system, also referred to as the "Red-Amber-Green" or "RAG" system, reflected in other internal documents uncovered in Lead Plaintiff's investigation(which are discussed further below). According to those

documents, the "Red" rating meant that "[s]uccessful delivery of the project/programme appears to be **unachievable.** There are **major issues** on project/programme definition schedule, budget required quality or benefits delivery, **which at this stage does not appear to be manageable or resolvable**. The project/programme may need re-baselining and/or overall viability re-assessed."

159. The "Amber" rating meant that "[s]uccessful delivery appears feasible but **significant issues exist requiring management attention**. These appear resolvable at this stage and if addressed promptly, should not present a cost/schedule overrun." Finally, the "Green" rating meant that "[s]uccessful delivery of the project/programme to time, cost and quality appears highly likely and there are no major outstanding issues that at this stage appear to threaten delivery significantly."

160. The above CW confirmed that a red rating signified that the goal was not being achieved; green signified that the goal was being achieved; amber signified that the goal was on its way to becoming red; and yellow was synonymous with amber in the RAG system.

161. Additionally, the Risk Register included a column titled "Risk Owner." The above CW stated that the person identified as the Risk Owner for each risk was responsible for monitoring it and reporting it up the chain of command. For the recruitment risk discussed above, the Risk Owner listed was Judith Whitaker, who was the Director of HR at CHDA from April 2015 to September 2016, and, according to the above CW, reported directly to Leslie Wolfe.

162. Finally, these Risk Registers included a column titled "Report to DWP," which listed "Yes" for all identified risks, showing that Maximus had communicated these risks to the DWP.

163. Accordingly, per the Risk Register, as of April 28, 2015 at the latest, Maximus internally identified "Recruitment Capacity and Candidate Availability" as extremely high-risk, meaning that the goal was not being achieved as planned and was considered "unachievable" at that stage because of "major issues" in the recruiting efforts and that this failure had been communicated to the DWP.

164. Thus, this internal Maximus document corroborates the Government Audit Report's later revelation that in April 2015 Maximus had identified "healthcare professional capacity as high risk" to the DWP.

#### (iii) Maximus Was Not Meeting Its Recruitment Targets In the Spring of 2015 as It Took Over the HAAS Contract

##### [1] Weekly Resource Report Shows that Maximus Was Missing Internal Recruiting Targets

165. Another internal Maximus document confirms that Maximus had low monthly recruiting numbers (compared to its internal targets) and was thus facing major recruiting deficits beginning in the first few months after it took over the HAAS Contract.

166. Specifically, a document titled "Weekly Resource Report Week Ended 31 July 2015" (the "Weekly Resource Report") contained, *inter alia*, numerous charts that tracked recruiting numbers since the start of the contract through July 31, 2015, and provided recruiting projections for several months beyond that.

167. Both CW1 and CW2 received and reviewed such Weekly Resource Reports. CW1 stated that this was a weekly report that was sent to the heads of Human Resources (Judith Whitaker), Recruitment (Michael O'Halleron), Operations (Evan Harris), Wolfe, and other personnel in Clinical Training, HR, and Operations, including CW1. This was confirmed by the cover email (from August 2015) to which this weekly report was attached, showing that it was sent to, *inter alia*, Wolfe, the other executives named above, Dr. Paul Williams, Mahdjoub (the

head of Learning and Development), and Catalina Murillo, Senior Vice President of UK Human Resources from December 2014 and November 2015.

168. CW1 explained that the Weekly Resource Update Report was presented to the DWP every Monday and that these weekly meetings with the DWP were attended by many Maximus employees from HR and Operations, including Harris, O'Halleron, and Mahdjoub. CW1 attended some of these DWP meetings and was involved in the preparation for such meetings. CW1 said that these reports highlighted issues with clinical training and recruiting, which were also discussed with the DWP at the weekly meetings, where the DWP was primarily interested in Maximus's recruitment figures.

169. The Weekly Resource Report demonstrates that Maximus's recruitment numbers were far below its monthly targets, and that, therefore, Maximus was **not** "meeting [its] recruiting targets" for HCPs on May 7, 2015. A chart titled "Accepted Offers by Location Week Ended 31 July" in the report listed the number of HCPs recruited as of July 31, 2015 for each month from February through July, and also provided projections of recruits who had already accepted offers and were expected to start in the months of August through November 2015.[11] This chart shows that the total numbers recruited were as follows: **February – 48; March – 45**; April – 121; May – 98; June – 129; July – 105.

### [2] Recruitment Workstream Report Confirms that Initial Recruiting Results Were Below Targets

170. Indeed, another internal Maximus document, a PowerPoint presentation from August 2015 titled "Recruitment and Retention CHDA Workstream Status Report" (the "Recruitment Workstream Report"), which is discussed in greater detailed below, indicates that

[11] CW1 explained that to the extent the charts in this report provided numbers for months that had not yet occurred, *i.e.* August and beyond, they represented projections, rather than historical data, based on the number of recruits who had accepted offers as of the date of the document (*i.e.* July 31, 2015), and were expected to start in those future months.

the initial default recruitment target was **120** HCPs per month. Specifically, it states that the goal of the "Recruitment & Retention Workstream" was to "[m]aintain delivery of Clinical Recruitment to **120 HCPs** each month (**or revised figure if higher numbers are required**)." (That number was later increased in the summer of 2015 to 211 per month, as detailed below.)

171. Accordingly, in the first two months of its recruiting efforts, Maximus recruited only about **one third** of the targets. In other words, it missed its February and March targets by approximately **67%.** Moreover, even though Maximus just barely met its target in April 2015, recruiting 121 HCPs according to the chart for April in the Weekly Resource Report, overall it was still substantially behind its total targets for those first three months: only 214 recruits from February through March (48 + 45 + 121), as compared to a target of 360 (120 x 3). Thus, Maximus was behind its recruiting goals by a total of **over 40%** for those first three months. Given these metrics, Maximus was **not** "meeting recruiting targets" as of May 7, 2015, as Montoni falsely assured investors at that time.

172. Further, Maximus's recruiting in May worsened—a fact that Defendants reasonably foresaw even before the May 7, 2015 earnings call given they maintained recruiting projections for the coming months based on the number of accepted offers to date who were expected to start in those months. According to the chart titled "HCP Recruitment Against Plan – May 2015," Maximus recruited **only 98 HCPs for May**, which was **still significantly below the listed target of 128**, as reflected in the column titled "Variance," which showed that the variance from plan was "-12" for doctors and "-18" for other HCPs (nurses, physiotherapists, and occupational therapists). Thus, in May 2015, Maximus missed its recruiting target by 30 total HCPs, or about **23%**, on top of the dramatic deficits in February and March 2015.

173. Because Wolfe (in addition to other senior executives of Maximus UK) received the Weekly Resource Reports on a weekly basis, she knew, or was severely reckless in not knowing, that Defendants' positive public statements regarding Maximus's recruitment of HCPs, positive progress in achieving its assessment volumes, and expected revenues in year one from the HAAS Contract were false and misleading. Because she was the head of CHDA, *i.e.* Maximus's entire UK operation responsible for the HAAS Contract, an employee of Maximus U.S.,[12] and Maximus spokesperson in the U.K. for issues related to the HAAS Contract, during the Class Period, her scienter is imputed to Maximus.

**(iv) Maximus Continued to Miss Its Increased Recruitment Targets in the Summer of 2015**

174. Maximus's recruiting problems continued in the Summer of 2015. As detailed below, even though it began to recruit more HCPs, the Company was still far below its monthly recruiting targets, which it needed to substantially increase over the coming months to meet its annual assessment target.

**[1] Weekly Resource Report**

175. According to the chart for June 2015 in the Weekly Resource Report, Maximus just barely met its recruiting target for that month, recording a total of 129 recruitments compared to the target of 126. Moreover, according to CW1, the numbers reflected in this Weekly Resource Report were inflated as they were based on "Accepted Offers" and, in reality, fewer people than listed here actually started. *See* ¶183, *infra*.

176. Moreover, Maximus's improved recruitment performance in June was fleeting. According to the July chart in the Weekly Resource Report, Maximus missed its July 2015

[12] At the February 3, 2016 Hearing, Wolfe confirmed that she was employed directly by Maximus U.S., rather than CHDA, its British subsidiary.

target by a large margin—37 total HCPs, or **26%**—recruiting only 105 as compared to its increased target of 142.

177. In particular, even though Maximus was already struggling to meet its initial 120 monthly target, it was forced to substantially increase that number to make up for the smaller than expected number of Atos HCPs who had transferred over, the much slower than expected recruiting start, and the extremely high attrition rate it was facing. According to the Recruiting Workstream Report, as well as two CWs, these recruitment targets spiked dramatically to **211** by no later than August and September 2015, and remained at that level for many months.

**[2] Recruiting Workstream Report: Maximus Raised Its Recruiting Target to 211 in July 2015**

178. Indeed, the Recruiting Workstream Report referenced above shows that the decision to increase Maximus's monthly recruiting target to 211 occurred in **July 2015**. This report was attached to a cover email from August 2015, from a Maximus junior project manager to Mahdjoub, Dr. Williams, and numerous other personnel from HR, Recruitment, Operations, and Clinical Training. CW1 stated that all of these Workstream Status reports were updated each week prior to a weekly meeting, which was attended by Recruitment, HR, Clinical Training, and other personnel, based off the last week's presentation, and which thus contained information from prior months. The cover email states that the project managers "have updated these [attached reports] to reflect the final commentary we provided to the DWP, the risks from the Risk Log, and other information provided by you, and others, in compiling the report." It then asked the recipients to update the attached reports with the latest information, including the "RAG status" (the red-amber-green rating system discussed above) for each workstream, by August 10, 2015, in time for submission to "the delivery board" later that week.

### [3] Recruiting Workstream Report: Increased Monthly Recruiting Target of 211 Was a "Significant Challenge" in August 2015

179. The Recruiting Workstream Report indicated that it was "produced by" Elizabeth Curry, who, according to CW1, was in charge of clinical recruitment. Crucially, this report explained that Maximus was forced to dramatically increase its monthly recruiting target to 211 because of its failure to meet prior monthly recruiting goals and the high attrition of newly recruited HCPs that Maximus was experiencing at the time:

> For July we had 109 positions offered and accepted. August has 124 accepted offers to date. Partly as a result of **this target not being achieved**, and more broadly as a result of higher levels of training attrition than expected, **a decision has been taken to revise the monthly demand profile to 211 [for] August**.

180. The Recruitment Resource Report also included the following bullet point under the heading "Risks:" "The increased numbers of recruits required – rising from 140 in June to 211 in August is a **significant challenge** from both sourcing and logistics (screening, on-boarding, training) perspective." Further, the report was rated "Amber," which, according to the key included therein, signified that "**significant issues exist requiring management attention**."

181. When asked about this document, CW1 noted his/her understanding that this report shows that Maximus did not have confidence that it could to recruit 211 HCPs per month, as targeted. The report also noted that it was "[a]waiting sign off on increased capacity in the recruitment team," which, according to CW1, referred to necessary approval from HR in the U.S. Reston headquarters. This indicates that they too were aware of this problem.

182. Further, it was CW1's understanding that Maximus had calculated this 211 monthly recruiting target as necessary to achieve the first-year target for annual assessments, based on several assumptions, including a productivity target that each of its HCPs would

conduct an average of 6 assessments per day (a metric that could not be met, as discussed further below in Section IV.E.3.). Moreover, this is consistent with Maximus's statements to the DWP in April 2015, as revealed in the Government Audit Report and noted above, that the Company considered recruitment of HCPs to be "high risk" given "market pressures" at the time—*i.e.* the extremely low rate of available HCPs (3%). *See* Section IV.E.1.(b)(i), *supra*.

#### [4] CW1: Maximus Never Came Close to the 211 Recruiting Target

183. CW1 confirmed that Maximus never came close to meeting the 211 monthly recruiting target during his/her tenure with the Company (June 2015 through the end of the Class Period), and thus through the entire Class Period. CW1 recalled that not more than **120** ever started in any month – or more than **40%** below the 211 target. CW1 knew this, based on, *inter alia*, the Weekly Resource Reports that s/he received, which detailed the recruitment figures as set forth above. CW1 added that the recruiting numbers in the Weekly Resource Reports discussed above represented those who had accepted offers; thus, even though some of the monthly charts may have shown more than 120 accepted offers, fewer people actually ended up starting and reporting for training. Thus, according to CW1, the recruiting numbers for those who actually started at Maximus were often even lower than represented in the Weekly Resource Report charts.

184. Moreover, the Weekly Resource Report dated July 31, 2015 projected that Maximus's recruiting deficits was only expected to deteriorate further, particularly given these much larger targets (as compared to the March – July 2015 period). For example, based on the "HCP Recruitment Performance Against Plan" chart for August 2015, Maximus was projected to recruit only 139 HCPs as compared to the target of 211 for August 2015—representing a miss of **72** HCPs, or **34%**. CW1 added that even fewer HCPs would actually start in those

months than projected given the high attrition rates during training and other delays s/he knew about based on performance in prior months. Further, s/he noted that there were many locations where more HCP positions were filled than were needed, as reflected in the charts in the Weekly Resource Report, yielding a positive variance number. CW1 explained that this positive variance was misleading because those HCPs could not be efficiently used where there was no need for them.

185. CW1 reiterated that these charts in the Weekly Resource Report, which was sent to Wolfe, confirmed that Maximus's recruiting was running at a deficit from the outset of the HAAS Contract and that this was discussed at the weekly DWP meetings.

#### (v) CWs 2-4 Confirmed That Maximus Missed Its Recruiting Goals Throughout the Class Period

##### [1] CW2

186. CW2 corroborated CW1's statements regarding Maximus's failure to meet internal recruiting targets during the first year of the HAAS Contract. CW2 received internal reports that discussed recruitment numbers, *e.g.,* the Weekly Resource Reports discussed above, which included charts logging the results of Maximus's recruitment and training efforts.

187. CW2 confirmed that Maximus struggled with recruiting their targeted number of HCPs especially in the first nine months of the Contract, (*i.e.* at least through the end of 2015). S/he also corroborated CW1's statements that Maximus had an internal target of recruiting 211 HCPs per month during the Class Period. S/he recalled that this target was necessary to meet Maximus's annual 1 million assessments target. S/he stated that there was not one month where Maximus's 211 monthly recruitment target was met.

**[2] CW3**

188. Another CW, who worked in CHDA's HR department and thus was directly knowledgeable about Maximus's recruiting efforts at CHDA, also described similar recruitment problems throughout the Class Period.

189. In particular, CW3 stated that Maximus had an extremely difficult time hiring new HCPs and retaining them. CW3 also noted that Maximus's recruitment team was not properly trained to find the proper HCPs and that background checks were not properly conducted, resulting in Maximus hiring candidates that should not have been hired.

**[3] CW4**

190. CW4, who had worked for both Atos and Maximus, also confirmed that Maximus did not meet its recruitment targets under the HAAS Contract.

191. Specifically, CW4 confirmed that Maximus had a target of recruiting 1,000 new HCPs for the HAAS Contract. CW4 also stated that Maximus struggled with recruiting and retaining HCPs during CW4's tenure at the Company. Accordingly, CW4 stated that Maximus was unable to meet its goal of recruiting 1,000 new HCPs.

**(c) Defendant Caswell Discussed Maximus's Recruiting and Other Contract Performance Problems on a Teleconference Soon After the Contract Start in March 2015**

192. CW2 stated that not long after Maximus took over the HAAS Contract from Atos in March 2015, Caswell held a VideoLink teleconference from Reston, Virginia with the Maximus CHDA employees in the U.K. All of the U.K. employees were invited to participate, except for the HCPs assessing claimants at the time of the call. CW2 recalled that Wolfe participated in this video teleconference as well. On this teleconference, Caswell discussed the difficulties that Maximus was experiencing with the HAAS Contract, including its poor performance in the following categories: (1) HCP recruitment; (2) HCP training; (3) HCP

productivity, including assessment volumes; and (4) assessment quality. According to CW2, Caswell stressed that Maximus's performance in these categories needed to be improved. In particular, he specifically stated that recruitment and training passage rates needed to be increased.

193. Moreover, CW2 stated that Dr. Williams and other CHDA staff also regularly generated Operation Reports, which provided metrics on recruitment, training, productivity, and quality of assessments. CW2, knew about these reports from his/her supervisor Mahdjoub, who contributed to them and discussed them with CW2. According to CW2, these Operation Reports were "frequently" sent to Maximus's headquarters in Reston, VA. This was corroborated by CW4, who also stated his/her belief that Operation Reports were sent to Maximus's Reston, VA headquarters. Accordingly, the Individual Defendants also knew about CHDA's problems with meeting recruiting, training, productivity, and training targets from these Operation Reports, which they would have received regularly.

194. Further, CW4 stated that one of Montoni's lieutenants traveled to the U.K. and was informed of the problems with the HAAS Contract. CW4 directly spoke with this executive when he was in Bristol, U.K. and discussed with him the transition from Atos and the challenges that Maximus was experiencing with the contract performance. CW4 described him as the CEO's next-in-command. Upon information and belief, this executive was likely Caswell, given his position as President and Montoni's statements about sending Caswell to the U.K. to monitor the status of the HAAS Contract (*see* ¶¶383, 396-397, *infra*).

**(d) Defendants' Later Admissions Confirmed that Maximus Was Still Missing Its Monthly Recruiting Targets in the Fall of 2015, Contrary to Their Statements at the Time**

195. Maximus's recruiting problems continued in the Fall of 2015. Specifically, on February 4, 2016, the end of the Class Period, Montoni disclosed: "During the **autumn** [2015] timeframe, we were hiring approximately **100 new healthcare professionals each month."**

196. As noted above, this 100 monthly figure was **less than half** of Maximus's 211 monthly target at the time. That Maximus was achieving less than half of its monthly recruiting target in the Fall of 2015 directly contradicts Caswell's statements on the November 12, 2015 earnings call that Maximus was "***at the right rate for recruiting***" at that time, and was then "***reaching a level of recruiting that, from a rate perspective, is an appropriate level***."

**2. Maximus Suffered From an Extremely High Attrition Rate Starting in March of 2015 and Could Not Successfully Train Enough HCPs to Meet Its Assessment Targets**

**(a) Per CWs and Internal Maximus Documents, in the First Few Months of the Contract, Maximus's Training Passage Rate Was, at Best, Only 44% Rather than 95%**

197. As explained above, for Maximus to successfully perform the HAAS Contract and generate the promised profitability, it needed to not only hire more than 1,000 new HCPs, but also to successfully train them so that they could quickly and productively start performing the requisite number of assessments. However, as Defendants knew internally, but failed to disclose to investors, from the outset of the Contract Maximus experienced a massive attrition and training failure rate—at least **eleven times** its target rate of 5% according to CWs, and as high as **14 times** that target at the start of the Contract per Wolfe's later admission—which compounded its recruiting shortages. These attrition and training problems rendered Maximus's attainment of 1 million assessments in its first Contract year – and the corresponding revenue benefits –unachievable, demonstrating that Defendants lacked a reasonable basis for their public

statements on that subject when made. Further, Maximus's inability to meet this critical driver of assessment volume shows that Maximus could not have been "on track" to achieve the 1 million of assessments on May 7, 2015, as Montoni falsely assured investors at that time.

#### (i) CW1: Training Passage Rate Was Only 44% After Maximus Took Over the Contract

198. CW1 stated that Maximus's recruitment problem was exacerbated by a large attrition rate, which meant Maximus did not have close to enough HCPs to achieve their assessment volume targets. According to CW1, Maximus's clinical training passage rate was only **44%** when s/he joined in June 2015, which was not publicly disclosed but was well known within the Company and DWP at the time. In other words, on average, only 44% of Maximus's new HCPs were successfully graduating its training program such that they could start doing assessments. Thus, CW1 said that training was "always running at a deficit" during his/her tenure at the Company.

199. CW1 knew of this 44% rate based on his/her attendance at internal meetings where it was discussed and based on his/or her responsibilities for clinical training. CW1 also clarified that when the contract began and for many months thereafter, Maximus's calculation of this training passage rate included the attrition of HCPs who left or did not start the training program after being recruited for any reason, rather than just those who specifically failed the training. In other words, the 44% passage rate meant that **56%** of Maximus's new HCP recruits were failing the training tests or voluntarily leaving after being recruited—*i.e.* the attrition rate was **56%,** more than 11 times higher than the assumed attrition rate of 5%.

200. Further, it was CW1's understanding that the passage rate had been approximately 44% **since March 1, 2015**, when Maximus took over the contract from Atos. CW1 understood this based on the Weekly Resource Reports s/he regularly reviewed, which

included such training outcomes data from before June 2015, and from his/her participation in internal meetings and the weekly meetings with the DWP where this 44% rate was regularly discussed. In fact, CW1 stated that everyone at CHDA knew of this 44% rate because it was discussed at the DWP meetings. CW1 recalled that the attendees at the weekly DWP meetings questioned why this rate was so low.

#### (ii) CW2 Corroborated the 44% Training Passage Rate

201. CW2 likewise stated that Maximus's training passage rate was only 44% in the first few months of the Contract. S/he also confirmed CW1's statements that Maximus calculated the training passage rate by including the attrition of newly hired HCPs for non-training-related reasons: *i.e.* some of the new HCPs were hired and did not attend training, others left during training, and others failed the training exams. CW2 indicated that s/he sent emails discussing this high training failure rate, related training issues, and the quality of the new assessors being hired, to their managers and the interim HR Director, Judith Whitaker. CW2 also reported such issues to Dr. Williams. CW2 also stated that his/her supervisor Mahdjoub also told CW2 that he discussed these training and other problems with Maximus's performance on the Contract in monthly calls that included Wolfe, Dr. Williams, Jan Nesom, Rob Winter, and Lucy Scott Douglas, an employee in Finance.

#### (iii) The Government Audit Report Confirmed the CWs' Statements Regarding Maximus's Low Training Passage Rate and Revealed That Its *Target* Passage Rate Was 95%

202. The 2016 Government Audit Report confirmed the CWs' statements, revealing similar figure for March through August of 2015, the time period evaluated in the report: "In practice **around half** of those recruited by CHDA completed their training."

203. Crucially, Maximus's 44% training passage rate was **less than half** of its assumed passage rate of **95%**, which it believed necessary to achieve the 1 million assessments target. Specifically, as revealed by the January 2016 Government Audit Report: "During the ESA bidding process, CHDA used a capacity model that assumed **95%** of staff would still be in post after one month."

204. Put differently, Maximus's attrition rate among recruited HCPs in training was 56% in the initial months of the Contract, or over **eleven times** higher than the assumed attrition rate of 5%.[13]

#### (iv) Internal Documents Further Corroborate the Low Training Passage Rate

##### [1] The Weekly Resource Report Shows a Similar Passage Rate in the First Months of the Contract

205. Internal Maximus documents corroborate these CWs' statements regarding Maximus's dismal training passage rate after it took on the Contract in March 2015. The Weekly Resource Report, which was emailed to Wolfe and other CHDA executives, contained a chart titled "HCP Training Outcomes Week Ended 31 July 2015," which provided training outcome and attrition data for March through July 2015. CW1 confirmed that this chart showed the training passage rate reported as early as March 2015, as well as for the subsequent months through July 2015.

206. CW1 explained that the total number of trainees in any given month could be calculated by adding the number of recruits listed in the "Started" and "Rejoin From Prior

[13] Moreover, the Government Audit Report stated: "CHDA told us [NAO] that the Department did not challenge CHDA's assumption [of 95% training passage rate] despite being aware that **only 70%** of staff completed their training with the previous provider [Atos]." Thus, Maximus's 56% attrition rate in the early months of the Contract was almost **double** its predecessor's.

Month" fields, or by adding the number of recruits listed in the "Attrition" and "Remaining" fields (which results in the same sum either way). CW1 further explained that the number of recruits who "Passed Training" were listed separately from those who became "DWP Accredited" that month, and one could calculate the percentage of either.

207. The passage rate was calculated as follows, according to CW1: look at the total number listed in the "remaining" or "attrition" numbers; divide the number of recruits listed in "Attrition" or "Remaining" by the total number of trainees as calculated above. Thus, for example, for March 2015, the training failure or attrition was calculated as follows: 22 in Attrition divided by 49 total recruits = 44.9 %, meaning that approximately 45% of recruits did not pass training or otherwise left the program. The inverse of that would be to divide the number "Remaining" by the total recruits number. Thus, in March 2015, according to the figures in the chart, that would be: 27 / 49 = 55% who passed. Accordingly, the Weekly Resource Report reveals that the training passage rate for March 2015 was approximately 55%, and the corresponding attrition rate was 45%.

208. The Weekly Resource Report thus reveals the following training passage rates for April through June 2015: April – 50%; May – 42%; June – 60%. The average of the rates for March through May 2015 is approximately 45%, similar to the CWs' figure of 44% and the Government Audit Report's figure of "about half."

209. Moreover, it was CW1's understanding that Maximus's training passage rate plummeted when it increased its recruiting goal to 211, in July 2015. CW1 explained that Maximus lacked the training capacity to train so many new recruits, as further discussed below. Thus, Maximus's training rate declined further after the March – June 2015 period depicted in the Weekly Resource Report.

210. Accordingly, given the extremely low training passage rates in March and April of 2015 (55% and 50%, respectively), which were far short of Maximus's target of 95%, **Maximus could not have been "on track" to achieve the 1 million of assessments on May 7, 2015, as Montoni falsely assured investors** at that time.

211. As noted above, Wolfe regularly received these weekly reports reflecting Maximus's low training outcomes, and thus knew, or was severely reckless in not knowing, that Maximus was not "on track" to achieve the assessments volume target in May 2015.

#### [2] The Risk Register Shows that "Higher Attrition Rate and Absence Rate" Was a Known, Substantial Risk No Later than April 2015

212. The existence of weekly internal Maximus reports confirms that Defendants knew or recklessly disregarded that by no later than April 2015 its high attrition rate would impact its ability to meet its 1 million assessments volume in year one. Specifically, the Risk Registers from July 2015 discussed above included a risk titled "Higher attrition rate and absence rate." The description of the risk stated: "**Initial high attrition rate from training continues** and risk of increased attrition from established staff following initial retention incentives." The "Impact" for the risk stated: "**Not enough HCPs coming into business,** reducing capacity and **affecting volumes**." The risk "Likelihood" was rated 4 and the "Impact" was rated 4, for a combined "Risk Profile" of 16, which was flagged red. The "Risk Raised" date listed was "4/28/2015," indicating that Maximus knew of such severe attrition and training problems, which were already "affecting volumes," no later than April 28, 2015. Moreover, Maximus knew that this would imperil its ability to meet the 1 million assessment targets given the "red" risk profile, which indicated that this goal was not being achieved. Further, the "Risk Owner" listed was Judith Whitaker, the director of HR who was a direct report to Leslie Wolfe.

213. Given the "Risk Raised" date of April 28, 2015, the "Impact" description in the present tense of "Not enough HCPs coming into business, reducing capacity and affecting volumes," and the red "Risk Profile," CW1 confirmed that the PMO and Ms. Whitaker would have known by no later than April 28, 2015, that Maximus did not having enough HCPs, jeopardizing its ability to meet the requisite assessment volumes.

214. Moreover, CW1 stated that s/he attended an internal meeting soon after CW1 joined Maximus (in June 2015) that was also attended by Wolfe and other CHDA executives, including Whitaker and O'Halloren, where these training statistics, including the low training passage rate, were discussed.. According to CW1, Wolfe and other CHDA executives at the meeting all recognized that these low passage rates were a major problem.

### (b) Maximus's Training Passage Rate Was So Low Due to Widely-Known and Widespread Recruitment and Training Problems

#### (i) CW1 Statements Revealed Severe Recruitment and Training Problems

215. CW1 understood that a main reason that the training passage rate was so low was that Maximus had too few training venues and seats within its classrooms compared to its much larger number of recruits, such that it could not adequately train them after taking over the contract in March 2015.

216. Thus, according to CW1, even if Maximus could hire its target number of HCPs per month (and it could not), it did not have the capability to train the targeted number of recruits. For example, CW1 noted that when Maximus had a monthly target of 211 recruits (starting in August 2015), the training department was only running 10 or 11 courses per month, which had enough seats to train, at most, 120 recruits.

217. CW1 also stated that the training passage rates were so low because Maximus was hiring lower quality candidates, who could not keep up with the training. S/he explained that Maximus was hiring whoever they could without doing the "proper screening" given their high recruitment targets.

218. CW1 received feedback from the trainers that the quality of the new recruits was poor. CW1 stated that s/he raised issues with respect to training and recruiting problems, including the negative feedback that s/he received from the trainers about the poor caliber of the recruits, at internal meetings and in emails with HR personnel.

219. CW1 believed that another issue with training that impacted the training passage rates was that Maximus had instructors (nurses and physicians) who had not received adequate training on how to train others. S/he explained that Maximus had only one very basic "train the trainer" session for its instructors, where a doctor advised them on what the training was, which was not sufficient.

220. Defendants corroborated CW1's statements that Maximus's training program took months to complete, and contributed to the high attrition rate. Specifically, on the November 12, 2015 earnings call, Caswell partially disclosed the high attrition rates, suggesting they were the result of the rigor of that program:

> **The real issue that we've been facing is our ability to graduate those trainees that we bring into the system on a timely basis and ensure that we have a high level of graduation rate, and obviously a correspondingly low attrition**. And it might be helpful just to give you a sense of what the training program is like that folks have to go through. It's very extensive and rigorous**. Takes a long time, about three months, for them to complete.**

221. Finally, CW1 stated that during the period when Atos transitioned the contract to Maximus (November 2014 through February 2015), Maximus sent several managers from Reston, VA to the UK to help establish the various departments. For example, Thomas Kimpel

was sent from Maximus US to serve as the interim head of training and development during the transition from Atos. Likewise, Jan Nasom, another Maximus manager sent from the US, acted as the interim Director of Operations. Thus, Maximus US personnel worked directly on the start-up of Maximus's operations for the HAAS Contract and knew about its severe recruitment and training problems (and other problems).

**(ii) CW2's Statements Confirmed that Defendants Knew of Severe Recruitment and Training Problems that Contradicted Their Positive Public Statements**

222. CW2 stated that Maximus's training outcomes in the Spring of 2015 were dipping significantly, as was the quality of candidates hired as HCPs. CW2 attributed the "shocking" 44% training passage rate in significant part to the lower quality of these candidates and the higher recruitment targets. For instance, CW2 noted that training results went down after the recruiting targets went up, even though the trainers did not change.

223. CW2 also corroborated CW1's statements that there were many problems in training capacity, which also led to the high training failure rate, such as Maximus not having enough facilities and trainers for the higher number of recruits. In particular, CW2 explained that in the beginning of the contract, PA Consulting (a consulting company hired during the transition period) and Maximus had cut the number of trainers per group of trainees compared to Atos's training, so that Maximus could train more new HCPs faster. But this only led to much poorer training outcomes.

224. CW2 indicated that Dr. Williams, who received direct reports on recruitment and training problems, was responsible for reporting the message up to Wolfe. He apparently did so, as Wolfe later admitted that Maximus did not adequately screen its candidates and that this contributed to its high attrition rate, confirming CW2's statements. For example, at the February 3, 2016 Parliament Hearing, Wolfe acknowledged.

> **Initially, we did have difficulty attracting, retaining and graduating healthcare professionals at the rate we had anticipated, so we started to fall behind the volumes.…** Initially, we attracted the right number, **but they weren't staying. We were not doing a good enough job at screening people and making sure that they really understood the role**. We didn't initially have access to the seasoned, most experienced healthcare professionals when we first started to recruit, because they were just transferring in or had not yet transferred in, **so we needed to change the way we were screening and what kind of competencies we were looking for**. We were also not really telling well enough the story of what the job entails for healthcare professionals….

225. Moreover, it is clear that Maximus's training and recruitment problems were well known to Defendants. CW2 noted that in **Caswell**'s VideoLink teleconference shortly after the start of the Contract, as described above, he **discussed issues regarding HCP training and stated that recruitment and training passage rates needed to be increased**.

### (c) Internal Documents Confirm the CWs' Statements Regarding Maximus's Training and Attrition Problems

#### (i) Per the Risk Register, "Training Capacity for New HCP Recruits" Was a Substantial Risk Known in April 2015

226. Internal Maximus documents further corroborate the CWs' statements regarding the severe training problems experienced by Maximus upon taking over the Contract on March 1, 2015. In particular, the Risk Registers from July 2015 discussed above, indicated that these training problems was another key risk that Maximus knew of in April 2015 at the latest.

227. Specifically, the second risk listed in the Risk Register was called "Training Capacity for new HCP recruits," which had the following "Risk Description:" "**We will not have the required training capacity to match the recruited volumes**. Capacity covers training seats and trainers." The risk "Impact" was described as follows: "**We will not be able to train all the staff we recruit in a timely manner and this would stop us from meeting the assessment volumes**. Delays may impact on attrition of new hires." Its "Likelihood" was rated "4" and "Impact" was rated "5," for a "Risk Profile" score of 20. The "Risk Profile" was color-

coded red, indicating its severity as discussed above. The "Risk Raised Date" was listed as April 28, 2015. Dr. Williams was identified as the risk owner. Accordingly, Maximus knew no later than April 28, 2015 that recruitment capacity was a major problem that would likely prevent it from achieving the 1 million assessments target in the first year.

#### (ii) Per the Training Workstream Report, Training "Remain[ed] the Critical Challenge and Risk" in August 2015

228. Another internal document, one of the Workstream Status PowerPoint reports from August 2015 described above, also corroborated the CWs' accounts regarding training problems. Specifically, the August 2015 cover email also attached a Workstream Status report titled "Training CHDA Workstream Status Report" (the "Training Workstream Report"). The "Description" for the project goal in this report stated, in relevant part: "Maintain delivery of Clinical Training to 128 (June) and 142 (July) newly recruited HCPs each month; Increase Training capacity to deliver training to 210 HCPs from August."

229. Under "Overall Status," it stated that while the training department was "largely on track for delivery of key milestones" on certain projects related to the development of training programs, "there are still a number of process issues and BAU ["Business as Usual"] issues that could impact on the targeted number of HCPs initiating and passing training." It noted "**the high attrition rates during training**," and stated that "[i]n the shorter term however, there is a need to increase training capacity in order to meet increased demand targets of 210 in August. **Expanding training capacity remains the critical challenge and risk – and the RAG status would be Red here.**"

230. CW1 confirmed that this language meant that the high attrition rates during training and logistical difficulties in providing training capacity (*i.e.* not having an adequate number of training venues, number of rooms, audio/visual equipment and trainers) contributed

to rendering Maximus's training targets (*i.e.* training a much larger number of new HCPs each month) unrealistic. S/he explained that often even if Maximus could secure a new training venue it would still not be ready for use, *e.g.*, because it did not have the necessary audio/visual equipment in place. Indeed, CW1 recalled that at least three new training locations (Banberry, Bracknell, and Westminster) never were ready for training. CW1 added that these problems with training capacity meant that the training department did not have the necessary training sites and resources to train the targeted 211 new recruits per month.

231. The overall Training Workstream Report was rated "Amber" per Maximus's "RAG" system, which indicated that "significant issues exist requiring management attention." CW1 said that this report would have been reviewed by CW1's supervisor at the relevant time and the PMO, which consolidated all these Workstream reports for their Workstream meetings and into a combined corporate report that would then be sent to the DWP. CW1 also stated that these Workstream PowerPoint reports were accessible on "Bravo Domain," Maximus's internal document management system to which the DWP also had access.

#### (d) Maximus's Statements at the End of the Class Period Confirmed the Severity of Its Attrition and Training Problems

232. During the Parliamentary Hearing, Leslie Wolfe stated that Maximus had to make assumptions about its training rate. She also acknowledged that, "**Initially, [Maximus] did have difficulty attracting, retaining and graduating healthcare professionals at the rate we had anticipated, so we started to fall behind the volumes**. . . ." She also acknowledged that initially, Maximus's "retention and graduation rates **[were] the 30% or so reflected in the NAO Report**." Thus, according to Wolfe, Maximus's initial training passage rate was even lower than the 44% passage rate discussed by the CWs above.

233. Wolfe further explained that, "Initially, we attracted the right number, but they weren't staying. We were not doing a good enough job at screening people and making sure that they really understood the role."

### 3. Maximus Also Failed to Achieve Its Productivity Targets

#### (a) Maximus Was Underperforming Its Target of 6 Daily Assessments Per HCP

234. As noted above, the third primary factor driving Maximus's ability to meet its assessment volume targets and revenue goals for the HAAS contract was productivity—*i.e.* that the fully trained HCPs doing the assessments would be able to perform enough assessments to meet Maximus's first-year 1 million target. As discussed below, Maximus's key productivity metric was the average number of assessments that each HCP was expected to perform per day. Maximus's failure to achieve this productivity target thus further contradicted their statements about the progress and profitability of the Contract, *e.g.,* that it was "***on track to meet [its] requirements for assessments volumes***" and that the Contract was "***still expected to be profitable for . . . [fiscal year] '15***."

##### (i) Maximus's Internal Target Was 6 Daily Assessments Per HCP

235. At the February 3, 2016 Hearing, Wolfe stated that 6 daily assessments per HCP was the internal target set by Maximus **from the outset of the Contract**, which it modeled as necessary to meet its annual assessments volume targets:

> It was an assumption-based contract in many respects. We had a lot of experience from other operations and other programmes, so we set a number of assumptions around how we would attract and recruit enough people, train them and mentor them and when they would graduate and become productive. It is quite a complex modelling process in which you anticipate when you are going to be able to get people from zero to two, to four, to **six assessments** a day. **That was the structure we built it on.**

236. Likewise, CW1 confirmed that Maximus's assumption for it to meet the 1 million assessment target was that each HCP would do an average of **6 assessments per day**.

237. CW2 also corroborated the internal target of 6 average daily assessments per HCP. Specifically, s/he stated that DWP had set a target of 6 face-to-face assessments per day for each HCP from the start of the Contract in March 2015.

#### (ii) Multiple CWs Revealed That This Target Was Unreasonable and Was Not Being Achieved

##### [1] CW1

238. CW1 stated that this 6 daily assessments goal was unrealistic because **only the top 10 HCPs** at Maximus (out of the over 1,000 total HCPs that eventually worked for Maximus) could do 6 assessments per day. According to CW1, the average daily number of assessments per HCP was significantly less – between **4 to 4.2** assessments. CW1 knew that the 6 daily assessments target was unrealistic based on his/her discussions with Maximus HCPs during the Class Period, as well as his/her training colleagues who were former Atos employees and had transferred to Maximus. Thus, CW1 confirmed that Maximus knew from the start of the HAAS Contract in March 2015, that its target of 6 average assessments per day for each HCP was unrealistic.

##### [2] CW2

239. CW2 corroborated CW1's statements that Maximus was not meeting the 6 average assessments target from the outset of the Contract. S/he explained that for a number of reasons, including lack of experience of the new HCPs and the large influx of complex, time-consuming reassessments, many of the HCPs were unable to meet this target. (CW2 elaborated that many of the claimants that were assessed under previous DWP rules had to be reassessed, and many of those claimants had complex conditions.) S/he stated that complex cases, where

claimants had multiple medical conditions, could take up to **three hours** to assess and that HCPs with such assessments were unlikely to see **more than two claimants per day**. CW2 estimated that an average face-to-face assessment likely took about 1 hour and 20 minutes, but that this assumed a very experienced HCP was doing it and that it was a simple case. CW2 also said that in the early stage of an HCP's learning curve, the HCP could perform only about **two assessments** per day.

240. CW2 further stated that HCPs conducted face-to-face assessments at CHDA centers, which were open from 9:00 A.M. until 5:00 P.M., giving HCPs roughly seven hours to conduct their assessments, factoring in lunch and other breaks. According to CW2, that was insufficient time in which to complete six assessments per day. Moreover, this was assuming that claimants came to their appointment on time, or at all, which CW2 said was often not the case. When claimants did not show up, HCPs would not have someone to assess. Indeed, CW2 said that this problem with no-shows was well-known within the Company and compounded the productivity problems.

**[3] CW4**

241. CW4 also described similar productivity problems, particularly the failure to meet the internal 6 daily assessments target. CW4 received several internal reports that discussed various performance metrics on the HAAS Contract. One such report was a daily report known as the "Traffic Light Report," which CW4 believes Wolfe was copied on as well. This report detailed how many assessments were completed on a **daily basis** at each of Maximus's 286 assessment centers. According to CW4, this report also highlighted which HCPs were not meeting targets, as well as how long assessments were taking.

242. According to CW4, after HCPs passed training, they could not hit their assessment targets because the targets were unrealistically high. CW4 confirmed that HCPs

were expected to assess 6 (or more) per day. CW4 stated that this target was unrealistic, as most HCPs conducted **only between 2-4 assessments** per day. S/he further confirmed that most assessments took over an hour, and that complex cases could take significantly longer. S/he also stated that assessment centers had to close at a specific time, and assessments were not allowed to continue past closing time. This also affected the number of daily assessments that could be done.

**[4] Wolfe Confirmed the CWs' Statements at the February 3, 2016 Hearing**

243. Further, at the February 3, 2016 Parliament hearing, Wolfe corroborated the CWs' statements about the length of these face-to-face assessments and that this represented an additional problem for Maximus in meeting its 1 million first-year target. Specifically, she stated that Maximus faced greater productivity hurdles than Atos because under Maximus's contract, 75% of its assessments were required to be face-to-face, which were very time-consuming:

> First, it is difficult to compare our contract with Atos's contract for WCA. They are very different. In our contract, for example, we are required to do about **75% face-to-face assessments. In a face-to-face assessment, it takes approximately 75 minutes on average for a healthcare professional to see someone and then write up the report**, meaning that we will need many more healthcare professionals to hit the 1 million target that was set for us. That meant we needed to hire a lot of healthcare professionals.

244. Indeed, another CW stated that beginning in late 2015, Maximus required face-to-face assessments to take even more time, approximately 90 minutes. Specifically, CW5 stated that when s/he joined Maximus in October 2015, Maximus raised the amount of time for the face-to-face assessments to 90 minutes. According to CW5, 90 minutes was still not enough time to do an assessment.

245. Because Maximus's assessment centers were only open for enough time to give HCPs seven hours to conduct assessments per day, *see* ¶240, a single HCP could conduct no more than about four 90-minute face-to-face assessments in any single day. As a result, Maximus's goal of six assessments per HCP per day was unachievable for this reason as well.

**(iii) Based on Caswell's VideoLink Teleconference and Risk Register, Defendants Knew that HCP Productivity Was a High Risk No Later than May 2015**

**[1] Caswell's VideoLink Teleconference**

246. CW2 confirmed that Caswell specifically discussed such problems with HCP productivity on his VideoLink teleconference (referenced above), which took place soon after the start of the Contract. In particular, according to CW2, Caswell noted on this teleconference that productivity, including the average daily number of assessments performed by HCPs and the total assessment volumes conducted, was falling short of Company goals and needed to be increased. Thus, Defendants knew of Maximus's inability to meet this key internal target from early in the Class Period.

**[2] Risk Register: Substantial Productivity Risk Identified No Later than May 2015**

247. Indeed, internal Company documents confirm that Maximus knew of a substantial risk to its productivity assumptions and its likely, severe impact on its ability to meet the first-year 1 million assessments target by May 2015 at the latest. Specifically, the Risk Registers described above included a risk titled "Productivity," which was described as follows: "There is a risk that **actual HCP productivity is lower than expected. Impact: Impacts ability to meet target volumes to be delivered.**" The "Risk Raised Date" listed in the spreadsheet was May 11, 2015. The "Likelihood" of the risk was rated 3 and the "Impact" was

rated 5 for a combined "Risk Profile" score of 15. It was color-coded "Amber," which as noted above indicated that there "significant issues exist requiring management attention."

248. The "Risk Owner" identified for this risk was Jan Nesom, who, according to CW1, the interim Director of Operations at the start of the HAAS Contract. CW1 stated that Nesom was sent by Maximus U.S. to the UK to head up Operations during the transition period with Atos, and eventually returned to the U.S. Therefore, Maximus knew on May 11, 2015, at the latest, that there was a significant risk that it would not be able to meet its productivity targets and thus attain its first-year 1 million assessments volumes.

#### (b) New HCPs Were Not Fully Productive Until 6-8 Months After Completing Training and Experienced HCPs Were Mentoring, Rather than Performing Assessments

##### (i) Defendants Admitted This Information in the November 12, 2015 Partial Disclosure

249. Moreover, Defendants knew, but failed to disclose until November 12, 2015, that even after the new HCPs successfully completed Maximus's training program, it would take them 6-8 months to become fully productive. Specifically, on the November 12, 2015 earnings call, Montoni discussed "productivity" as the "third area" that was "tied directly" to Maximus's "ability to hit the volume targets," and disclosed for the first time: "Once new staff begin performing assessments, there is **a learning curve**, and it may take between **six and eight months** for them to achieve full productivity levels." Caswell similarly stated on the call "that it takes individuals up to six to eight months to reach full productivity after they graduate. **And that's why we're seeing the lag in the uptake of production**."

250. Further, as noted above, on the November 12, 2015 earnings call, Caswell stated that "the training program … **[t]akes a long time, about three months, for [HCPs] to complete**."

251. Thus, if it took 3 months for the newly recruited HCPs to complete training and then 6-8 months for them to become fully productive, then the **earliest** that these new HCPs could be producing the targeted number of daily assessments was **9-11 months** after they started working for Maximus. This means that, even assuming a best case scenario where Maximus was meeting its monthly recruitment and training passage targets—which it was **not**—it still could not meet its assessments volume for the year given that its new recruits were not expected to hit the requisite productivity targets until the last three months of the first year, at the earliest.

252. Moreover, at the same time, the experienced HCPs who transferred over from Atos were also not being productive. As Wolfe revealed at the February 3, 2016 Hearing:

> [T]the NAO Report only covers us at five months in, which is right at the height of our staffing and recruitment, **so all our experienced members are actually coaching and mentoring and doing one-on-ones with people. They are not actually producing the assessments**. It was initially taking us longer to graduate people, **so the experienced workforce was being drawn down**.

Accordingly, given that (1) Maximus's new HCPs were not able to achieve Maximus's productivity targets until at least 9-11 months after starting and (2) its experienced HCPs were not being at all productive for at least the first 5 months of the Contract, Maximus could not reasonably achieve the 1 million assessments target in the first year. This further shows that Defendants knew that the first-year assessments target was unachievable, especially given Maximus's recruiting and training attrition problems in the first year of the contract, as described above.

**(ii) The Risk Register Confirms that Maximus Knew That Lack of Sufficient Training Resources Affected Productivity No Later than April 2015**

253. Internal Maximus documents show that Maximus knew of this risk in April 2015 at the latest. Specifically, the Risk Register included a risk titled "Capacity to absorb new

staff," which was described as not being follows: "Recruitment volumes **provide challenge to successfully mentor the staff** and maintain the quality standard. Impact: **- volumes: mentors taking away from their operational flexibilities**; - delay in accreditation for new recruits." The "Risk Raised Date" was April 28, 2015. It had a "Likelihood" rating of 4 and an "Impact" rating of 3, for a combined "Risk Profile" of 12. It was color-coded amber, signifying that that "significant issues" existed as described above. Nesom, the Director of Operations who had been transferred from Maximus U.S., was identified as the "Risk Owner."

254. Thus, this document confirms that by April 2015 Maximus knew of a significant risk that its productivity and assessment volume goals would be affected by the lack of adequate personnel to mentor the increased number of new recruits, which required existing HCPs to mentor the new recruits rather than performs assessments.

### 4. Maximus Was Failing to Meet Its "Number One" Target of Assessments Volume

255. As a result of these severe problems with recruitment, training and productivity, Maximus repeatedly failed to meet its monthly assessments targets, which was the "number one" driver of Maximus's revenues from the Contract. Accordingly, Defendants knew by May 7, 2015 that Maximus was not "on track" to meet its first-year 1 million assessments volume target in May of 2015 or later in the first year.

#### (a) The Government Audit Report and Other Parliament Documents Revealed That Maximus Was Not "On Track" to Achieve Its First-Year 1 Million Target

256. Evaluating Maximus's volumes month by month illustrates the extent of how off-track it was, from the beginning. As noted above, this monthly assessments information was first made public by the Government Audit Report, which revealed Maximus's assessment volumes, compared to its monthly targets and broken down by face-to-face and paper, for the

first five months of the Contract (March-August, 2015). Maximus's assessment volumes in the subsequent seven months of the Contract's first year (September 2015-February 2016), were also made publically available on Parliament's website (though not broken down by face-to-face vs. paper), in the DWP's "Written Questions and Answers," after the Class Period.

**(i) The Government Audit Report's Findings**

257. As noted above, based on Maximus's poor performance on this metric in the first five months of the Contract, the DWP specifically concluded that Maximus "**is not on track to complete the expected number of ESA assessments for 2015**. This is largely due to problems reaching the full staff complement, particularly in London and the Home Counties. It is facing significant challenges with staff failing to complete training requirements." This poor performance was depicted in the following chart included in the Government Audit Report, as follows:

**Figure 4**

ESA volumes: actual against target between March and August 2015

**Centre for Health and Disability Assessments (CHDA) has struggled to meet volume targets since the start of the contract**




| | Mar 2015 | Apr 2015 | May 2015 | Jun 2015 | Jul 2015 | Aug 2015 | Sep 2015 | Oct 2015 | Nov 2015 | Dec 2015 | Jan 2016 | Feb 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ■ Paper-based assessments – actual | 22,133 | 22,732 | 20,556 | 18,441 | 18,366 | 13,804 | | | | | | |
| ● Paper-based assessments – target | 16,287 | 16,688 | 17,736 | 19,864 | 22,254 | 24,460 | 26,716 | 28,701 | 30,347 | 31,822 | 32,517 | 32,608 |
| ■ Face-to-face assessments – actual | 38,765 | 33,376 | 34,360 | 45,510 | 45,265 | 37,164 | | | | | | |
| ● Face-to-face assessments – target | 38,002 | 38,939 | 41,383 | 46,350 | 51,926 | 57,075 | 62,337 | 66,969 | 70,810 | 74,251 | 75,873 | 76,085 |

**Notes**

1 Target volumes to June 2015 reflect those agreed in the initial contract. In June 2015, the Department and CHDA agreed to reduce the expected annual target volume from 1 million to 980,000 given a lower number of healthcare professionals transferred from the previous provider than the contractual assumption agreed by the Department and CHDA. In September 2015, they agreed to reduce the target number of paper-based assessments by 69,000, and therefore the overall target to 911,000, to complete proportionally more face-to-face assessments.

2 The Department did not apply volume-based service credits in the first three months of the contract. It did not alter the annual target so any shortfall across the start of the year would still be applied. CHDA forecast they will not complete the expected number of face-to-face or paper-based assessments and have communicated this to the Department.

3 The Department and CHDA agreed an improvement plan given lower than expected volumes.

Source: National Audit Office analysis of Departmental data

258. Moreover, the Government Audit Report revealed as follows: "**In late spring 2015**, the Department and CHDA **identified that volume targets were not being met as fewer staff than expected completed training requirements**. They agreed to a performance improvement plan just weeks later **in early July 2015**." Therefore, the Government Audit Report strongly suggests that Maximus knew that its "volume targets were not being met" due to severe training attrition problems "in late spring 2015," and thus Defendants knew that the Company was not "on track" to meet its assessment volume target for the first year as of May 7, 2015.

**(ii) Maximus's Monthly Assessments Volumes Compared to Its Targets Only Grew Worse as the First Contract Year Went On**

259. Moreover, Maximus never met its monthly volume assessment targets for the remainder of the first year of the HAAS Contract. As its targets grew each month, its shortfalls only compounded. The following chart, based on the figures in the Government Audit Report and the DWP's "Written Questions and Answers," summarizes Maximus's failure to achieve its monthly assessment volume targets throughout the first year of the HAAS Contract:

| HAAS Assessments -- Actual & Targets (by Month) | | | | | | |
|---|---|---|---|---|---|---|
| **Date** | **Actual Assessments** | **Original Target** | **Variance (vs Orig.)** | **Reduced Target*** | **Variance (vs Reduc.)** | **Source(s)** |
| Mar. 2015 | 60,898 | 54,289 | 6,609 | 54,289 | 6,609 | **A** (Actual and Target) |
| Apr. 2015 | 56,108 | 55,627 | 481 | 55,627 | 481 | **A** (Actual and Target) |
| May. 2015 | 54,916 | 59,119 | -4,203 | 59,119 | -4,203 | **A** (Actual and Target) |
| Jun. 2015 | 63,951 | 66,214 | -2,263 | 66,214 | -2,263 | **A** (Actual and Target) |
| Jul. 2015 | 63,631 | 74,180 | -10,549 | 71,680 | -8,049 | **A** (Actual and Target) |
| Aug. 2015 | 50,968 | 81,535 | -30,567 | 79,035 | -28,067 | **A** (Actual and Target) |
| Sep. 2015 | 64,334 | 89,053 | -24,719 | 75,053 | -10,719 | **A** (Target); **B** (Actual) |
| Oct. 2015 | 69,929 | 95,670 | -25,741 | 81,670 | -11,741 | **A** (Target); **B** (Actual) |
| Nov. 2015 | 77,411 | 101,157 | -23,746 | 87,157 | -9,746 | **A** (Target); **B** (Actual) |
| Dec. 2015 | 73,108 | 106,073 | -32,965 | 92,073 | -18,965 | **A** (Target); **B** (Actual) |
| Jan. 2016 | 78,967 | 108,390 | -29,423 | 94,390 | -15,423 | **A** (Target); **B** (Actual) |
| Feb. 2016 | 83,406 | 108,693 | -25,287 | 94,693 | -11,287 | **A** (Target); **B** (Actual) |
| **TOTALS** | **797,627** | **1,000,000** | **-202,373** | **911,000** | **-113,373** | |

Key: **A**: Government Audit Report Fig. 4
**B:** DWP "Written questions and answers" to Parliament, No. 34983

*Assumes reductions evenly distributed

260. The mounting shortfalls month after month reveal that Maximus was not only incapable of meeting its monthly assessment targets, but it was also never closing the gap **at any point**.

261. As noted above, Maximus's performance was subject to "annual reconciliation" or "true-ups." This meant that Maximus was required to pay back all award fees earned in a

given month if it did not exceed its annual volume targets for the year. With each new month of shortfalls, Maximus fell further and further from its annual volume target. Indeed, as shown by the chart above, the Company finished the first year short of its reduced target by 113,373 assessments – a larger deficit than even the Company's most productive month. As a result, there was no point during the HAAS Contract's first year at which it would have been reasonable to believe the targets could have been achieved. Because assessment volumes were the "number one driver" of its overall profit/loss on the Contract, this severely undermined any belief that the Contract could have been profitable in fiscal 2015 (*e.g.*, as Nadeau stated on the August 6, 2015 earnings call).

262. A closer review of Maximus's monthly assessment volumes confirms this conclusion. Specifically, in March of 2015, the first month of Maximus's operation of the Contract, Maximus's volume targets were set at the lowest they would ever be. According to the Government Audit Report, its targets were set at 16,287 paper-based assessments and 38,002 face-to-face assessments, making 54,289 total. Maximus exceeded its targets for both paper-based and face-to-face assessments – for the only time in the Class Period – by completing 22,133 paper-based assessments and 38,765 face-to-face assessments in March of 2015. In total, Maximus completed 60,898 assessments compared to its target of 54,289 (annualizing to 651,468 – significantly below the 1 million required). Maximus's over-performance was primarily driven by making extra paper-based assessments, which were cheaper, less time-consuming, and crucially, less of a priority for the DWP. In particular, as noted above, the DWP required that **70%** or 700,000 of Maximus's 1 million first-year assessments were to be **face-to-face**. In fact, under the clear terms of the Contract, Maximus would earn no "Award Fees," for exceeding its overall target in a month if it failed to meet its

face-to-face targets for that month, no matter how many extra paper-based assignments it completed. *See* ¶71, *supra*.[14] For March of 2015, it exceeded the key face-to-face targets by only 763 assessments.

263. Further, any award fees earned in March would need to be repaid to DWP if, at the end of the year, Maximus "does not exceed the Face to Face Annual Volume Target in that Service Delivery Year," per the Contract.[15] Because Maximus did not exceed its annual volume target for its first year, it would have been contractually obligated to return any award fees earned in March 2015.

264. In April of 2015, Maximus's targets were **increased** to 16,688 paper-based assessments and 38,939 face-to-face assessments, for a total of 55,627. Maximus exceeded its targets for paper-based assessments by completing 22,732. However, it **failed** to meet its target for **face-to-face** assessments by over 5,000, completing only 33,376. Because Maximus failed to meet its face-to-face assessment targets, it would earn no award-fee profit for its paper-based assessments under the terms of the HAAS Contract for April of 2015. *See* ¶71, *supra*. Further, it would incur "service charge" penalties for failing to meet its face-to-face targets.[16]

265. Because Maximus substantially missed its April 2015 volume target for face-to-face assessments, the key type of assessment that comprised 70% of its 1 million target, the

[14] The relevant provision of the HAAS Contract is Schedule 7.1, ¶6.5.
[15] The relevant provision of the HAAS Contract is Schedule 7.1, ¶6.8.
[16] The relevant provision of the HAAS Contract is Schedule 2.2, ¶4.2 ("Service Points will be incurred and Service Credits applied if the Supplier fails to achieve the total of the aggregate of the monthly Target Service Levels for the relevant [monthly] Measurement Period."); *see also* Terms & Conditions, ¶ 7.5 ("If, in any Service Period, a Service Level Failure occurs, Service Points shall accrue in accordance with Schedule 2.2 (Performance Levels).") and ¶ 7.6 ("Service Points shall be converted into Service Credits, and deducted from Charges, in accordance with Schedule 7.1 (Charges and Invoicing).")

Company could not have been "on track" to meet that first-year volume requirements, as Montoni assured on May 7, 2015.

266. In May of 2015, Maximus **failed** to meet both its face-to-face targets **and** its overall targets. Its targets increased to 17,736 paper-based assessments and 41,383 face-to-face assessments, making 59,119 total. Maximus exceeded its targets for paper-based assessments by completing 20,556. However, it failed to meet its target for face-to-face assessments by a greater shortfall, completing only 34,360. Because Maximus failed to meet its face-to-face assessment targets, it would earn no award fee for its paper-based assessments under the terms of the HAAS Contract for May of 2015. *See* ¶71, *supra*. Further, it would incur "service charge" penalties for failing to meet its face-to-face and overall assessment targets. *See* ¶264, *supra*.

267. In June of 2015, Maximus failed to meet its face-to-face targets, its paper-based targets, and its overall targets, falling further behind. Its targets increased to 19,864 paper-based assessments and 46,350 face-to-face assessments, making 66,214 total. Maximus completed only 18,441 and 45,510 respectively, or 63,951 total, failing to meet any of its monthly volume targets. Thus, it would incur "service charge" penalties for failing to meet its assessment targets.

**(iii) Government Audit Report Revealed That the DWP Twice Reduced Maximus's First-Year Assessments Target**

268. Moreover, per the Government Audit Report, the DWP twice reduced Maximus's first-year 1 million assessments target during the Class Period. First, as noted above, in June 2015, it lowered the original 1 million target to 980,000 assessments, after fewer than expected Atos HCPs transferred over. Then, in September 2015, the DWP again "reduced the number of assessments on which service credits would apply to **911,000** by requiring 69,000

fewer paper-based assessments." However, as the chart above demonstrates, Maximus still failed to meet even this substantially reduced target of 911,000, completing **less than 800,000** in the first Contract year, which was a miss of over 200,000 from its original target.

**(b) CWs and Internal Documents Confirmed that Defendants Knew Maximus Was Missing Assessment Volume Targets Early On**

**(i) CW2: Caswell's VideoLink Teleconference**

269. Additionally, CW2's statements confirm that Defendants knew that Maximus was not meeting its assessment volume targets soon after the start of the Contract, and thus at the time of their statements in May 2015. As noted above, on his VideoLink teleconference, which was not long after Maximus took over the Contract, Caswell specifically noted that **Maximus was falling short of its goals on the total assessment volumes performed**, and that these numbers also needed to be increased.

**(ii) Maximus Documents Show It Knew of High Risks Jeopardizing Ability to Meet Volume Target No Later than April**

270. Further, as discussed above, the Risk Registers and Workstream Reports described above repeatedly stated that Maximus's substantial recruitment, attrition and training, and productivity problems were jeopardizing its ability to meet the contracted assessments target for the first year. These problems were known as of **April 2015** at the latest and continued throughout 2015. Accordingly, by May 7, 2015, Defendants knew or recklessly disregarded that they were not "on track" to meet the Company's annual volume target or monthly targets given the severe problems experienced in all three areas necessary to achieve those targets.

#### (iii) CW1 Confirmed Maximus's Inability to Meet Volume Targets During the Class Period

271. CW1 confirmed that it was well known within Maximus at the time s/he joined (in June 2015) that the volume targets were unachievable and were not being met given the problems in recruiting, training, and productivity that the Company was experiencing, as described above. CW1 also stated that Maximus knew from the beginning of the contract that the 1 million annual assessments target was "unrealistic" based on Atos's prior experience. According to CW1, Maximus agreed to DWP's targets in the contract just to get the contract, even though it knew the numbers were unachievable in the first year.

272. CW1 stated that Maximus continued to miss its assessment volume targets during the Class Period and indeed was still not meeting its recruitment and assessment volume targets when s/he left, long after the end of the Class Period. CW1 confirmed that Wolfe was in a position to know that that 1 million assessments target was unrealistic given her access to internal information showing the negative recruitment, training attrition, and productivity metrics (for instance, in the Weekly Resource Reports that she received).

### 5. Defendants Admitted They "Always Knew" that the HAAS Contract Was "Risky" and Would Take 12-18 Months to "Turn Around"

273. At the end of the Class Period, in the February 3, 2016 Hearing, Wolfe admitted that Defendants "always knew" that this was "a risky contract" and would take "12 to 18 months to turn [] around" to achieve successful performance and profitability:

> "**We knew this was going to be a risky contract.** We felt the risk was in the recruitment, but we always knew this was an ambitious programme. **We always knew when we started off that it would take 12 to 18 months to turn this around** and transform the service, improve wait times, clear the backlog and improve customer service.

274. Accordingly, Defendants knew from the outset of this Contract that it was "risky" in terms of meeting the performance targets and thus the expected revenues. In

particular, they "always knew" that it would take 12-18 months "to turn [it] around" –*i.e.*, they knew from the outset of the Contract that it would take that long for Maximus to be able meet DWP's performance targets, particularly the "number one" target of assessments volume, and that the Contract thus would not be profitable in the first year, contrary to their public statements. Specifically, if they knew it would take 12-18 months from March 2015 to turn the ship around, then the earliest that Maximus would be meeting its key targets and thus generating profits would be **March-September 2016—long after the first year of the contract.** Such admissions directly contradict Defendants' positive statements during the Class Period assuring the successful progress of the Contract and profitability of the Contract in the first year.

### 6. Maximus Also Failed to Achieve Its Quality Targets

275. Maximus was also failing to achieve another key performance metric under the HAAS Contract—the quality of the assessments. In the first two years of Maximus's Contract, it was to have a maximum 5% of assessment reports that did not meet quality standards (*i.e.* received a "Grade C," per the Contract). Assessment reports could fail quality standards by being too poorly written and presented, by containing apparent contradictions, or by containing conclusions unsupported by evidence, among other factors.

#### (a) Per the Government Audit Report, Maximus's Quality Failure Rate Was Twice as Bad as Its 5% Contract Target

276. Almost **twice** the amount of Maximus's assessment reports failed to meet these quality standards as the HAAS Contract allowed, according to Figure 5 of the Government Audit Report, below:

**Figure 5** *continued*

ESA and PIP assessment report quality: proportion of assessment reports below expected quality standards between January 2014 to August 2015

**ESA providers**




**Notes**

1 Reports not meeting a Department or provider quality assessment may contain errors in spelling and grammar or the excessive use of acronyms and abbreviations but they may still be judged fit for purpose by the Department and used as part of the decision-making process.

2 Shows three-month rolling average. As such, data for the new ESA provider from March 2015 were not available until the third month of the contract. Under the new contract, new assessment report quality audit arrangements are in place. Changes include having a single, dedicated, independent audit team (compared to multiple provider audit teams); how assessment reports are selected for testing and when selected reports will drop out of the sample.

3 The Department expected 4% of PIP reports sampled to not meet contractual quality standards, reducing to 3% in subsequent years. Data for Capita was unavailable for July 2014. Quality audits conducted by providers and not independently assured. Capita raised concerns over the comparability of performance across providers. The Department and providers are currently reviewing report quality audit arrangements.

Source: National Audit Office analysis of unaudited provider data

277. According to the chart above, in May, June, and July 2015, 10% of Maximus's reports did not meet quality standards. By August 2015, Maximus's failure rate on report quality was still 9%. Because Maximus's report quality data was based on a three-month rolling average, a separate percentage was not available for March or April; rather, data measuring assessment quality from March and April were included in the May figure. Likewise, data measuring assessment quality from April were included in the June figure. Thus, Maximus failed to achieve its contractually required assessment quality targets in any month through August of 2015, and possibly beyond. The Government Audit Report concluded

that "assessment report quality is lower as staff may be less experienced" and explained that Maximus's lapse in quality might be a "possible consequence of [HCP] capacity shortages."

278. Indeed, at the February 3, 2016 Hearing, Wolfe admitted that Maximus still had "quality issues" with its assessment reports and thus did not meet its 5% target as of that time:

> I think **we still have some quality issues** ourselves. We are still not where we need to be, either, so I am not happy with that. I will not be satisfied until we meet our quality score as well. There was a change in methodology when we took over on 1 March, but that is not an excuse. **We agreed to a 5% target** and we need to get there. Again, the NAO Report is reporting our performance for the first five months. The good news is that we have continued to trend towards that target. **As of December we are at 7.4[%] for our C grades, and I am determined to get us under 5**.

279. By not meeting the HAAS Contract's quality targets, Maximus would forfeit potential revenue and profit. According to paragraph 6 of Schedule 7.1, certain payment awards based on completed assessment volume would only be paid if Maximus simultaneously "achieve[d] the relevant quality Service Levels . . . for all Completed WCA Assessments completed in that Month," In fact, Montoni underscored the importance of quality metrics on the November 13, 2014 Q4 2014 Earnings Call, stating that performance was "tied to quality, timeliness, and the number of assessments completed." On the August 6, 2015 Q3 2015 Earnings Call, Montoni further stated that the Contract included "performance-based incentives that [would] create performance billing points or revenue for us. And while there are many of them, it's a complex contract, as you would expect, the number one driver is volume. The number two driver is quality."

#### (b) Maximus Documents Confirm That Defendants Knew of Substantial Quality Problems No Later Than April 2015

280. Internal Maximus documents confirm that the Company knew soon after it started the Contract that it was facing substantial problems with the quality of its assessments.

### (i) The Risk Register: That "Quality Score" Was "Reduced" Was Known Internally in April 2015

281. For example, the Risk Register included another risk titled "IAAP Sampling Methodology," which discusses known quality issues that Maximus was concerned about no later than April 2015. Specifically, the risk description stated: "DWP AAP sampling methodology for WCA is different to Atos. **This appears to have reduced the quality score**. Impact: Fail on Service Credits, Reputation." The "Risk Raised Date" was April 28, 2015. The "Likelihood" and "Impact" columns had ratings of 5, for a total "Risk Profile" score of 25, the maximum. It was color-coded red per Maximus's internal rating system described above. The "Risk Owner" listed was Dr. Williams.

282. The notes in the "Mitigation Strategy" and "Mitigation Action Updates" confirm that this risk referred to a Maximus having a reduced score for the quality of assessment reports based on DWP's audits of sample reports, as discussed in the Government Audit Report above. For instance, the mitigation strategies included an initiative to "engage external consultant to review the Quality Assurance Methodology and determine improvements," which was done and various actions attempting to improve training, such as "creation and delivery of supplemental training material," and other actions to "discuss results and plans to rectify errors."

283. The "Mitigation Action Updates" column also revealed that by no later than May 12, 2015, Maximus was already seeking to meet with the DWP, including a "meeting scheduled on the 13th of May to discuss next steps." Further, the Mitigation Actions Updates column clarified that "CHDA and DWP [were] to work together to agree on reasonable adjustments to the audit methodology going forward" as of June 10, 2015. It also showed that the quality problems were sufficiently severe that "a Quality Improvement Plan [was] submitted to DWP" by Maximus on July 10, 2015. The updates column indicated that the various mitigation

initiatives were still ongoing as of July 2015, confirming that problems were far from resolved as of that time.

284. Accordingly, based on this document, Maximus was aware of substantial problems in its quality scores, and thus a severe risk to its ability to meet its contracted quality targets and related revenues, no later than **April 28, 2015 and knew they had not been resolved by the end of the Class Period**.

### (ii) August 2015 Quality Workstream Report: "Quality Outcomes Are a Major Concern"

285. Another document confirmed that these quality problems continued in August 2015. The August 2015 email described above also attached a PowerPoint presentation titled "Clinical Quality CHDA Workstream Status Report." It indicated that it was produced by Angela Graham, who CW1 said was a Clinical Director that reported directly to Wolfe, and later replaced Dr. Williams as Chief Medical Officer. The description stated that the goal of this workstream was "[t]o maintain quality standards during transition and recruitment of new HCPs, plan for longer term sustainable quality improvements and explore a balanced score card approach to quality improvement and reporting."

286. The "Overall Status" was described as follows: "Progress on clinical quality initiatives is generally good although **quality outcomes are a major concern**. Quality Improvement Plan drafted and remedial actions commencing." Under "Risks," it stated that "**Recruitment volumes remain the main challenge**, **with support requirement placing considerable demands on local clinical teams to successfully mentor to approval and maintain BAU**[17] **quality standards**." One of the "Key Issues" listed also explained that "[e]xtensive new entrant programme requiring mentoring, auditing. The report also elaborated

[17] CW1 stated that "BAU" stood for "Business as Usual."

that "Clinical Quality Improvement Plan [was] drafted and passed to DWP" and noted that the "**[k]ey is to restore quality as soon as possible** and maintain it." Accordingly, the overall report was flagged "Amber," according to Maximus's RAG system, which again indicated that "significant issues" existed.

#### (iii) CW2: Caswell Discussed Quality Problems in His VideoLink Teleconference

287. CW2 confirmed that Defendants knew about the problems with assessment quality soon after the start of the Contract in March 2015. As noted above, CW2 stated that during his VideoLink teleconference, which was not long after the Contract began, Caswell specifically discussed the problems with assessment quality. In particular, CW2 recalled that Caswell told the participants that the quality of the assessments was not good enough and that there were too many rejections.

288. Further, CW2 noted that many of the HCPs who transferred from Atos to Maximus were not hitting quality targets, and thus had to receive remedial training in early 2015. According to CW2, approximately 100 of these former Atos HCPs left Maximus after not being able to successfully complete the retraining they were required to do or left for other reasons at that time in early 2015. CW2 and other training staff personally logged these results. CW2 also stated that Dr. Angela Graham, CHDA Clinical Director who reported to Dr. Williams, was aware of the retraining issues with the former Atos HCPs.

## F. Post-Class Period Revelations

### 1. Later Reports by Parliament Committee Further Criticized Maximus's Performance Under the HAAS Contract

289. On March 31, 2016, the House of Commons Committee of Public Accounts published a scathing report of its conclusions and recommendations from the hearing. The Committee noted that even though Maximus had argued that its contract was different from the

government's contract with Atos, it was "still not meeting expected standards and . . . there had not been any noticeable improvements" since Maximus took over.[18] The report acknowledged that Maximus had not achieved its volume target in the first year partly because it "assum[ed] a lower training attrition rate during the early days of the contract."

290. The report further noted that despite Maximus's attempts to improve retention, "it was now achieving retention rates of around 80% over the first 90 days compared to around 50% at the start of the contract. These are both well below MAXIMUS' initial 95% assumption."[19] It stated that the DWP had "allowed bidders to make assumptions it knew were difficult to achieve."

291. The report concluded that "MAXIMUS has struggled to meet contractual performance expectations, in particular quality and assessment volume targets." The Committee report confirmed that Maximus did not attain its first year volume target, and that there had not yet been service improvements, but the Company made a commitment to meeting its goals in the second year of the Contract.[20]

292. Thereafter, in May 2016, the U.K. Government published another report, presented to Parliament by the Economic Secretary to the Treasury by Command of Her Majesty, responding to the Committee's report. It accepted all of the recommendations, including publishing data on contractor performance, and agreed with the need to ensure that DWP had "well-trained, knowledgeable assessors who are sensitive to the complex issues that claimants are dealing with, particularly those with mental health conditions." The report further

[18] https://publications.parliament.uk/pa/cm201516/cmselect/cmpubacc/727/727.pdf at 6
[19] Report p. 12-13, internal citations omitted)
[20] (Report p. 12, internal citations omitted)

agreed that the government would need to develop a regime to monitor and improve the quality of assessments.[21]

### 2. After the Class Period, the DWP Once Again Reduced Maximus's Annual Assessment Volume Target, Confirming that Maximus Could Not Achieve the Initial Targets in the Contract

293. As noted above, during the Class Period, the DWP twice reduced Maximus's 1 million first-year assessment volume target due to its underperformance: first to 980,000 and then to 911,000. After the Class Period, the DWP reduced Maximus's volume assessments target even further.

294. After the release of the Government Audit Report, a January 7, 2016 article by *The Guardian* reported that, even after DWP agreed to lower Maximus's first-year assessment volume targets to 911,000, "Auditors said this would be cut again before the financial year ends in March."[22]

295. On a May 5, 2016 earnings call, the Company confirmed that its second-year assessment volume target – originally set at 1.2 million – would be **decreased**. Specifically, Nadeau revealed that the HAAS Contract underwent "several contract modifications" after its first year, including agreeing to "**assessments at a reduced level**," which would reduce the Company's expected revenue from the Contract:

> Let me focus my health segment commentary today on our HAAS Contract, where **we have completed several contract modifications**. Some of the HAAS modifications were normal course cleanup items that can be required at the end of a contract year, and in this case, contract year one, which ended on February 29. These modifications included changes to certain performance benchmarks specified in the contract. The contract was modified to put a greater emphasis on carrying out face-to-face assessments **at a reduced level**. This will achieve

---

[21] https://www.gov.uk/government/uploads/system/uploads/attachment_data/file/525714/treasury_minutes_web.pdf
p. 21-23

[22] https://www.theguardian.com/society/2016/jan/08/maximus-miss-fitness-to-work-test-targets-despite-spiralling-costs

> DWP's services goals, while at the same time achieving greater value for money overall.

296. Later on the call, an analyst asked for "more color" on how the HAAS Contract would be modified for its second year. In response, Montoni provided greater detail about these modifications, admitting that the HAAS Contract would be less risky with lowered volume targets because "**[t]he prior volumes were very, very -- were very challenging in some regards**" during the contract's first year Specifically, he admitted:

> [Analyst:] Just to expand a little bit more on the HAAS Contract, I know you talked a little bit more about the profitability, but maybe, Rich, **talk a little bit more about -- some more color there on what exactly changed there**, if you can, expand on that. . . .
>
> Montoni: On the HAAS Contract, I think I just mentioned the driver behind it, that we work with our client to adjust these programs accordingly. In the HAAS situation, this really emanated from a client's routine annual evaluation of programs and their budget and their programmatic needs. I do think there has been, behind the situation, a need for UK to do a spending review on all of its budget. And they came back and simply said, given – and I think part of it is a reduction in backlog, but we think the volumes won't be quite as high in demand for the program in years two and three.
>
> So, in partnership and negotiation with our client, the volumes were adjusted. At the end of the day, again, as we work with our clients, I think we ended up with a better risk profile. **The prior volumes were very, very -- were very challenging in some regards**. So, **with the reduced volumes, I view it as a better risk profile**. We really do have a more stable footing for both the client and MAXIMUS with these revisions.

297. According to the Parliament's website, this modification reduced Maximus's annual target for the second year of the HAAS Contract from 1,200,000 to **1,170,000 assessements**.[23] However, Maximus completed **only 945,343** assessments in its second year of the HAAS Contract – a shortfall of over 19% from its newly reduced target, as well as still

[23] http://www.parliament.uk/business/publications/written-questions-answers-statements/written-question/Commons/2016-04-08/33014/

substantially below even its original first-year target of 1 million.[24] Thus, Maximus failed to meet its reduced targets in its second year of the HAAS Contract, as well.

298. Finally, a June 29, 2016 *Seeking Alpha* article titled "Maximus: U.K. Contract May Continue To Drag Down The Performance" further discussed the continuing problems in the HAAS Contract in 2016 and their significant, adverse impact on Maximus's revenues, supporting the materiality of this information to investors:

> **Lately, much of the Long thesis relied on growth driven by the U.K. HAAS (health assessment advisory service) contract** and new work as well as expansion of existing contracts in the U.S., but the recent developments seem to be putting a spanner in the plans.
>
> **U.K. Health Assessment Advisory Service contract - a problem spot**
>
> **The HAAS Contract, which started in fiscal 2015, has been the biggest growth driver for the Health Services business**, which constitutes more than 50% of the total mix and is growing much faster than the consolidated revenues on an organic basis.
>
> **For a while, investors have been concerned about the impact of a slower ramp, weak volumes and reduced contribution from the HAAS Contract**, **especially against high hopes from the contract**. Even though the company has recently completed contract modifications, including performance benchmarks, face-to-face assessments and the usual end of contract year modifications, **the changes seem to be a case of too little and too late.** Reducing revenue guidance and tightening of EPS guidance may have helped only so much. Financially, the last quarter results benefited from a pickup of a few million dollars of out-of-period revenue and income, but the modifications are expected to lower the future revenue run rates.
>
> **Considering the importance of the HAAS Contract as a growth driver and investors' expectations**, the Brexit seems to have added an additional layer of the regulatory risk, which was already increasing for the company in other geographies.

[24] http://www.parliament.uk/business/publications/written-questions-answers-statements/written-question/Commons/2017-03-28/69499/

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD, AND ANALYST AND MARKET REACTIONS THERETO

299. During the Class Period, Defendants made the following false and misleading statements and material omissions.

### A. February 5, 2015 – Earnings Announcement

#### 1. Misstatement and Omission No. 1 – Caswell's February 5, 2015 False and Misleading Statement Regarding the Transition

300. On February 5, 2015, Maximus issued a press release in which it announced its first quarter 2015 financial results. In connection with this press release, CEO Montoni touted Maximus's "good progress" on the HAAS Contract as follows: "In our Health Services Segment, . . . we are making good progress as we ramp up our new health contracts in the United Kingdom and the United States."

301. Later the same day, during the Company's related earnings call, Maximus provided further detail on how it was handling the transition of the HAAS Contract from Atos. During the question and answer portion of the conference call, an analyst asked the Company for details about its preparation for taking over the HAAS Contract, which Montoni directed Caswell to answer. In doing so, Caswell represented that the transition was "***going as expected***":

[Analyst]: Could you just speak a little to the work you've been doing to prepare for that Health Assessments Advisory Services contract and how that's going?

Montoni: We'd be glad to do that Alan. Bruce why don't you tackle that one.

Caswell: Sure. Allen good morning, I'd just say that as Rick mentioned in his notes we continue to work on ramping up for that contract. It has a takeover day or deadline of March 1. The teams are working across a number of work teams as you could imagine in

> conjunction with our client and ***we feel very much that it's going as expected***.

302. Caswell's statement in the preceding paragraph was false and misleading because the transition was **not** going as Maximus expected in February 2015 given that Maximus had not successfully achieved a key goal of the transition and a primary driver of its successful performance of the Contract— the transfer of a sufficient number of HCPs from Atos. Per the Government Audit Report, Maximus concluded a secret negotiation with the DWP in July 2015 to reduce its annual assessment target volumes by 20,000 on the sole basis that "**fewer staff transferred from the previous provider than the contractual assumption** agreed by the Department and CHDA." Per the Contract, Maximus had to have known of this shortfall by November 13, 2014. ¶72. Further, Maximus had to officially report that shortfall to the DWP in its first monthly "Resource Plan" by February 1, 2015, just days before this misstatement. ¶68.

303. To the extent the statement conveyed Caswell's opinion, it was false and misleading because it lacked a reasonable basis and omitted Maximus's significant shortfall of transfers from Atos – a fact which would conflict with what a reasonable investor would understand from the statement itself.

304. As President, Montoni knew, or was severely reckless in not knowing, that his preceding statement was false and misleading for the reasons discussed above and in Section VI.A.1.(a), *infra*. Further, the Company knew, or was severely reckless in not knowing, that the preceding statement was false and misleading for the reasons discussed above and in Section VI.B., *infra*.

### 2. Market Reactions to the Misstatement and Omission

305. On this news, Maximus's share price rose approximately 3.9% from its closing price the prior day, to close that day at $59.68 per share. By contrast, the S&P 500 Index rose only .33% over the same period.

306. Analysts were encouraged by Maximus's misstatements and omissions regarding the positive progress of the transition from Atos. For example, a report issued that day by Avondale Partners maintained its positive "Outperform" rating, and raised its price target to $68 per share (from $63) after Maximus's "reaffirmation" of its guidance for expected revenue and earnings per share. The report specifically noted management's assurance that the negative "drag" from other contracts would be "offset by a positive $0.18 [earnings per share] contribution from HAAS."

## B. May 7, 2015 – Earnings Announcement

307. On May 7, 2015, prior to the trading session, Maximus issued a press release announcing its second quarter 2015 financial results, first reporting on the performance of the HAAS Contract after it took over from Atos on March 1, 2015.

### 1. May 7, 2015 Misstatements and Omissions by Montoni

308. Later that day, the Company hosted a conference call with analysts to discuss its financial results, including its initial performance on the HAAS Contract. All of the Individual Defendants participated in this call.

309. During the May 7, 2015 call, Montoni discussed the purportedly successful launch of the HAAS Contract as follows:

> Moving on to our international health operations where MAXIMUS successfully launched the Health Assessment Advisory Service in the UK on March 1. This is the contract where MAXIMUS is conducting assessments for individuals seeking certain disability benefits according to the rules set down by the United Kingdom Parliament.

> Our startup of operations are [sic] progressing well. We are working hard to achieve the program's goals related to improved service to UK citizens, including increasing the overall number of healthcare professionals who support the program. This allows us to meet our assessment volume requirements and lower the backlog so people can be assessed in a timely manner.
>
> ***Nearly all of the employees transferred over from their previous provider*** and ***early indications are that we are meeting our recruitment targets for healthcare professionals***. This is key in helping us bring about positive change and, although it is early days, ***we are also on track to meet our requirements for assessment volumes***.[25]

#### (a) Misstatement and Omission No. 2: Montoni's May 7, 2015 Statement Regarding the Transfer of Atos HCPs

310. Montoni's statement that "***[n]early all of the employees transferred over from their previous provider***," Atos, was false and misleading because "nearly all" Atos employees did not transfer over, a fact that Defendants knew no later than November 2014, per the Contract. *See* ¶72, *supra*. According to the Government Audit Report, in July of 2015 – less than two months after this statement was made – Maximus concluded a secret negotiation with the DWP to reduce in annual assessment target volumes by 20,000 on the basis that "fewer staff transferred from the previous provider than the contractual assumption agreed by the Department and CHDA." In fact, at the time Montoni made this statement, Maximus was already negotiating with the DWP to decrease its annual assessment target on the sole ground that not enough Atos employees transferred over. *See* ¶302, *supra*.

311. As CEO, Montoni knew, or was severely reckless in not knowing, that his preceding statement was false and misleading for the reasons discussed above and in Section VI.A.2.(a), *infra*. Further, the Company knew, or was severely reckless in not knowing, that the preceding statement was false and misleading for the reasons discussed above and in Section VI.B., *infra*.

---

[25] A presentation accompanying Montoni's statements on the same day contained substantially similar statements, which were false and misleading for the same reasons detailed herein.

### (b) Misstatement and Omission No. 3: Montoni's May 7, 2015 Statement Regarding Recruitment Targets

312. Montoni's statement that "***early indications are that we are meeting our recruitment targets for healthcare professionals***" was false and misleading because: Maximus was **not** "meeting [HCP] recruitment targets" at this time, as discussed above. *See* Sections IV.E.1.(a), IV.E.1.(b)(i)-(iii), & IV.E.1.(c), *supra*. For instance, Maximus had internally recorded as a high risk, on April 28, 2015, that "[r]ecruitment results may be below requirements and impact . . . assessment volumes." *See* Section IV.E.1.(b)(ii), *supra*. Similarly, the Government Audit Report revealed that as of April 2015, Maximus had determined that recruiting the needed number of HCPs was "high risk." *See* Section IV.E.1.(b)(i), *supra*. Finally, internal Maximus documents show, and CWs confirmed, that Maximus was falling far short of its early recruiting targets, by 40-67%, during this time period. *See* Section IV.E.1.(b)(iii), *supra*.

313. As CEO, Montoni knew, or was severely reckless in not knowing, that his preceding statement was false and misleading for the reasons discussed above and in Section VI.A.2.(b), *infra*. Further, the Company knew, or was severely reckless in not knowing, that the preceding statement was false and misleading for the reasons discussed above and in Section VI.B., *infra*.

### (c) Misstatement and Omission No. 4: Montoni's May 7, 2015 Statement Regarding Assessment Volumes

314. Montoni's statement that "***we are also on track to meet our requirements for assessment volumes***" was false and misleading when made because Maximus was not "on track" to meet its requirements for assessment volumes at this time. To the contrary, it was already falling far short of its recruitment, training, and productivity targets that Defendants knew at the time were all necessary to meet the Contract's assessment volume requirements.

*See* Section IV.E.1-4, *supra*. Further, even though Maximus met its low assessment targets in March 2015, it failed to meet its key face-to-face volume targets in April 2015, which comprised 70% of its annual target at the time and thus needed to be met for it to be "on track" to achieve its 1 million volume requirement for the first year. In fact, Maximus's monthly rate for completing assessments was already decelerating between March and April due to the persistence of the above recruitment, training attrition, and productivity problems, while its monthly assessment requirements were rising (and would continue to rise), at such a rate that it would not be able to meet its targets for any subsequent month during the Class Period. *See* Section IV.E.4.(a), *supra.*

315. As CEO, Montoni knew, or was severely reckless in not knowing, that his preceding statement was false and misleading for the reasons discussed above and in Section VI.A.2.(c)-(e), *infra*. Further, the Company knew, or was severely reckless in not knowing, that the preceding statement was false and misleading for the reasons discussed above and in Section VI.B., *infra*.

**2. Market Reactions to the Misstatements and Omissions**

316. On this news, Maximus's share price rose approximately 4.1%, to close that day at $65.55 per share, on unusually heavy trading volume of 1,476,800 shares being traded, compared to just 581,800 the previous day.

317. Analysts were encouraged by Maximus's misstatements and omissions regarding the positive progress of its HAAS Contract and the resultant increased revenues and profits that it represented. For example, a May 7, 2015 analyst report by Avondale Partners, titled "MMS – Strong Earnings Print; '15 Guidance Raised and '16 Introduced," maintained its "Outperform" rating and raised its price target from $71 to $74 per share. The report noted that, "[i]n Q3 the company expects an increase in revenue and profit as the HAAS Contract will be

providing a full quarter of contribution," adding, "[t]o this extent, it is not surprising that the company expects Q3 to be the strongest quarter in 2015." The report also noted that a $0.10 earnings per share "FY [fiscal year] '15 drag" from two other start-up contracts "will be offset by a positive $0.18 [earnings per share] contribution from HAAS." (Emphasis in original.) Thus, the analyst incorporated into his investment thesis that Maximus would meet its targets for the HAAS Contract, and that it would be profitable in fiscal year 2015.

318. Also on May 7, 2015, Jefferies gave Maximus a "Buy" rating in a report titled "Like Old Faithful, MMS Delivers Again: 4 Key Insights From F2Q15." They analyst noted "especially strong" performance "driven by the Health Services business," which included the HAAS Contract. It further pointed out and that the forecasted 2016 earnings per share contribution from the Contract was higher than expected.

319. On the same day, Maxim Group published a report titled "Raising Price Target to $78 (from $72) After MMS Posts Better-Than-Expected Results and Outlook." The report stated: "It was the health segment that delivered all of the $23 million upside, compared to our revenue estimate of $459 million."

**C. May 8, 2015 – Form 10-Q**

320. On May 8, 2015, Maximus filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarterly period ended March 31, 2015 and fiscal year ("2015 2Q 10-Q"). The 2015 2Q 10-Q contained signed SOX certifications by Defendants Montoni and Nadeau, stating that the financial information and other statements contained in the 2015 2Q 10-Q were accurate.

321. Although the 2015 2Q 10-Q was the first to be filed since Maximus began performance on the HAAS Contract, it contained only the same risk warnings from before it

began performance of the HAAS Contract. Under the heading "Risk Factors," it incorporated by reference the risk factors from Maximus's fiscal 2014 Form 10-K:

> In connection with information set forth in this Form 10-Q, the factors discussed under "Risk Factors" in our Form 10-K for fiscal year ended September 30, 2014 should be considered. The risks included in the Form 10-K could materially and adversely affect our business, financial condition and results of operations. **There have been no material changes to the factors discussed in our Form 10-K for the year ended September 30, 2014.**

### 1. Misstatement and Omission No. 5: May 8, 2015 Risk Factors Regarding Recruitment and Retention of New HCPs, and Other Contractual Assumptions

322. In its fiscal 2014 Form 10-K, filed on November 17, 2014, Maximus disclosed the following as "Risk Factors," which, as noted above, were incorporated by reference and reiterated in its 2015 2Q 10-Q on May 8, 2015. These disclosures were certified as accurate pursuant to SOX by Montoni and Nadeau:

> ***If* we fail to accurately estimate the factors upon which we base our contract pricing, we *may* generate less profit than expected or incur losses on those contracts**. . . .To earn a profit on these contracts, we must accurately estimate costs involved and assess the probability of completing individual transactions within the contracted time period. ***If* our estimates prove to be inaccurate, we *may* not achieve the level of profit we expected or we may incur a net loss on a contract.**
>
> . . .
>
> ***We may be unable to attract and retain sufficient qualified personnel to sustain our business***. Our delivery of services is labor-intensive. When we are awarded a government contract, we must quickly hire project leaders and case management personnel.

323. These risk warnings were identical to previous "Risk Factor" warnings included in Maximus's prior Form 10-K filed on November 19, 2013 for the fiscal year ended September 30, 2013.

324. Defendants' statements above were false and misleading because they warned of only potential risks, when in fact those risks had already materialized. Specifically, Maximus

**already** failed to "***estimate factors upon which***" the HAAS Contract was based, and **already** was "***generat[ing] less profit than expected***" on that Contract. Maximus was already failing to achieve its internal targets for recruitment, training, productivity, and total assessment volume under the Contract at the time it made this statement. For example, the Contract assumed that Maximus would be able to recruit 120 HCPs when this statement was made, but Maximus was **already** falling short of that target by 40-67%. *See* Section IV.E.1.(b)(iii), *supra*. The Contract also assumed that Maximus would be able to successfully train **95%** of recruited HCPs to conduct assessments, but at this time Maximus was successfully training on average **only 44%** according to CWs, as corroborated by the Government Audit Report; indeed, according to Wolfe, it was only training **30%** of new HCPs when it first took over the Contract from Atos. *See* Section IV.E.2., *supra*. Further, according to Company documents, its training passage rate was only 55% in March of 2015, followed by 50% in April.

325. Moreover, Maximus assumed it would need its HCPs to complete 6 assessments each day, but they **never** reached that productivity goal during the Class Period, missing it by about 33% (*i.e.* 4 assessments per day rather than 6). *See* Section IV.E.3., *supra*. As a result, as of May 8, 2015, Maximus was not able to recruit or train sufficient HCPs to conduct enough assessments to meet its monthly face-to-face target for April, or its first-year contractual requirement of 1 million assessments, which was the "number one" driver of profitability on the Contract. *See* Section IV.E.4., *supra*. Indeed, internal Risk Registers show that all of the above were known, substantial risks that the Company had identified and that had thus materialized no later than April 2015. In addition, Maximus was also already falling far short of its quality targets for assessment reports, which was the second main driver of the Contract's profitability. *See* Section IV.E.6., *supra*.

326. Moreover, Maximus was **already** "unable to attract and retain sufficient qualified personnel to sustain [its] business." For instance, Maximus had internally recorded as a high risk, on April 28, 2015, that "[r]ecruitment results may be below requirements and impact . . . assessment volumes." *See* Section IV.E.1.(b)(ii), *supra*. Similarly, the Government Audit Report revealed that as of April 2015, Maximus had determined that recruiting the needed number of HCPs was "high risk." *See* Section IV.E.1.(b)(i), *supra*.

327. Finally, internal Maximus documents show, and CWs confirmed, that Maximus was falling far short of its early recruiting targets, by 40-67% during this time period. *See* Sections IV.E.1.(b)(ii)-(v), *supra*.

328. As noted above, Montoni and Nadeau acknowledged the accuracy of the information contained in this 10-Q by signing SOX certifications, and thus were makers of statements contained therein. Montoni, as CEO, and Nadeau, as CFO knew, or were severely reckless in not knowing, that their preceding statement was false and misleading for the reasons discussed above and in Sections VI.A.2.(b)-(f) & VI.A.3., *infra*, respectively. Further, the Company knew, or was severely reckless in not knowing, that the preceding statement was false and misleading for the reasons discussed above and in Section VI.B., *infra*.

### 2. Misstatement and Omission No. 6: May 8, 2015 Item 303 Omission

329. In its 2015 2Q 10-Q filed on May 8, 2015, Maximus made financial disclosures, certified as accurate under SOX by Montoni and Nadeau, regarding the performance of its Health Services Segment, which included the HAAS Contract. It contained actionable omissions pursuant to Item 303 of Regulation S-K, 17 C.F.R. §229.303.

#### (a) Maximus Did Not Satisfy Its Duty to Disclose Under Item 303

330. Pursuant to Item 7 of Form 10-K, Maximus's SEC filings were required to furnish the information required Under Item 303 of Regulation S-K, 17 C.F.R. §229.303.

Specifically, Maximus was required to disclose any known trends, events or uncertainties that had caused or were reasonably likely to cause its financial information not to be indicative of future results.

331. The 2015 2Q 10-Q failed to disclose information required under Item 303(a)(3), including, *inter alia*:

(a) the known trend or uncertainty of diminishing monthly total assessments being conducted (from 60,898 in March 2015 to 56,108 in April 2015);

(b) the known trend or uncertainty of diminishing monthly face-to-face assessments conducted (from 38,765 in March 2015 to 33,376 in April 2015), which meant Maximus went from meeting its contractual target (of 38,002 in March) to falling significantly short of its contractual target (of 38,939 in April) – a trend which would continue for every month through August of 2015 and possibly later; and

(c) the known trends or uncertainties that Maximus was substantially falling short of the HAAS Contract's performance targets for recruitment, training, productivity, and assessment quality described in Sections IV.E.1.-3. & IV.E.6., *supra*. Specifically:

(i) recruitment fell far short of Maximus's internal monthly target of 120 in the time period spanning February through April (*see* ¶¶170-172);

(ii) the training passage rate fell far short of the assumed 95% success rate each month, starting at only 30% (*see* ¶118) and averaging roughly 44% at this time (*see* ¶¶197-201);

(iii)productivity fell far short of the targeted 6 assessments per HCP per day for all but the top 1% of HCPs, and was further being slowed by a known 9-11 month learning curve from when the HCP joined Maximus (*see* Section IV.E.3.); and

(iv) Maximus was on its way to having its assessments fail quality standards by **twice** the contractually allowed rate by the end of May 2015 (*see* Section IV.E.6).

332. These were known trends or uncertainties that had caused – and were reasonably likely to continue causing – Maximus's financial information in its 2015 2Q 10-Q not to be indicative of future results. Indeed, as a result of these known trends, Maximus admitted just three months later, on August 6, 2015 that "revenue will be offset by start-up challenges" with the HAAS Contract, including the "recruiting and retaining of healthcare professionals," which had "proved to be tougher than we had anticipated." Because the above known trends or uncertainties were having, and were reasonably likely to have, a material impact on the Company's continuing operations, Defendants were required to disclose them pursuant to Item 303.

333. Montoni, as CEO, and Nadeau, as CFO knew, or were severely reckless in not knowing, that their material omission in the preceding statement was false and misleading for the reasons discussed above and in Sections VI.A.2.(b)-(f) & VI.A.3., *infra*, respectively. Further, the Company knew, or was severely reckless in not knowing, that this material omission in the preceding statement was false and misleading for the reasons discussed above and in Section VI.B., *infra*.

### D. August 6, 2015 – Earnings Announcement

#### 1. Partial Corrective Disclosure

334. On August 6, 2015, prior to the trading session, Maximus issued a press release to announce its financial results for its third fiscal quarter of 2015 (ending June 30, 2015). It reported strong revenue growth and increased its expected revenue forecast for the fiscal year (from a range of $2.05 billion to $2.08 billion, to a range of $2.10 billion and $2.14 billion). It also maintained its guidance for earnings per share to stay in the previously given "range

between $2.33 and $2.40," but no longer stated (as it did the previous quarter) that it was with "a bias towards the upper end of the range." However, the Company announced that for its Health Services Segment, which includes the financial impact of the HAAS Contract, operating margin fell from 14.2 percent from the prior year to 13.7 percent in the third quarter of 2015.

335. During the Company's related earnings call later the same day, Nadeau partially disclosed the "challenges" the Company was experiencing with the HAAS Contract, including specifically problems with "recruiting and retaining" of HCPs that were causing "variances" from its assessment volume targets:

> The Health Services Segment had some recent positive developments. We recently picked up some scope expansion on a couple of existing domestic health contracts but we expect margin levels to be lower initially. In addition, we were also awarded a new subcontract in our U.S. federal business for an existing client under a relatively new program. Under the contractual terms, we cannot provide any additional details, but we can tell you that we have already started work on this health-related contract.
>
> Revenue will materialize from these contracts in the fourth quarter and it is the principal reason for the increase to revenue guidance. This additional revenue will be **offset** by **start-up challenges that we are experiencing with the Health Assessment Advisory Service contract in the UK**.
>
> . . .
>
> **Since our last earnings call, the recruiting and retaining of healthcare professionals has proved to be tougher than we had anticipated.**[26] **As a result, we are experiencing volume and, to a lesser extent, quality variances from our plan. This means lower revenue and profit contributions from the contract at this time.**

336. As part of his prepared remarks, Montoni reiterated to investors that the factors most strongly affecting its financial results from the HAAS Contract were the number, quality,

[26] This part of the statement was the first time that the Company publicly acknowledged any difficulties with recruiting and training HCPs, despite knowing about them since March 2015. *See* Section IV.E.1.-IV.E.2., *supra*.

and timeliness of assessments it performed versus "required" levels. However, Montoni also reassured that Maximus's initiatives to improve these shortfalls were "gaining traction":

> **Our performance under this program is tied to quality, timeliness and the number of assessments completed**. So as with any new program, we are focused on hitting the **required** performance metrics.
>
> **We believe that our efforts to drive recruitment and improve retention are gaining traction** and are the right course of action. This includes but is not limited to an aggressive recruitment campaign that is well underway. We believe this should drive a significant uplift in qualified applicants.

337. During the question and answer portion of the conference call, Montoni provided greater detail on these problems, including the difficulty in recruiting qualified HCPs. An analyst asked him to explain **why** Maximus was having trouble recruiting HCPs, and whether there was any plan to address it. In response, Montoni disclosed that Maximus had failed to anticipate that the HCPs were in short "**supply**" and too-high "**demand**" compared to how Maximus had planned to recruit them, as opposed to a negative perception of "the nature of the program itself" due to Atos's reputation:

> [Analyst]: I'm curious why you think you're having trouble recruiting on the HAAS Contract? Does it have anything to do with the contract's reputation from the previous vendor? And if not, what do you think the issue is as you see it and/or the plan to fix that issue.
>
> Montoni: []I think the challenges on recruiting health care professionals, and we recruit two types of health care professionals, one happens to be doctors and the other one's nurses and this is across the United Kingdom. So, finding the right number of those health care professionals, as we know here in the U.S., there's not a surplus of such professionals in our economy. The same condition exists in the United Kingdom. So, we are looking for individuals, the majority of which are gainfully employed, **so recruiting them is tougher than some other types of professionals**. And the geographic factors also play into it. As it relates to the nature of the program and the work that we do, I think there are individuals that are actually passionate about it and care about it very, very much, and I think we've managed the program such that it is attractive to many, many individuals. So, I think **it's really just a matter of supply and demand**. . . .

**2. Market Reactions to the Partial Corrective Disclosure**

338. On the news described in the previous section, Maximus's share price declined approximately **13.8**% over two trading days. On August 6, 2015, Maximus's share price declined approximately 6.4%, to close the day at $64.78 per share, down from a closing price of $69.22 per share the previous day. On the following day, August 7, 2015, Maximus common stock price continued to decline by an additional 7.9% to close at $59.65 per share.

339. Analysts also reacted negatively to the disclosures that Maximus was underperforming on the HAAS Contract.

340. For example, an August 6, 2015 analyst report from Maxim Group remarked that "the ramp of this [HAAS] contract has been slower than expected" due to "trouble recruiting sufficient healthcare professionals to meet the demand requirement of the contract." The report further noted the "sub-par performance . . . triggered lower revenue and profits."

341. Also on August 6, 2015, Wells Fargo published a report noting that "MMS [was] having some difficulty hiring and retaining healthcare professionals, which has resulted in quality variances and therefore lower incentive fees." It highlighted the negative news that Maximus "missed" its expected gross profit margin as being specifically "due to challenges ramping the new health assessment contract in the United Kingdom."

342. A later analyst report, issued by Jefferies on September 30, 2015, confirmed that "the biggest factor driving the sell-off post 2Q results was the slower ramp of the UK disability assessment contract."

**3. Misstatement and Omission No. 7: Nadeau's August 6, 2015 False and Misleading Reassurance**

343. Although Defendants disclosed some issues with the HAAS Contract, they also minimized the problems and falsely reassured that this Contract would still be profitable in

fiscal year 2015, set to end less than two months later, on September 30, 2015. Specifically, Nadeau stated in pertinent part:

> In March, we took over the contract from the prior provider and at the time of take-over, it was a very troubled program. Many things are going well with the contract and we remain confident that we can bring about positive change to the program over time.
>
> . . .
>
> ***The project is still expected to be profitable for*** both ***[fiscal year] '15*** and [fiscal year] '16.[27]
>
> As Rich will talk about, we have already implemented many initiatives to drive recruitment and increase new applicant retention. It is important to note that the Health Assessment Advisory Service is one of several new programs in startup. We operate a portfolio of contracts that are in various stages of maturity. As a result, at any given time our more mature contracts offset our newer programs.

344. Nadeau's statement in the preceding paragraph was false and misleading because of undisclosed productivity problems – in addition to the "tougher than we had anticipated" recruiting and training problems – known to the Company at the time this statement was made. Maximus was falling significantly short of its assumed recruitment, training, and productivity levels, which it knew at the time were necessary to meet the Contract's assessment volume targets, as described above. *See* Sections IV.E.1.-4., *supra*.

345. Further, Maximus's award fees and service credits for assessment volume targets were assessed monthly, and were the "number one driver" of its revenues and profits from the Contract. ¶126. Maximus failed to meet its contractual volume targets in the four months, preceding this statement (April, May, June, and July). In fact, in July, Maximus performed fewer assessments (63,631) than it had in June (63,951), even though its target had risen significantly (from 66,214 to 74,180). The ongoing month of August would be far worse,

[27] A presentation accompanying Nadeau's statements on the same day contained substantially similar statements, which were false and misleading for the same reasons.

wherein Maximus would only complete 50,968 assessments, versus an even higher monthly target of 81,535. Thus, the Company's shortfalls in assessment volumes were accelerating. *See* Section IV.E.4, *supra*. Indeed, based on Maximus's assessment volume performance in the first 6 months of the Contract (March through August 2015), the Government Audit Report concluded that Maximus was "not on track" to meet its first-year volume requirement.

346. Maximus was also behind in its contractual requirements for assessment quality, the "number two driver" of its performance and thus profits from the Contract, in May, June, July, and August, which directly impacted the Company's revenue and profit in the form of service credits, yet the full extent of its quality shortfalls remained undisclosed. *See* Section IV.E.6.

347. Because of these known shortfalls in both its "number one" and "number two" drivers of performance – volume and quality, the Contract was not on a path to being profitable for fiscal year 2015. In fact, the indications at the time of this statement were that its performance was rapidly worsening, and as a result, the Contract was not profitable for the fiscal year 2015.

348. Nadeau's statement was false and misleading in omitting the preceding material, adverse facts, because it created a strong impression of a state of affairs (that performance of the HAAS Contract was improving) that differed in a material way from the one that actually existed (that performance of the HAAS Contract was deteriorating).

349. To the extent the statement conveyed Nadeau's opinion, it was misleading because it lacked a reasonable basis and omitted the full extent of Maximus's failure to meet volume and quality targets (including the underlying targets for recruitment, training, and

productivity) as well as the rapidly increasing size of its volume shortfalls —facts which would conflict with what a reasonable investor would understand from the statement itself.

350. As CFO, Nadeau knew, or was severely reckless in not knowing, that his preceding statement was false and misleading for the reasons discussed above and in Section VI.A.3., *infra*. Further, the Company knew, or was severely reckless in not knowing, that the preceding statement was false and misleading for the reasons discussed above and in Section VI.B., *infra*.

#### 4. Misstatement and Omission No. 8: Montoni's August 6, 2015 False and Misleading Reassurance Regarding Size of Shortfall

351. During the question and answer portion of the conference call, an analyst asked to follow up on Montoni's description of Maximus's recruitment shortfalls as "just a matter of supply and demand." *See* ¶337, *supra*. In response, Montoni falsely minimized Maximus's problems as follows:

> [Analyst]: Okay. And then the follow up, I guess, then is if it's supply and demand, how long do you expect it might take to get this contract's revenue[,] profitability and head count to the path that you originally thought?
>
> Montoni: [O]ur original thought was that all of [fiscal 2015] would be a ramp period. We took this over [] in the spring. And all of [fiscal 2015] and throughout a good portion of 2016, our original plan this would be in ramp mode. So our plan was that this would stabilize in [fiscal 2016] and that's still our plan. So ***we're <u>a bit</u> <u>behind</u> where we wanted to be*** but we have actions in place such that we think we can stay on course and get this stabilized in [fiscal 2016].

352. Montoni's statement in the preceding paragraph was false and misleading because Maximus was substantially more than "***a bit behind***" at the time when this statement was made. In fact, in August of 2015, Maximus was **substantially** behind in its recruitment, training, and productivity. *See* Sections IV.E.1.(b)(iv)-(v), IV.E.1.(c), IV.E.2., & IV.E.3.

Further, as described above, Maximus was far behind in its contractual requirements for overall assessment volume and quality in May, June, July, and August, which directly impacted the Company's revenue and profit in the form of service credits. *See* ¶¶345-346, Section IV.E.4 & Section IV.E.6.

353. Further, Montoni's statement was false and misleading in omitting the preceding material, adverse facts because it created a strong impression of a state of affairs (that Maximus was only "a bit" behind in its performance goals on the Contract) that differed in a material way from the one that actually existed (that Maximus was significantly behind, and falling further behind).

354. To the extent the statement conveyed Montoni's opinion, it was misleading because it lacked a reasonable basis and omitted the above facts, including notably the extent and accelerating nature of Maximus's shortfalls —facts which would conflict with what a reasonable investor would understand from the statement itself.

355. As CEO, Montoni knew, or was severely reckless in not knowing, that his preceding statement was false and misleading for the reasons discussed above and in Sections VI.A.2.(b)-(f), *infra*. Further, the Company knew, or was severely reckless in not knowing, that the preceding statement was false and misleading for the reasons discussed above and in Section VI.B., *infra*.

#### 5. Market Reactions to Defendants' False and Misleading Reassurances

356. Analysts reacted positively to Defendants' false and misleading reassurances that Maximus was only "a bit behind" its performance metrics on this contract and that it thus was on track to generate the promised revenues and profits in fiscal 2015.

357. For instance, the same August 6, 2015 report from Maxim Group (described in ¶340, *supra*) stated that the analyst remained "confident" in the Company's "ability to address

the recruiting challenges in a timely fashion." It acknowledged that the "UK HAAS Contract [was] facing recruiting issues **but we expect management will fix the problem within six month[s]**." Accordingly, it maintained its "Buy" rating.

358. Similarly, the Wells Fargo analyst report acknowledging the negative news that day (described in ¶341, *supra*) also echoed Nadeau's reassurance, reiterating that "**management still expects the project to be profitable for both FY2015** and FY2016." The analyst therefore "continue[d] to believe MAXIMUS has a strong track record and a trusted reputation and is well positioned to benefit as fiscally-challenged governments rely upon outsourced services to improve inefficient programs," and maintained his "Outperform" rating.

359. Finally, the analyst report issued by Jefferies on September 30, 2015 (described in ¶342, *supra*) reiterated its "Buy" rating after Defendants' reassurances, stating: "**This issue, slower than expected hiring of doctors/nurses to perform assessments (a pay point), seems solvable**. A more aggressive recruiting plan is already in place."

**E. August 7, 2015 – Form 10-Q**

360. On August 7, 2015, Maximus filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarterly period ended June 30, 2015 ("2015 3Q 10-Q"). The 2015 3Q 10-Q contained signed SOX certifications by Defendants Montoni and Nadeau, stating that the financial information and other statements contained in the 2015 3Q 10-Q were accurate.

361. The 2015 3Q 10-Q again contained only the same risk warnings from before Maximus began performance of the HAAS Contract. Under the heading "Risk Factors," it incorporated by reference the risk factors from Maximus's 2014 Form 10-K, as follows:

> In connection with information set forth in this Form 10-Q, the factors discussed under "Risk Factors" in our Form 10-K for fiscal year ended September 30, 2014 should be considered. The risks included in the Form 10-K could materially and

> adversely affect our business, financial condition and results of operations. **There have been no material changes to the factors discussed in our Form 10-K for the year ended September 30, 2014.**

### 1. Misstatement and Omission No. 9: August 7, 2015 Risk Factors Regarding Recruitment and Retention of New HCPs, and Other Contractual Assumptions

362. In its 2014 Form 10-K, filed on November 17, 2014, Maximus disclosed the following as "Risk Factors," which it incorporated and reiterated in its 2015 3Q 10-Q on August 7, 2015. These disclosures were certified as accurate pursuant to SOX by Montoni and Nadeau:

> ***If** we fail to accurately estimate the factors upon which we base our contract pricing, we **may** generate less profit than expected or incur losses on those contracts*. . . .To earn a profit on these contracts, we must accurately estimate costs involved and assess the probability of completing individual transactions within the contracted time period. ***If** our estimates prove to be inaccurate, we **may** not achieve the level of profit we expected or we **may** incur a net loss on a contract*.
>
> . . .
>
> ***We may be unable to attract and retain sufficient qualified personnel to sustain our business***. Our delivery of services is labor-intensive. When we are awarded a government contract, we must quickly hire project leaders and case management personnel.

363. Those risk warnings were identical to previous "Risk Factor" warnings included in Maximus's prior Form 10-K filed on November 19, 2013 for the fiscal year ended September 30, 2013.

364. Defendants' statements above were false and misleading because they warned of only potential risks, when in fact those risks had already materialized. Specifically, Maximus **already** failed to "***estimate factors upon which***" the HAAS Contract was based, and **already** was "***generat[ing] less profit than expected***" on that contract. Maximus was already failing to achieve its internal targets for recruitment, training, productivity, and total assessment volume under the HAAS Contract at the time it made this statement. For example, in the months

preceding this statement, Maximus had **already** repeatedly failed to meet its initial monthly recruitment targets (starting at 120) by a wide margin, as discussed above. *See* Sections s IV.E.1.(b)-(c), *supra*. Indeed, in July 2015, Maximus had decided to increase its monthly recruitment target to 211 for August and beyond in an effort to compensate for its recruitment and training shortfalls, which it knew would be even more difficult to meet, and which it again repeatedly missed. *See* Section IV.E.1.(b)(iii), *supra*. Further, instead of the assumed 95% training passage rate for new HCPs, Maximus's rate was on average only **44%** during this time period, as corroborated by the Government Audit Report, which discussed Maximus's performance through August 2015. *See* Section IV.E.2., *supra*. Moreover, Maximus assumed it would need its HCPs to complete 6 assessments each day, but it **never** reached that productivity goal during the Class Period, missing it by about 33% (*i.e.* 4 assessments per day rather than 6). *See* Section IV.E.3., *supra*.

365. As a result, as of August 7, 2015, Maximus was not able to recruit or train sufficient HCPs to meet its first-year contractual volume requirement, which had recently been reduced to 980,000 assessments due to the shortfall in HCPs that had transferred from Atos. Therefore, Maximus was **already** unable to meet its monthly total assessment requirements under the HAAS Contract for May or June of 2015 – as well as its total assessment requirement for the relevant quarter running April through June of 2015 – causing a negative impact on its quarterly financial results. Nor was it able to meet its assessment requirements for July of 2015, the month immediately preceding this statement. Likewise, in August, when this statement was made, Maximus would fall short of its assessment requirement by the largest amount yet: −28,067 (50,968 assessments compared to a target of 79,035). Indeed, based on these results

through August 2015, the Government Audit Report concluded that Maximus was not "on track" to meet its first-year assessments volume target.

366. Montoni, as CEO, and Nadeau, as CFO knew, or were severely reckless in not knowing, that their material omission in the preceding statement was false and misleading for the reasons discussed above and in Sections VI.A.2.(b)-(f) & VI.A.3., *infra*. Further, the Company knew, or was severely reckless in not knowing, that this material omission in the preceding statement was false and misleading for the reasons discussed above and in Section VI.B., *infra*.

### 2. Misstatement and Omission No. 10: August 7, 2015 Item 303 Omission

367. In its 2015 3Q 10-Q filed on August 7, 2015, Maximus made financial disclosures, certified as accurate pursuant to SOX by Montoni and Nadeau, regarding the performance of its Health Services Segment, which included the HAAS Contract. These disclosures contained actionable omissions pursuant to Item 303 of Regulation S-K, 17 C.F.R. §229.303.

#### (a) Maximus Did Not Satisfy Its Duty to Disclose Under Item 303

368. Pursuant to Item 7 of Form 10-K, Maximus's SEC filings were required to furnish the information required Under Item 303 of Regulation S-K, 17 C.F.R. §229.303. Specifically, Maximus was required to disclose any known trends, events or uncertainties that had caused or were reasonably likely to cause its financial information not to be indicative of future results.

369. The 2015 3Q 10-Q failed to disclose information required under Item 303(a)(3), including, *inter alia*:

(a) the known trend or uncertainty of monthly total assessments falling far short of their contractual targets, specifically 54,916 actual assessments versus 59,119 required in May of 2015; 63,951 actual assessments versus 66,214 required in June of 2015; and 63,631 actual assessments versus 74,180 required in July of 2015 – a trend which would continue for every month through the first year of the Contract (ending in February 2016) and possibly later; and

(b) the known trends or uncertainties that Maximus was substantially falling short of the HAAS Contract's performance targets for recruitment, training, productivity, and assessment quality described *supra*. Specifically:

(i) recruitment fell far short of Maximus's internal monthly target of 120-140 for February through July 2015 (*see* Section IV.E.1.);

(ii) the training passage rate fell far short of the assumed 95% rate during each month from February through July 2015, averaging only 44% (*see* Section IV.E.2);

(iii)productivity fell far short of the targeted 6 assessments per HCP per day for all but the top 1% of HCPs, and was being slowed by a known 9-11 month learning curve from when the HCP joined Maximus (*see* Section IV.E.3.); and

(iv)Maximus was failing its quality standards by **twice** the contractually allowed rate by the end of July 2015 (*see* Section IV.E.6).

370. These were known trends or uncertainties that had caused – and were reasonably likely to continue causing – Maximus's financial information in its 2015 3Q 10-Q to not be indicative of future results. Because the above known trends or uncertainties were having, and were reasonably likely to have, a material impact on the Company's continuing operations, Defendants were required to disclose them pursuant to Item 303.

371. Montoni, as CEO, and Nadeau, as CFO knew, or were severely reckless in not knowing, that their material omission in the preceding statement was false and misleading for the reasons discussed above and in Sections VI.A.2.(b)-(f) & VI.A.3., *infra*, respectively. Further, the Company knew, or was severely reckless in not knowing, that this material omission in the preceding statement was false and misleading for the reasons discussed above and in Section VI.B., *infra*.

### F. November 12, 2015 – Earnings Announcement

#### 1. Second Partial Corrective Disclosure

372. On November 12, 2015, Maximus issued a press release in which it announced its fourth quarter and full year 2015 financial results. In detailing its disappointing operating (profit) income and margin compared to the same period the prior year in the Health Services Segment, the Company attributed the shortfall directly to the underperformance of the HAAS Contract:

> Health Segment revenue for the fourth quarter of fiscal 2015 increased 29% (32% on a constant currency basis) to $296.2 million, compared to $230.5 million reported for the same period last year. Operating income for the fourth quarter of fiscal 2015 totaled $30.5 million (10.3% operating margin), compared to $31.2 million (13.5% operating margin) for the same period last year.
>
> For the full fiscal year, Health Segment revenue increased 22% (25% on a constant currency basis) to $1.1 billion, compared to $906.7 million for the same period last year. All growth was organic. Fiscal 2015 operating income totaled $154.3 million (13.9% operating margin), compared to operating income of $115.6 million (12.7% operating margin) for fiscal 2014.
>
> The increases in revenue for the fourth quarter and the full fiscal year 2015 were driven by new work and the expansion of existing contracts. **Operating margins for the fourth quarter and full fiscal year 2015 were tempered by new programs in start-up, most notably the U.K. Health Assessment Advisory Service contract, which is not performing to the Company's previous expectations**.

373. In the same press release, the Company lowered its earnings per share guidance for the fiscal year 2016, and attributed the change exclusively to the HAAS Contract:

> The Company is updating its preliminary fiscal year 2016 GAAP diluted earnings per share guidance and now expects GAAP diluted EPS to range between $2.40 and $2.70. **The lowered earnings outlook is attributable to a slower ramp and hence a reduced contribution from the U.K. Health Assessment Advisory Service contract.**

374. On the same day, during the related earnings call, Nadeau reiterated that the reduced 2016 earnings guidance was "**a result of a single program, the UK Health Assessment Advisory Service** [HAAS]" contract, because "**the ramp-up to contract volume targets has been slower than originally planned**." In particular, he disclosed that the HAAS Contract would not be profitable in FY 2015 as Defendants had previously assured, but instead would operate at a **loss of $4 million**. He further disclosed that the HAAS Contract generated significantly less revenue than the Company initially told investors it would – $105 million instead of the original "$140 million to $165 million" range. He further stated that "[r]evenue in the fourth quarter was lower than expected, **principally due to the UK Assessment contract**." Nadeau also detailed the fiscal year performance of the HAAS Contract, stating, in relevant part:

> For [fiscal year 2015], the UK Assessment contract delivered approximately $105 million in revenue and an operating loss of $4 million. Revenue was short of our initial projected range of $140 million to $165 million. The shortfall has two primary elements. **First, our staffing levels are running lower than our plan** and, therefore, billable costs are lower than forecast. As a result, **revenue and operating income are lower** on the cost reimbursable piece of the contract. **Second, we are not achieving certain performance metrics, most notably volume targets and as a result, we are not earning the performance-based incentive fees**.

Thus, Nadeau disclosed that shortfalls in the Company's overall financial performance were directly attributable to its inability to maintain proper HCP "**staffing levels**" or achieve

"**performance metrics, most notably volume targets**" as assumed and required by the HAAS Contract.

375. A presentation accompanying these remarks further stated, in pertinent part: "**Progress remains short of initial targets & original projections for operating income.**"

376. In addition to the shortfall for its recently ended fourth quarter and full fiscal year 2015, CFO Nadeau reiterated during the November 12, 2015 Earnings Call that the HAAS Contract's negative impact on earnings would continue into the next fiscal year of 2016:

> As a result [of the HAAS Contract], we now expect that FY16 diluted earnings per share will range between $2.40 and $2.70.
>
> We have put forth FY16 earnings guidance that includes a wide range of possible outcomes under this program. The lower end of the range assumes that we continue to face challenges related to achieving our contract volume targets. The upper end of the range contemplates improved performance and increased volume output. The management team is certainly focused on delivering results that move us toward the upper end of this range.
>
> . . .
>
> We are firmly committed to getting the program on track, and **we have made significant progress in bringing positive improvements to the overall service**. Rich will talk about this in greater detail in his prepared remarks.

377. Later on the earnings call, Montoni offered to "pick up where Rick left off, and start with the UK Assessment contract." He reiterated that the Company's "ability to hit the volume targets is tied directly to three areas: the number of healthcare professionals that we recruit, the number that complete training and graduate, and the productivity of these new recruits." He admitted: "**[W]e are falling short of achieving the initial volume targets**." Focusing on the third area, Montoni admitted for the first time that the Company's shortfalls were also being caused by problems with HCP productivity:

> The third area is productivity. Once new staff begin performing assessments, **there is a learning curve, and it may take between six and eight months for them to achieve full productivity levels**. In the meantime, we have efforts

> under way to increase productivity with our current workforce. . . . We expect that the increased recruiting efforts, supplemented by the enhanced training and optimization of our current workforce, will help us to increase our productivity, meet volume targets, and reduce wait times over the coming months.

378. Further, during the question and answer portion of the earnings call, Caswell related additional detail about the Company's underperformance on the HAAS Contract. He stated:

> **The real issue that we've been facing is our ability to graduate those trainees that we bring into the system on a timely basis and ensure that we have a high level of graduation rate, and obviously a correspondingly low attrition**. And it might be helpful just to give you a sense of what the training program is like that folks have to go through. It's very extensive and rigorous.
>
> Takes a long time, about three months, for them to complete. They have to go through multiple competency tests in that process. And these are healthcare professions that, for a good portion of their career, predating their joining us, have been giving very direct care to folks in a clinical environment versus assessing very complex conditions, many of which can fluctuate from day to day.
>
> . . .
>
> [I]t takes individuals **up to six to eight months to reach full productivity after they graduate**. And that's why we're seeing the lag in the uptake of production.

### 2. Market Reactions to the Partial Corrective Disclosure

379. On the news described in the previous section, Maximus's share price declined approximately **21.9%.**

380. Analysts also reacted negatively to Defendants' partial disclosures. For example, on November 12, 2015, Jefferies published an analyst report titled "4 Key Insights from [F]3Q15: Buying Opportunity On the Sharp Sell-Off," which lowered its price target for Maximus to $65 from $75 per share, and noted that the "UK disability contract is taking longer to ramp **and is the driver behind today's pressure**" driving the share price down. The report noted that because "hiring and retaining doctors/nurses to perform the health & disability

assessments ha[d] been challenging . . . the company is missing revenue milestones that fall straight to the bottom line."

381. The same day, analysts from Canaccord Genuity published a report titled "Maintain HOLD and lower PT to $59; FY'16 guide appears easily attainable." The report lowered its price target for Maximus and noted a "Key negative" that the "Underperforming HAAS Contract dr[ove] FY'16 EPS [earnings per share] guidance down 13.6% to $2.40-$2.70" compared to its previous range of "$2.85-$3.05." The report made clear that the "lowered guidance was solely due to HAAS."

382. Also the same day, Maxim Group published an analyst report titled "Recommend MMS on Weakness; **Recruiting Still An Issue on UK HAAS**; Expect Recovery At The End of F16." This report explained the difficulties in staffing the program and their view that "HAAS is the main reason EPS guidance was slashed." Wells Fargo's analysts reported in the article "MMS: UK Contract Stifling FY2016 Profits--Should Improve By FY17" that "**continued challenges with the UK Health Assessment contract also drove a miss for the Health Services segment**."

### 3. Misstatement and Omission No. 11: Caswell's November 12, 2015 False and Misleading Reassurance Regarding Recruiting Rates

383. Later, on the same call, Caswell similarly discussed the news of lower than expected revenue from the HAAS Contract while simultaneously reassuring that Maximus had already "made very good progress." During the question and answer portion of the conference call, an analyst inquired about the HAAS Contract underperformance, and Montoni had Caswell answer the question given his direct oversight of the contract:

> [Analyst]: I was wondering if you could talk about the slower than expected ramp of staffing for the UK Assessment contract. Is that being driven by a shortage of qualified healthcare professionals in the

market? Or if you could just talk about what factors are causing the drag in recruiting, that would be great.

Montoni: Stephen, think that's a great question. Bruce Caswell, who is our President, by the way has spent, as you expect, **along with the rest of the Executive team, a lot of time on this project. He has been over to London several times and has some really great insight in terms of what's been done and what we will do to move this forward**. I'm going to ask Bruce to comment upon and give you some insights as it relates to that topic.

Caswell: Fundamentally, actually recruiting has improved quite a bit over the course of the last several months. Actually is no longer as a significant a constraint as it was previously. So we feel like we've made very good progress in recruiting and ***we are now reaching a level of recruiting that, from a rate perspective, is an appropriate level***.

So the issue is really that we need to sustain that rate for the foreseeable future. We've done that through a number of methods, by increasing our supply chain partners, focusing on the quality of the recruits that were getting and so forth. So recruiting, less of a constraint.

. . .

[Another analyst]: [H]ow many healthcare professionals do you have on that contract, the assessments contract, right now and what does the current workload require?

. . .

Caswell: As a matter of client confidentiality, we can't actually speak to the detailed metrics in terms of the number of healthcare professionals that we have on board, but I would remind you that we feel like we've made very significant progress in expanding our supply chain of qualified healthcare professionals. I spoke a moment ago about the breadth of that supply chain.

. . .

[W]e feel that ***we are at the right rate for recruiting***. And we feel that we just need to keep it going for the foreseeable future.

384. Caswell's statements in the preceding paragraph was false and misleading because Maximus was not at the "right rate" or "appropriate level" for recruiting at this time.

By this point the Company had already determined that the appropriate number of HCPs to recruit each month was 211, but as it would later admit, it was in fact only "hiring approximately 100 new healthcare professionals each month" at the time this statement was made, *i.e.*, "[d]uring the autumn [2015] timeframe." *See* Sections IV.E.1.(b)(iv), IV.E.1.(b)(v), and IV.E.1.(d). Indeed, according to CWs and internal Company documents, Maximus never came close to achieving this 211 target in any month leading up to the statement, and indeed, any month during the Class Period. *See* Section IV.E.1.(b)(iv). Thus, at this time, Maximus was **not** "at the right rate for recruiting" or at "the appropriate level" for recruiting given it was recruiting **fewer than half** of its targeted number of HCPs per month.

385. Caswell's statement was false and misleading in omitting the preceding material, adverse facts, because it created a strong impression of a state of affairs (that Maximus was recruiting at the rate it needed to achieve its volume and quality targets under the Contract) that differed in a material way from the one that actually existed (that it was falling short of that rate by **over 50%**).

386. To the extent the statement conveyed Caswell's opinion, it was misleading because it lacked a reasonable basis and omitted that Maximus was actually falling far short of its own internal recruitment targets at the time—facts which would conflict with what a reasonable investor would understand from the statement itself.

387. As President, Caswell knew, or was severely reckless in not knowing, that his preceding statement was false and misleading for the reasons discussed above and in Section VI.A.1.(b), *infra*, respectively. Further, the Company knew, or was severely reckless in not knowing, that the preceding statement was false and misleading for the reasons discussed above and in Section VI.B., *infra*.

#### 4. Market Reactions to Defendants' False and Misleading Reassurances

388. Analysts were comforted by Defendants' false and misleading reassurances.

389. For example, the November 12, 2015 Jefferies analyst report noted above concluded that the outlook for the year was "intact," echoing Caswell's misstatements regarding improved recruiting rates::

> Management ha[d] been aware of this issue for several months and **corrective action plans are in place to accelerate hiring**. **MMS tells us recruiting has shown a significant uptick in the last couple months and it believes it will reach full run-rate earnings potential during FY16**. That's later than originally expected, but means FY17 earnings contribution from this contract shouldn't be any different than what investors were modeling yesterday.

Thus, the analyst maintained its positive "Buy" rating, noting that "Management Gets Benefit Of The Doubt. This negative update is uncharacteristic of MMS."

390. Similarly, Canaccord Genuity noted in its November 12, 2015 report that it remained confident in management and that even though "[l]owered guidance is solely attributable to HAAS, **we do not believe the story is broken**." The analyst was comforted that "MMS detailed the HAAS Contract challenges and corrective actions being taken." The report concluded: "We expect progress to materialize in 1H FY'16 [the first half of fiscal year 2016]."

391. The analyst from Maxim Group was similarly reassured, and stated in a November 12, 2015 report, titled "Recommend MMS on Weakness; Recruiting Still An Issue on UK HAAS; Expect Recovery At The End of F16" that although the quarter's results were below expectations "as a result of continued shortfalls in the U.K. Health Assessments contract," the analyst nonetheless "expect[ed] the UK health assessments contract's issues [to] be corrected by the end of F2016." The report also noted:

> Although management acknowledged recruiting issues in 3Q:F15, its preliminary F2016 EPS guidance assumed after about six months it could staff the program and generate a 10-15% operating margin in F2016 as a stronger pay and benefits package would drive better recruiting and performance. While this

> target margin remains intact, management now expects to be fully staffed on the program by the end of the summer in 2016 and it should be able to still achieve the high end of the target operating margin range of 10-15%, in our view.

Thus, the analyst reiterated his positive "Buy" rating.

## VI. ADDITIONAL SCIENTER ALLEGATIONS

392. During the Class Period, as alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew or were severely reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were severely reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

393. The Individual Defendants permitted Maximus to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's stock.

394. As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Maximus, their control over, receipt, and/or modification of Maximus' allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Maximus, participated in the fraudulent scheme alleged herein.

395. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Maximus common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding Maximus' business, operations, and

management and the intrinsic value of Maximus common stock and caused Lead Plaintiff and members of the Class to purchase Maximus common stock at artificially inflated prices.

### A. Montoni, Nadeau, and Caswell Knew About Maximus's Underperformance on the HAAS Contract, and the True Reasons Therefor

#### 1. Caswell Closely Followed the HAAS Contract, Spent "A Lot of Time On" It, and Was Designated to Focus on It

396. When an analyst asked Montoni on November 11, 2015 about HCP staffing for the HAAS Contract, Montoni replied by affirming that the **entire** "**Executive team**" of Maximus had been **spending** "**a lot of time on this project**." He singled out Caswell as having "been over to London several times" to focus on "what's been done and what we will do to move this forward." And he directed Caswell to address the question, indicating that Caswell had special "insights as it relates to that topic" of HCP recruitment.

397. On February 4, 2016, an analyst again asked about "the HAAS Contract" and any "improvements that you made there." Montoni again directed the question to Caswell, who he again emphasized "**has been spending an awful lot of time, as you might imagine, on this HAAS Contract**." CW4 corroborated that Montoni sent one of his lieutenants, who on information and belief was Caswell, to the U.K. to monitor the status of the HAAS Contract on his behalf.

398. Further, according to CW2, not long after Maximus took the over HAAS Contract from Atos in March 2015, Caswell held a VideoLink teleconference from Reston, Virginia. Every Maximus U.K. employee was invited to participate, save only HCPs assessing claimants at the time of the call. Wolfe participated on this video teleconference as well.

399. Per CW2, on this VideoLink teleconference, Caswell discussed the problems that Maximus was experiencing with the HAAS Contract, including HCP recruitment, HCP training, HCP productivity, overall assessment volumes, and overall assessment quality – stressing that

performance needed to be improved. He specifically stated that recruitment and training passage rates needed to be increased. He further noted that productivity (*e.g.*, the average daily number of assessments performed by HCPs and the total assessment volumes performed), was falling short of Company goals and also needed to be increased. Caswell also acknowledged that assessment quality was a problem, including but not limited to his observation that too many assessments were being rejected, and needed to be improved.

400. Overall, a variety of factors contributed to Maximus's underperformance of the HAAS Contract during the Class Period. These factors included, but were not limited to: not enough HCPs transferring over from Atos, insufficient HCP recruiting, training, and productivity, and inadequate assessment report quality. As detailed below, these shortfalls made Maximus's assessment and quality targets unreachable during the Class Period. These factors were well known within Maximus during the Class Period, and by Caswell in particular, as early as February 2015. Accordingly, Caswell's statements and omissions were knowingly (or severely recklessly) false or misleading, as detailed below.

**(a) Caswell Knew, or Was Severely Reckless in Not Knowing, That an Insufficient Number of HCPs Transferred From Atos**

401. It was Company-wide knowledge that not enough HCPs transferred over from Atos. Schedule 17 of the HAAS Contract required that, no later than November 13, 2014, Maximus be provided with a list of all "Transferring Employees" from Atos, including HCPs. *See* ¶72. Further, Maximus had to officially report any shortfall to the DWP in its first monthly "Resource Plan" by February 1, 2015. ¶68 . Around that time, Maximus began renegotiating with DWP to lower its annual assessment targets, as a result of recognizing that, in the words of the Government Audit Report, "fewer staff transferred from the previous provider [Atos] than

the contractual assumption" – a negotiation which the Company had to initiate "no later than" March 13, 2015, ¶70, and continued through June/July 2015.

402. On the November 13, 2014 earnings call, Caswell discussed the "**key elements** of the ramp-up of the program." He stated: "The **biggest one is really the conversion of the existing staff over from Atos** as the incumbent provider as we ramp-up to the March launch."

403. Thus, Caswell would have known about the shortfall in Atos transfers – the "biggest" "key element" in Maximus's transition – well before February 5, 2015, particularly given his close monitoring of the HAAS Contract's progress, when he stated that "we feel very much that ***[the transition from Atos is] going as expected***." Accordingly, Caswell's **Misstatement No. 1** was made with scienter.

**(b) Caswell Knew, or Was Severely Reckless in Not Knowing, That Maximus Was Recruiting an Inadequate Number of HCPs**

404. In February through April of 2015, Maximus was behind on its recruiting goals by over 40%. *See* ¶171, *supra*. Maximus knew it was not recruiting sufficient HCPs to satisfy the HAAS Contract by at least April 28, 2015. That was the day the Company's internal Risk Registers identified as raising a high likelihood that the Company would "**not be able to source and process sufficient recruits of appropriate quality** to meet the demand profile," coding it "red." Widespread knowledge of this problem is corroborated by the Government Audit Report's account that in **April 2015** Maximus had identified "healthcare professional capacity as **high risk**" to the DWP. The problem only got worse as the Class Period progressed. *See* Section IV.E.1.(b), *supra*.

405. Caswell held a VideoLink teleconference shortly after March 2015 to discuss problems with HCP recruitment, where he specifically stated that recruitment rates needed to be increased. In addition, Caswell had access to Operation Reports providing metrics on the

Company's recruitment. Thus, Caswell would have known about the Company's shortfall in HCP recruiting before November 12, 2015, when he stated: "***[W]e are now reaching a level of recruiting that, from a rate perspective, is an appropriate level***," and "we feel that we are ***at the right rate for recruiting***." Thus, Caswell's **Misstatement No. 11** was made with scienter.

**(c) Caswell Knew, or Was Severely Reckless in Not Knowing, That Maximus Was Training an Inadequate Number of HCPs**

406. By June of 2015, Maximus was experiencing only a 44% success rate training its recruited HCPs, behind the 95% success rate assumed by the HAAS Contract by over a factor of two; put differently, its failure rate was **almost eleven times** its internal target rate of 5%. *See* Section IV.E.2., *supra*. Maximus knew it was not training sufficient HCPs to satisfy the HAAS Contract by at least April 28, 2015. That was the day the Company's internal Risk Registers identified as noting that "**Initial high attrition rate from training continues**," raising a high likelihood that there would be "**Not enough HCPs coming into business**, reducing capacity and **affecting volumes**," coding it "red." The Risk Register also noted, on the same date, that the Company "**will not have the required training capacity to match the recruited volumes,**" labeling the risk "red" and describing its "Impact" as follows: "**We will not be able to train all the staff we recruit** in a timely manner **and this would stop us from meeting the assessment volumes**."

407. Widespread knowledge of this problem is corroborated by the Government Audit Report's account that, for March through August of 2015: "In practice around half of those recruited by CHDA completed their training." The problem only got worse as the Class Period progressed. *See* Section IV.E.2., *supra*.

408. Caswell held a VideoLink teleconference shortly after March 2015 to discuss problems with HCP training, where he specifically stated that training passage rates needed to

be increased. In addition, Caswell had access to Operation Reports providing metrics on the Company's training. Thus, Caswell would have known about the Company's shortfall in HCP training before May 7, 2015.

**(d) Caswell Knew, or Was Severely Reckless in Not Knowing, That Maximus's HCP Productivity Was Inadequate**

409. While Maximus set an internal target to have HCPs conduct 6 assessments per day, its average productivity rate was significantly less: between 4 to 4.2 per HCP per day. *See* Section IV.E.3., *supra*. Maximus knew from the start of the HAAS Contract on March 1, 2015 that its internal target was unrealistic, based on Atos's experience coming to the same conclusion, and the companies' shared experience in the 4-month transition phase. *See* ¶238, *supra*. Indeed, multiple entries in the Company's internal Risk Registers identified productivity problems that could negatively impact assessment targets. *See* Section IV.E.3.(a)(iii)[2], *supra*.

410. Caswell held a VideoLink teleconference shortly after March 2015 to discuss problems with HCP productivity. In addition, Caswell had access to Operation Reports providing metrics on the Company's productivity. Thus, Caswell would have known about the Company's shortfall in HCP productivity before May 7, 2015.

**(e) Caswell Knew, or Was Severely Reckless in Not Knowing, That Maximus Was Not "On Track" to Meet Its First-Year Assessments Target**

411. Maximus missed virtually all of its monthly assessment volume targets in the months from April 2015 through February 2016.

412. The Company "assessed any penalties or any awards or any incentives on a month-to-month basis" and recognized revenue on the same basis. Crucially, meeting assessment targets was the "the number one driver" of Maximus's performance, according to Montoni's statements on August 6, 2015, and as confirmed by the terms of the HAAS Contract

itself. Mounting shortfalls month after month meant that Maximus not only was incapable of meeting its monthly assessment targets and was getting penalized each time, but it was also never closing the gap at any point. Because Maximus recognized revenue or losses each month on the contract and this was its "number one driver," each month without a positive award-fee profit contribution would have necessarily meant underperformance. As noted above, this first occurred in April of 2015, when Maximus failed to meet its face-to-face volume targets, and continued every month for the remainder of the Class Period as Maximus fell further and further behind.

413. Caswell held a VideoLink teleconference shortly after March 2015 to discuss the Company's poor performance with assessment volumes. In addition, Caswell had access to Operation Reports providing metrics on the Company's recruitment, training, productivity, and quality of assessments.

414. Thus, Caswell would have known about the shortfall in assessment volumes before May 7, 2015.

#### (f) Caswell Knew, or Was Severely Reckless in Not Knowing, That Maximus's Assessment Quality Was Inadequate

415. By May 2015, Maximus knew its HCP assessments were failing to meet quality standards at **twice** the rate allowed by the HAAS Contract, which was 5%. According to the Government Audit Report, in May, June, and July 2015, 10% of Maximus's reports did not meet quality standards. Schedule 2.1 of the HAAS Contract required Maximus to report "all aspects of quality" on a monthly basis. Internally, it was widely known that Maximus was not meeting its contracted quality standards, as noted in the Risk Register that indicated that "quality score" was already "reduced" compared to Atos's, by **April 2015**, at the latest. *See* ¶¶281-284, *supra*. Moreover, by early August 2015 an internal presentation titled "Clinical

Quality CHDA Workstream Status Report" reported that "**quality outcomes are a major concern**." It further noted that a "Clinical Quality Improvement Plan" had already been "drafted and passed to DWP." The overall report was flagged "Amber," indicating that "**significant issues**" existed and required "**management attention**."

416. In fact, Montoni underscored the importance of quality metrics on the November 13, 2014 Q4 2014 Earnings Call, stating that performance was "tied to quality, timeliness, and the number of assessments completed." On the August 6, 2015 Q3 2015 Earnings Call, Montoni reiterated that for "performance-based incentives" under the Contract, "[t]he number two driver is quality."

417. Caswell held a VideoLink teleconference shortly after March 2015 to discuss the Company's poor performance with assessment quality. In addition, Caswell had access to Operation Reports providing metrics on the Company's quality of assessments. Thus, Caswell would have known about the shortfall in assessment quality on or before May 8, 2015, when Maximus filed its misleading Form 10-Q.

418. In sum, given the magnitude of Maximus's problems in achieving all of these key drivers of Maximus's performance and revenues from this Contract—one of its largest—Caswell would have been aware of such problems at the time, particularly given Defendants' admissions above that he closely monitored the Contract's progress.

### 2. Montoni Closely Followed the HAAS Contract and Knew, or Was Severely Reckless in Not Knowing, About Maximus's Problems with the Contract

419. When an analyst asked Montoni on November 12, 2015 about HCP staffing for the HAAS Contract, Montoni replied by affirming that the **entire** "**Executive team**" of Maximus had been **spending** "**a lot of time on this project**," himself included.

420. Overall, a variety of factors contributed to Maximus's underperformance of the HAAS Contract during the Class Period. As noted above, these factors included, but were not limited to: not enough HCPs transferring over from Atos, insufficient HCP recruiting, training, and productivity, and inadequate assessment report quality. As detailed below, these shortfalls made Maximus's assessment and quality targets unreachable during the Class Period. These factors were well known within Maximus, and by Montoni, no later than May 2015. Accordingly, Montoni's statements and omissions were knowingly (or severely recklessly) false or misleading, as detailed below.

#### (a) Montoni Knew, or Was Severely Reckless in Not Knowing, That an Insufficient Number of HCPs Transferred From Atos

421. It was Company-wide knowledge that not enough HCPs transferred over from Atos. Schedule 17 of the HAAS Contract required that, no later than November 13, 2014, Maximus be provided with a list of all "Transferring Employees" from Atos, including HCPs. *See* ¶72. Further, Maximus had to officially report any shortfall to the DWP in its first monthly "Resource Plan" by February 1, 2015. ¶68. Around that time, Maximus began renegotiating with DWP to lower its annual assessment targets as a result of recognizing that, in the words of the Audit Report, "fewer staff transferred from the previous provider [Atos] than the contractual assumption" – a negotiation which the Company had to initiate "no later than" March 13, 2015, ¶¶70-71, and continued through June/July 2015.

422. Among the "**key elements** of the ramp-up of the program," the "**biggest one [was] really the conversion of the existing staff over from Atos** as the incumbent provider as we ramp-up to the March launch." Thus, Montoni would have known about the shortfall in Atos transfers well before May 7, 2015, when he stated: "***Nearly all of the employees***

***transferred over from their previous provider***." Thus, Montoni's **Misstatement No. 2** was made with scienter.

#### (b) Montoni Knew, or Was Severely Reckless in Not Knowing, That Maximus Was Recruiting an Inadequate Number of HCPs

423. In February through April of 2015, Maximus was behind on its recruiting goals by over 40%. *See* ¶171, *supra*. Maximus knew it was not recruiting sufficient HCPs to satisfy the HAAS Contract by at least April 28, 2015. That was the day the Company's internal Risk Registers identified as raising a high likelihood that the Company would "**not be able to source and process sufficient recruits of appropriate quality** to meet the demand profile," coding it "red." Widespread knowledge of this problem is corroborated by the Audit Report's account that in **April 2015** Maximus had identified "healthcare professional capacity as **high risk**" to the DWP. The problem only got worse as the Class Period progressed. *See* Section IV.E.1.(b), *supra*.

424. Montoni had access to Operation Reports providing metrics on the Company's recruitment. Thus, Montoni would have known, or have been severely reckless in not knowing, about the Company's shortfall in HCP recruiting before May 7, 2015, when he stated: "***early indications are that we are meeting our recruitment targets for healthcare professionals***." Thus, Montoni's **Misstatement No. 3** was made with scienter.

425. Further, Montoni would have known, or have been severely reckless in not knowing, about the Company's large and continuing shortfall in HCP recruiting on August 6, 2015 when he stated: "***we're a bit behind where we wanted to be***." Thus, his **Misstatement No. 8** was made with scienter.

426. Montoni's **Misstatement Nos. 5, 6, 9,** and **10** were made with scienter for the same reasons.

**(c) Montoni Knew, or Was Severely Reckless in Not Knowing, That Maximus Was Training an Inadequate Number of HCPs**

427. By June of 2015, Maximus was experiencing only a 44% success rate training its recruited HCPs, behind the 95% success rate assumed by the HAAS Contract by over a factor of two; put differently, its failure rate was **almost eleven times** its internal target rate of 5%. *See* Section IV.E.2, *supra*. Maximus knew it was not training sufficient HCPs to satisfy the HAAS Contract by at least April 28, 2015. That was the day the Company's internal Risk Registers identified as noting that "**Initial high attrition rate from training continues**," raising a high likelihood that there would be "**Not enough HCPs coming into business**, reducing capacity and **affecting volumes**," coding it "red." The Risk Register also noted, on the same date, that the Company "**will not have the required training capacity to match the recruited volumes,**" labeling the risk "red" and describing its "Impact" as follows: "**We will not be able to train all the staff we recruit** in a timely manner **and this would stop us from meeting the assessment volumes**."

428. Widespread knowledge of this problem is corroborated by the Audit Report's account that, for March through August of 2015: "In practice **around half** of those recruited by CHDA completed their training." The problem only got worse as the Class Period progressed. *See* Section IV.E.2., *supra*.

429. Montoni had access to Operation Reports providing metrics on the Company's training. Thus, Montoni would have known about the Company's shortfall in HCP training before May 7, 2015 when he stated: "***we are also on track to meet our requirements for assessment volumes***." Thus, his **Misstatement No. 4** was made with scienter.

430. Further, Montoni would still have known, or have been severely reckless in not knowing, about the Company's large and continuing shortfall in HCP training on August 6,

2015 when he stated: "***we're a bit behind where we wanted to be***." Thus, his **Misstatement No. 8** was made with scienter.

431. Montoni's **Misstatement Nos. 5, 6, 9,** and **10** were made with scienter for the same reasons.

**(d) Montoni Knew, or Was Severely Reckless in Not Knowing, That Maximus's HCP Productivity Was Inadequate**

432. While Maximus set an internal target to have HCPs conduct 6 assessments per day, its average productivity rate was significantly less: between 4 to 4.2 per HCP per day. *See* Section IV.E.3, *supra*. Maximus knew from the start of the HAAS Contract on March 1, 2015 that its internal target was unrealistic, based on Atos's experience coming to the same conclusion, and the companies' shared experience in the 4-month transition phase. *See* ¶238, *supra*. Indeed, multiple entries in the Company's internal Risk Registers identified productivity problems that could negatively impact assessment targets. *See* Section IV.E.3.(a)(iii)[2], *supra*.

433. Montoni had access to Operation Reports providing metrics on the Company's productivity. Thus, Montoni would have known about the Company's shortfall in HCP training before May 7, 2015 when he stated: "***we are also on track to meet our requirements for assessment volumes***." Thus, his **Misstatement No. 4** was made with scienter.

434. Further, Montoni would still have known, or have been severely reckless in not knowing, about the Company's large and continuing shortfall in HCP productivity on August 6, 2015 when he stated: "***we're a bit behind where we wanted to be***." Thus, his **Misstatement No. 8** was made with scienter.

435. Montoni's **Misstatement Nos. 5, 6, 9,** and **10** were made with scienter for the same reasons.

#### (e) Montoni Knew, or Was Severely Reckless in Not Knowing, That Maximus Was Not "On Track" to Meet Its First-Year Assessments Target

436. Maximus missed some or all of its monthly assessment volume targets in each month from April 2015 through February 2016.

437. The Company "assessed any penalties or any awards or any incentives on a month-to-month basis" and recognized revenue on the same basis. Crucially, meeting assessment targets was the "the number one driver" of Maximus's performance, according to Montoni's statements on August 6, 2015, and as confirmed by the terms of the HAAS Contract itself. Mounting shortfalls month after month meant that Maximus not only was incapable of meeting its monthly assessment targets and was getting penalized each time, but it was also never closing the gap at any point. Because Maximus recognized revenue or losses each month on the contract and this was its "number one driver," each month without a positive award-fee profit contribution would have necessarily meant underperformance. As noted above, this first occurred in April of 2015, when Maximus failed to meet its face-to-face volume targets, and continued every month for the remainder of the Class Period as Maximus fell further and further behind.

438. Montoni had access to Operation Reports providing metrics on the Company's recruitment, training, productivity, and quality of assessments. Thus, Montoni would have known about the Company's shortfall in HCP training before May 7, 2015 when he stated: "***we are also on track to meet our requirements for assessment volumes***." Thus, his **Misstatement No. 4** was made with scienter.

439. Further, Montoni would still have known, or have been severely reckless in not knowing, about the Company's large and continuing shortfall in HCP assessments on August 6,

2015 when he stated: "***we're a bit behind where we wanted to be***." Thus, his **Misstatement No. 8** was made with scienter.

440. Montoni's **Misstatement Nos. 5, 6, 9,** and **10** were made with scienter for the same reasons.

**(f) Montoni Knew, or Was Severely Reckless in Not Knowing, That Maximus's Assessment Quality Was Inadequate**

441. By May 2015, Maximus knew its HCP assessments were failing to meet quality standards at **twice** the rate allowed by the HAAS Contract, which was 5%. According to the Audit Report, in May, June, and July 2015, 10% of Maximus's reports did not meet quality standards. Schedule 2.1 of the HAAS Contract required Maximus to report "all aspects of quality" on a monthly basis. Internally, it was widely known that Maximus was not meeting its contracted quality standards, as noted in the Risk Register that indicated that "quality score" was already "reduced" compared to Atos's, by **April 2015**, at the latest. *See* ¶¶281-284, *supra*. Moreover, by early August 2015, an internal presentation titled "Clinical Quality CHDA Workstream Status Report" reported that "**quality outcomes are a major concern**." It further noted that a "Clinical Quality Improvement Plan" had already been "drafted and passed to DWP." The overall report was flagged "Amber," indicating that "**significant issues**" existed and required "**management attention**."

442. In fact, Montoni underscored the importance of quality metrics on the November 13, 2014 Q4 2014 Earnings Call, stating that performance was "tied to quality, timeliness, and the number of assessments completed." On the August 6, 2015 Q3 2015 Earnings Call, Montoni reiterated that for "performance-based incentives" under the Contract, "[t]he number two driver is quality."

443. Montoni had access to Operation Reports providing metrics on the Company's quality of assessments. Montoni would have known, or have been severely reckless in not knowing, about the Company's large and continuing shortfall in assessment quality by no later than May 8, 2015, when the Company filed its Form 10-Q that was certified pursuant to SOX by Montoni, and certainly by August 6, 2015, when he stated: "***we're a bit behind where we wanted to be***." Thus, his **Misstatement Nos. 5, 6 and 8** were made with scienter.

444. Further, his **Misstatement Nos. 9,** and **10** were made with scienter for the same reasons.

445. In sum, given the magnitude of Maximus's problems in achieving all of these key drivers of its performance and revenues from this Contract—one of its largest—Montoni would have been aware of such problems at the time, particularly given Defendants' admissions above that he closely monitored the Contract's progress.

#### (g) Montoni's False SOX Certifications Further Support His Scienter

446. Montoni's scienter is further supported by the fact that he certified, by personally signing each filing pursuant to SOX, that he reviewed Maximus's Form 10-Qs and confirmed their accuracy, "[**b]ased on [his] knowledge**." By certifying and signing these filings, he became responsible and liable for all of the misstatements and omissions contained therein and confirmed that he had the requisite knowledge.

### 3. Nadeau Likewise Made His Statements With Scienter

#### (a) Nadeau Closely Followed the HAAS Contract and Knew, or Was Severely Reckless in Not Knowing, About Maximus's Problems with the Contract

447. When an analyst asked Montoni on November 11, 2015 about HCP staffing for the HAAS Contract, Montoni replied by affirming that the **entire** "**Executive team**" of

Maximus, including Nadeau, had been **spending** "**a lot of time on this project**." Nadeau also had access to Operation Reports providing metrics on the Company's recruitment, training, productivity, and quality of assessments. As detailed above, the Company's problems in these areas were widespread and known throughout the Company.

448. Further, as detailed below, the shortfalls were in the "number one" and "number two" drivers of the Company's performance on the HAAS Contract – volume and quality. Because the Company "assessed any penalties or any awards or any incentives on a month-to-month basis" and recognized revenue on the same basis, Nadeau, as CFO, would have seen the financial impact of these shortfalls on at least a monthly basis.

449. Meeting assessment targets was the "the number one driver" of Maximus's performance, according to Montoni's statements on August 6, 2015, and as confirmed by the terms of the HAAS Contract itself. Mounting shortfalls month after month meant that Maximus not only was incapable of meeting its monthly assessment targets and was getting penalized each time, but it was also never closing the gap at any point. Because Maximus recognized revenue or losses each month on the contract and this was its "number one driver," each month without a positive award-fee profit contribution would have necessarily meant underperformance. This first occurred in April of 2015, when Maximus failed to meet its face-to-face volume targets, and continued every month for the remainder of the Class Period as Maximus fell further and further behind. As CFO, Nadeau would have seen the financial impact reflected in every month's financial results.

450. Regarding quality, according to the Audit Report, in May, June, and July 2015, 10% of Maximus's reports did not meet quality standards. Thus, by August 2015, Maximus's assessments were failing to meet quality standards at **twice** the rate allowed by the HAAS

Contract, which was 5%. As noted above, these quality problems were well-known within the Company by no later than April 2015, as indicated in the Risk Registers, and certainly by early August 2015, when an internal Workstream Status Report discussed them, as detailed above.

451. Because of these known shortfalls in both its "number one" and "number two" drivers of performance – volume and quality – the Contract was not on a path to being profitable for fiscal year 2015 in August of 2015. As CFO, Nadeau would have seen the financial impact reflected in every month's financial results. During August, the indications were the Contract was not profitable for the fiscal year 2015 set to end in less than two months. Indeed, Maximus missed virtually all of its monthly assessment volume and quality targets in the months from April 2015 through February 2016.

452. Given the magnitude of Maximus's problems in achieving both of these key drivers of Maximus's performance and revenues from this Contract—one of its largest—and given Montoni's admissions that Nadeau closely monitored the Contract's progress, Nadeau would have known about the Company's shortfalls by May 8, 2015, when the Company filed its Form 10-Q, which Nadeau certified pursuant to SOX, and certainly by August 6, 2015 when he stated: "***The project is still expected to be profitable for . . .[fiscal year] '15***. . . ." Thus, Nadeau's **Misstatement Nos. 5, 6, and 7** were made with scienter.

453. Nadeau's **Misstatement Nos. 9** and **10** were made with scienter for the same reasons.

**(b) Nadeau's False SOX Certifications Further Support His Scienter**

454. Nadeau's scienter is further supported by the fact that he certified, by personally signing each filing pursuant to SOX, that he reviewed Maximus's Form 10-Qs and confirmed their accuracy, "**[b]ased on [his] knowledge**." By certifying and signing these filings, he

became responsible and liable for all of the misstatements and omissions contained therein and confirmed that he had the requisite knowledge.

### B. The Company Had Scienter for Defendants' Misstatements and Omissions Regarding the HAAS Contract

#### 1. The Individual Defendants' Knowledge of Maximus's Underperformance on the HAAS Contract, and the True Reasons Therefor, Are Imputed to the Company

455. Because of their senior positions within the Company, the Individual Defendants' scienter, detailed above, is imputable to the Company itself.

#### 2. Wolfe's Knowledge of Maximus's Underperformance on the HAAS Contract, and the True Reasons Therefor, Are Imputed to the Company

##### (a) Wolfe Knew Maximus Could Not Achieve Its Volume and Quality Targets Under the HAAS Contract, Including Its Recruiting, Training/Attrition, and Productivity Targets

456. As noted above, Maximus knew about its recruitment, training and attrition performance (or lack thereof) on at least a monthly basis, because it was contractually obligated to monitor these metrics and report them to the DWP upon request. ¶67, *supra*. In reality, Maximus monitored them weekly through a "Weekly Resource Report." This report was accessible to all of the Defendants. As shown by an internal Company email distributing the Weekly Resource Report on August 7, 2015, Wolfe was included on the distribution list and received this information.

457. Wolfe was listed among Maximus's "Key Transition Staff" and therefore knew about shortfalls in HCPs carrying over from Atos by November 13, 2014. *See* ¶73, *supra*. She spoke on behalf of Maximus about its recruitment efforts both to *The Guardian* on January 18, 2015, to the BBC on February 24, 2015, and to Parliament on February 3, 2016.

458. Accordingly, Wolfe had been apprised of the problems described herein – with the Atos transition, HCP recruitment, HCP training, HCP productivity, overall assessment volumes, and overall assessment quality – on a monthly basis, if not weekly.

**(b) Wolfe's Scienter Is Imputable to the Company**

459. Wolfe ran the CHDA during the Class Period and was General Manager, *i.e.* the CEO, of Maximus U.K.[28] Further, she was employed directly by the Company (the U.S. parent entity, rather than a U.K. subsidiary): as she testified to Parliament at the February 3, 2016 Hearing, near the end of the Class Period, her "payroll is currently with **Maximus, Inc. . . . In Virginia**." Additionally, according to Maximus's website, she is currently a member of Maximus's Executive Committee, along with the Individual Defendants.

460. Wolfe also was authorized by the Company to speak on its behalf regarding the HAAS Contract, both to the press and the U.K. government. *See* ¶¶58, 63, 139-141, 235, 243, 252, 273 & 278.

461. Accordingly, Wolfe was a corporate officer of Maximus.

462. For all of these reasons, Wolfe was sufficiently senior within the Company such that her scienter during the Class Period can be imputed to Maximus.

**C. Core Operations Allegations: The HAAS Contract Was a Critical Endeavor for Maximus and Was Followed Closely by the Individual Defendants**

463. The HAAS Contract was one of Maximus's largest contracts ever. In its first year of operating the Contract, Maximus expected to receive approximately $140-165 million $in revenue from it. This would represent 7% to 8.6% of Maximus's expected revenue for its fiscal 2015 year, and 25.9% to 30.6% of its actual international revenue, notwithstanding the

[28] At the February 3, 2016 Hearing, Wolfe was identified as "General Manager, Maximus UK." Questioning by Committee members and Wolfe's responses indicated that this British title was equivalent to "its chief executive."

fact that the Contract would only be contributing revenue for only seven months of that fiscal year. Compared to its actual revenues over the three years for which the Contract would last, the expected value of the Contract would represent over 13.2% of all revenue. An analyst report from Avondale Partners dated December 3, 2015 confirmed: "The Health Assessment Advisory Services contract will likely be MAXIMUS's **largest** as a percentage of revenue in 2016," which would be the Contract's first full year of revenue contribution. The same analyst repeated this observation in reports dated January 19, 2016, and February 4, 2016, noting in the latter report that the Contract represented "roughly 9-10%" of Maximus's revenue in 2016.

464. Further, the Contract was critical to Maximus's international expansion plans. As noted above, the U.K. was an "important market" for the Company, and expanding into it had been its "long-term goal" since 2014, according to Montoni. *See* ¶51, *supra*. In a January 18, 2015 interview by *The Guardian*, Leslie Wolfe explained that Maximus wanted to specifically increase its U.K. presence: "'We have a presence in US, Canada, Saudi, but we didn't have a UK presence.'" *The Guardian* thus characterized the HAAS Contract as "a gateway for a large American company to expand into Europe."

465. Moreover, as discussed (*see* Section VI.A., *supra*), Montoni, Nadeau, and Caswell were intimately aware of, closely involved in, and even managed the day-to-day operations of the Company's performance of the HAAS Contract and the revenue/profit therefrom throughout the Class Period. For example, as noted above, the Individual Defendants admitted that they all "spent a lot of time" on the HAAS Contract, indicating that Caswell had "been over to London several times" on their behalf to monitor "what's been done and what we will do to move this forward."

466. Accordingly, the Individual Defendants had actual exposure to the relevant information about the HAAS Contract undermining their public statements. Montoni, Nadeau, and Caswell were thus at all times fully informed about the problems with the HAAS Contract, which was a critical contract for Maximus.

467. Alternatively to their direct knowledge, alleged above, given their senior positions within the Company and actual exposure to the relevant information, knowledge of the problems described herein – with the Atos transition, HCP recruitment, HCP training, HCP productivity, overall assessment volumes, and overall assessment quality – can be imputed to the Individual Defendants.

## VII. LOSS CAUSATION

468. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Maximus common stock and operated as a fraud or deceit on Class Period purchasers of Maximus common stock and exchange-traded options on such common stock by failing to disclose and misrepresenting the adverse facts detailed herein. As Defendants' prior misrepresentations and fraudulent course of conduct were disclosed to the market, the price of Maximus common stock declined significantly as the prior artificial inflation came out of the Company's stock price.

469. As a result of their purchases of Maximus's common stock and exchange-traded options on such common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused Maximus common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $69.80 per share at the close of the market on November 6, 2015 – less than a week before Defendants' second partial corrective disclosure.

470. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Maximus's business and prospects. As the truth about the Company was revealed to the market and concealed risks materialized, the price of Maximus's common stock fell dramatically. These declines removed the artificial inflation from the price of Maximus's common stock, causing economic loss to investors who had purchased Maximus common stock and exchange-traded options on such common stock during the Class Period.

471. The decline in the price of Maximus common stock after the partial corrective disclosures and/or materializations of risk on August 6-7, 2015 and November 12, 2015, and the final corrective disclosure and/or materialization of the risk on February 4-5, 2016, were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in Maximus's common stock negate any inference that the losses suffered by Lead Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

472. During the Class Period, the price of Maximus stock declined as the true state of Maximus's operations regarding the HAAS Contract was revealed to the investing public.

473. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme and course of conduct to artificially inflate the price of Maximus common stock and the subsequent material declines in the value of Maximus common stock when Defendants' prior misrepresentations, misleading half-truths and other fraudulent conduct were revealed.

474. Specifically, on August 6, 2015, Defendants disclosed "lower revenue and profit contributions from the [HAAS] contract" due to "start-up challenges" with "recruiting and

retaining" HCPs, which created "volume and, to a lesser extent, quality variances from our plan." As a result, on August 6, 2015 Maximus's stock fell almost 6.4% on unusually heavy trading with more than 623,600 shares trading hands (versus 443,300 shares traded the day before), dropping $4.44 per share to close at $64.78. By contrast, the S&P 500 Index decreased only 0.78% on August 6, 2015. However, as alleged herein, Defendants failed to disclose the full extent of its underperformance on the HAAS Contract up to that point, and made additional false and misleading reassurances on August 6 and August 7, 2015.

475. Analysts also reacted negatively to Defendants' partial corrective disclosure. For example, on August 7, 2015, Jefferies lowered its price target for Maximus on this news. Further, Maximus's common stock price continued to decline. It fell from $64.78 per share on August 6, 2015 to close at $59.65 per share on August 7, 2015 – a decline of $5.13 per share, or approximately 7.9%. By contrast, the S&P 500 Index decreased only 0.29% on August 7, 2015. The stock also experienced unusually heavy trading volume of over 1,301,300 shares traded, compared to just 778,800 shares traded the next business day.

476. Analyst commentary attributed the large negative reaction in the stock specifically to Defendants' disclosures. ¶¶340-342, *supra*. In addition, an August 7, 2015 analyst report by Jefferies stated that the "primary reason" for the price drop was the slower ramp of the HAAS Contract. The same report echoed Defendants' reassurances with optimism that there was a solution in place and that Maximums had "launched an aggressive hiring campaign" to address the disclosed problems.

477. On November 12, 2015, Defendants reported lower-than-expected financial results, and reduced their earnings and revenue guidance going forward, as "a result of a single program, the UK Health Assessment Advisory Service [HAAS]." They disclosed that the

Company failed to maintain proper HCP "staffing levels" or achieve "performance metrics, most notably volume targets" as assumed and required by the HAAS Contract, and thus instead of being profitable or contributing $140-165 million in revenue, the Contract would operate at a loss of $4 million while generating only "$105 million" in revenue.

478. As a result, on November 12, 2015 Maximus's stock fell almost **21.9%** on unusually heavy trading with more than 4,151,000 shares trading hands (versus 268,600 shares traded the day before), dropping $15.03 per share to close at $53.61. By contrast, the S&P 500 Index decreased only 1.4% on November 12, 2015. However, as alleged herein, Defendants failed to disclose the full extent of Maximus's underperformance on the HAAS Contract up to that point and made additional false and misleading reassurances that day.

479. Analyst commentary attributed the large negative reaction in the stock specifically to Defendants' disclosures. *See* ¶¶380-382, *supra*

480. On February 4, 2016, Defendants disclosed that Maximus was "still running below [its] volume targets" and "still ha[d] a ways to go" in meeting the requirements of the HAAS Contract.. As a result, on February 4, 2015 Maximus's stock fell almost 3.9% on unusually heavy trading with more than 1,085,100 shares trading hands (versus 808,600 shares traded the day before), dropping $2.04 per share to close at $50.41. By contrast, the S&P 500 Index increased 0.2% on February 4, 2016.

481. On the next day, February 5, 2016, Bloomberg News reported that Maximus's stock price had fallen to its lowest level in at least a year. Maximus's share price continued to decline, from $50.41 per share on February 4, 2016 to close at $46.92 per share on February 5, 2016 – a decline of approximately $3.49 per share, or approximately 6.9%. By contrast, the S&P 500 Index decreased only 1.8% on February 5, 2016. The stock also experienced

unusually heavy trading volume of over 1,776,300 shares traded, compared to just 759,100 shares traded the next business day.

482. Analyst commentary attributed the large negative reaction in the stock specifically to Defendants' disclosures. *See* ¶¶122-124, *supra*.

## VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

483. Lead Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact which there was a duty to disclose.

484. In the alternative, Lead Plaintiff and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory in that, among other things:

(a) Maximus's common stock was actively traded on the NYSE, an informationally efficient market, under the ticker symbol "MMS" throughout the Class Period;

(b) Maximus's common stock traded at high weekly volumes during the Class Period;

(c) as a regulated issuer, Maximus filed periodic public reports with the SEC;

(d) Maximus regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(e) the market reacted promptly to public information disseminated by Maximus;

(f) Maximus's securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace. The firms who wrote analyst reports on Maximus during the Class Period included, but are not necessarily limited to, the following: Jefferies & Co., Citigroup, Raymond James, Wells Fargo Securities, CJS Securities, Avondale Partners, Maxim Group, First Analysis Securities, Sidoti & Company, Stifel Nicolaus, and Canaccord Genuity;

(g) the material, public misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Maximus's common stock; and

(h) without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased shares of Maximus's common stock and exchange-traded options on such common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

485. As a result of the foregoing, the market for Maximus common stock promptly digested current information regarding Maximus from all publicly available sources and reflected such information in Maximus' stock price. Under these circumstances, all purchasers of Maximus common stock during the Class Period suffered similar injury through their purchase of Maximus' common stock at artificially inflated prices and the presumption of reliance applies.

## IX. NO SAFE HARBOR

486. The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged in this Complaint. *First*, Defendants' statements and omissions alleged to be false and misleading relate to historical facts or existing conditions. *Second*, to the extent any of the false and misleading statements alleged may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made. *Third*, any purported forward-looking statements were not accompanied by meaningful cautionary language because risks that Defendants warned of had already come to pass, and any cautionary language did not mention important factors of similar significance to those actually realized. *Fourth*, to the extent that there were any forward-looking statements that were identified as such, Defendants are liable because, at the time each of those forward-looking statements was made, the speaker knew the statement was false when made.

### A. Defendants' False and Misleading Statements and Omissions Were Not Forward-Looking

487. Defendants' false and misleading statements and omissions alleged herein, (1) relate to historical or current facts; (2) implicate existing conditions; and (3) do not contain projections of future performance or future objectives. Specifically, they relate to the current status of Maximus's performance on the HAAS Contract or developments in the Company's attempts to make the Contract contribute meaningful, profitable revenue. For example, Montoni's statement that ***"nearly all of the employees <u>transferred</u> over from their previous provider [Atos]***" describes historical facts. Likewise, his representation that "***we <u>are on track</u> to meet our requirements for assessment volumes***" was a misrepresentation about the current status of its performance under the HAAS Contract. Similarly, his statement that "***early***

***indications are that we <u>are meeting</u> our recruitment targets for healthcare professionals***" describes the current status of Maximus's recruiting efforts.

488. To the extent any of these statements might be construed to touch on future intent, they are mixed statements of present facts and future intent and are not entitled to safe harbor protection with respect to the part of the statement that refers to the present.

**B. The False and Misleading Statements Were Not Properly Identified as "Forward-Looking"**

489. The PSLRA imposes an additional burden on "oral" forward-looking statements, requiring defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). Defendants failed to both identify certain oral statements as forward-looking and failed to include the language required by the PSLRA. For example, Montoni did not specifically identify his statement that "***we are also on track to meet our requirements for assessment volumes***" as forward-looking on May 7, 2015.

**C. Any Forward Looking Statements Were Not Accompanied by Meaningful Cautionary Language**

490. None of Defendants' alleged false statements or omissions were accompanied by meaningful cautionary language that identified important factors that could cause actual results to differ materially from any results projected.

491. Additionally, to the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already manifested. As detailed herein, at the time Defendants assured investors that "***<u>[i]f</u> we fail to accurately estimate the factors upon which we base our contract pricing, we <u>may</u> generate less profit than expected or incur losses on those contracts***," they concealed that Maximus

**already** failed to "estimate factors upon which" the HAAS Contract was based, and **already** was "generat[ing] less profit than expected" on that Contract. Further, at the time Defendants assured investors that "***[w]e <u>may</u> be unable to attract and retain sufficient qualified personnel to sustain our business***," they concealed that Maximus was **already** "unable to attract and retain sufficient qualified" HCPs to "sustain" the HAAS Contract.

492. Thus, vague warnings regarding, for example "<u>[i]f</u> our estimates prove to be inaccurate, we <u>may</u> not achieve the level of profit we expected or we <u>may</u> incur a net loss on a contract," were insufficient because they failed to specify what estimates were being warned about, and failed to warn that the risks at issue here had already occurred when Defendants made their false and misleading statements.

493. To the extent Defendants included any cautionary language, that language was not precise and did not relate directly to any forward-looking statements at issue. In fact, the risk warnings were identical to risk warnings the Company made prior to obtaining the HAAS Contract on or about October 30, 2014.

### D. Defendants Knew That Any Forward-Looking Statements Were False or Misleading When Made

494. Even if the alleged statements were forward-looking, sufficiently identified as such, and accompanied by adequate cautionary language at the time they were made, each speaker knew that the statement was false or misleading, as discussed above. In addition, all such statements were authorized or approved by Maximus executive officers who actually knew that the statements were false or misleading when made. Accordingly, Defendants remain liable even for forward-looking statements.[29]

[29] Defendants' false and misleading statements and omissions alleged herein are not opinions, as defined in *Omnicare Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1329 (2015). However, even if they contain statements of opinion, they would

## X. CLASS ACTION ALLEGATIONS

495. Lead Plaintiff brings this federal securities class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and a class consisting of all person and entities who purchased or otherwise acquired Maximus common stock between February 5, 2015 and February 3, 2016, inclusive (the "Class Period"), and were damaged thereby (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Individual Defendant; (iii) any person who was an officer or director of Maximus during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Maximus's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

496. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Throughout the Class Period, Maximus had approximately 64.9 to 65.9 million shares of common stock outstanding and actively trading on the NYSE. While the

---

nevertheless be misleading because they could not fairly align with the information in Defendants' possession at the time – namely, that Maximus was falling behind its assumed rates of Atos employee transfer, HCP recruitment, HCP training, HCP productivity, face-to-face assessment volume targets, overall assessment volume targets, and assessment quality targets in the month or months leading up to each statement alleged herein. Defendants could not have conducted any inquiry that would have supported such opinions, because any inquiry would have undermined if not contradicted the stated opinions. Similarly, any opinion statements contain actionable omissions because they implied that performance of the HAAS Contract was better than it actually was, which conflicts with what Defendants knew at the time, namely that such performance was stagnating or deteriorating and much worse than Defendants represented, and, therefore, conflicts with what a reasonable investor would take from Defendants' statements. Thus, such statements lacked a reasonable basis when made. Finally, any such statements of supposed opinion would be false because Defendants could not have sincerely believed them while making them.

exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that the proposed Class numbers in the thousands and is geographically widely dispersed. Record owners and other members of the Class may be identified from records maintained by Maximus and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

497. Lead Plaintiff's claims are typical of the claims of the members of the Class. All members of the Class are similarly affected by Defendants' wrongful conduct in violation of the Exchange Act that is complained of herein.

498. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class. Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.

499. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class include:

(a) whether the securities laws were violated by Defendants' acts and omissions as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts, or omitted to state material information, about the business, operations and management of Maximus; and

(c) whether and to what extent the market price of Maximus's common stock and exchange-traded options on such common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

(d) whether Defendants acted with the requisite level of scienter;

(e) whether the Individual Defendants were controlling persons of Maximus;

(f) whether reliance may be presumed pursuant to the fraud-on-the-market doctrine and/or the presumption of reliance afforded by Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972); and

(g) whether members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

500. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

501. Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

502. This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

503. As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their

statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiff and members of the Class; (ii) artificially inflate and maintain the prices of Maximus common stock; and (iii) cause Lead Plaintiff and members of the Class to purchase Maximus common stock and options on such common stock at artificially inflated prices.

504. The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

505. As set forth above, Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a severely reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and the other members of the Class who purchased Maximus common stock and options during the Class Period.

506. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) Employed devices, schemes, and artifices to defraud;

(b) Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Maximus common stock during the Class Period.

507. In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Maximus common stock and options, Lead Plaintiff and other members of the Class purchased Maximus common stock and options at artificially inflated prices during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased Maximus common stock and options at such artificially inflated prices.

508. As set forth herein, when the true facts were subsequently disclosed, the price of Maximus common stock and options declined precipitously. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class were harmed and suffered damages in connection with their purchases of Maximus common stock and options at artificially inflated prices during the Class Period.

509. By virtue of the foregoing, Defendants are liable to Lead Plaintiff and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

510. Lead Plaintiff repeats, incorporates, and realleges each of the allegations set forth above as if fully set forth herein.

511. This Count is asserted pursuant to Section 20(a) of the Exchange Act against Defendants Montoni, Nadeau, and Caswell.

512. As alleged above, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase and sale of Maximus's common stock and options on such common stock and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period. This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with severely reckless disregard of the falsity of their statements and the fraudulent nature of its scheme during the Class Period. Thus, Maximus is primarily liable under Section 10(b) of the Exchange Act.

513. As set forth above, Defendants Montoni, Nadeau, and Caswell were controlling persons of Maximus within the meaning of Section 20(a) of the Exchange Act, during the Class Period, due to their senior executive positions with the Company and their direct involvement in the Company's day-to-day operations.

514. By virtue of the foregoing, Defendants Montoni, Nadeau, and Caswell each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Maximus, including the content of its public statements with respect to the HAAS Contract.

515. Defendants Montoni, Nadeau, and Caswell acted knowingly and intentionally, or in such a severely reckless manner as to constitute willful fraud and deceit upon Lead Plaintiff and the other members of the Class who purchased Maximus common stock and options during the Class Period.

516. In ignorance of the false and misleading nature of the Company's statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the

market prices for Maximus common stock and options, Lead Plaintiff and other members of the Class purchased Maximus common stock and options at an artificially inflated price during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased Maximus common stock and options at artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Maximus common stock and options declined precipitously and Lead Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Maximus common stock and options at artificially inflated prices and the subsequent decline in the price of that stock and options when the truth began to be disclosed.

517. By reason of the foregoing, Defendants Montoni, Nadeau, and Caswell are liable to Lead Plaintiff and the members of the Class as controlling persons of Maximus in violation of Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative, and appointing Labaton Sucharow LLP as class counsel pursuant to Rule 23(g);

B. Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C. Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial together with prejudgment interest thereon;

D. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

E. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Lead Plaintiff demands a trial by jury of all issues so triable.

DATED: December 4, 2017

Respectfully submitted,

/s/ *Stacey Rose Harris*
Stacey Rose Harris
**DIMURO GINSBERG PC**
Stacey Rose Harris (VSB# 65887)
Harvey B. Cohen (VSB# 06440)
1101 King Street
Suite 610
Alexandria, VA 22314
Telephone: (703) 684-4333
Facsimile: (703) 548-3181
Emails: sharris@dimuro.com
hcohen@dimuro.com

*Liaison Counsel for the Class*

Thomas A. Dubbs (admitted pro hac vice)
Louis Gottlieb (admitted pro hac vice)
Irina Vasilchenko (admitted pro hac vice)
Jeffrey A. Dubbin (admitted pro hac vice)
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Emails: tdubbs@labaton.com
lgottlieb@labaton.com
ivasilchenko@labaton.com
jdubbin@labaton.com

*Pro Hac Vice Counsel for Amalgamated Bank and Lead Counsel for the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 4, 2017, a true and accurate copy of the foregoing was electronically filed with the Court using the CM/ECF system.

/s/ *Stacey Rose Harris*
Stacey Rose Harris, Esq.