IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| IN RE MAXIMUS, INC. SECURITIES LITIGATION, | ) ) ) ) | Civil Action No. 1:17-cv-0884 (AJT/IDD) |

## MEMORANDUM OPINION

In this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, Lead Plaintiff Steamfitters Local 449 Pension Plan claims that between February 5, 2015 and February 3, 2016 (the "Class Period"), Defendants Maximus, Inc. ("Maximus") and its officers Richard Montoni, Richard Nadeau, and Bruce Caswell (collectively, the "Individual Defendants") issued false or misleading statements concerning Maximus's performance on a major contract with the British government. Because the Amended Complaint fails to adequately allege Defendants' scienter as to the relied upon statements and omissions (as well as, to some, materiality) or loss causation, as required under the Private Securities Litigation Reform Act ("PSLRA"), Defendants' Motion to Dismiss Amended Complaint With Prejudice [Doc. No. 49] (the "Motion") will be GRANTED; and the Amended Complaint, DISMISSED.

## I. BACKGROUND

Defendant Maximus, Inc. is a publicly-traded company organized under the laws of Virginia and headquartered in Reston, Virginia. Am. Compl. ¶ 33. Maximus's primary business is the administration of government-sponsored benefit programs, such as the Affordable Care Act, Medicare, and welfare-to-work programs. *Id.* On October 29, 2014, the United Kingdom Department for Work and Pensions ("DWP") awarded Maximus a three-year contract to administer health assessments for the DWP's Health Assessment Advisory Service, (the "HAAS Contract"). The DWP uses the HAAS program to determine whether British citizens are entitled

to Employment and Support Allowance ("ESA"), a government assistance program for those who cannot work due to long-term disabilities. To conduct these assessments, a healthcare professional ("HCP") evaluates an individual's capabilities and physical and mental needs against certain criteria set by DWP. The HCP can conduct this assessment based on the paper file or a more-time consuming and difficult face-to-face assessment. *Id.* at ¶ 3.

DWP initially contracted with Atos Healthcare, Inc. to provide the HAAS assessments. *Id.* at ¶ 4. However, Atos had failed to meet the requisite volume and quality targets and by early 2014 Atos had a backlog of approximately 724,000 assessments in addition to 600,000 appeals of its prior assessments. *Id.* at ¶¶ 54, 139. In March 2014, Atos decided it would forego £500 million in revenue and pay a substantial penalty to terminate its contract early rather than continue to provide services until the end of its contract in August 2015. *Id.* at ¶ 54. DWP started the bidding process to find a replacement for Atos, setting a non-negotiable target of 1 million assessments to be performed in the first year. *Id.* at ¶ 55. Multiple bidders raised concerns that the 1 million assessment target was not feasible, leading at least one "experienced" bidder to withdraw. However, "[n]one of this information was publicly known until January 8, 2016," and in any event, Maximus was one of only two companies to place bids, despite the high assessment targets. *Id.*

Maximus ultimately won the HAAS contract on October 29, 2014, with responsibility for performing ESA assessments transferring from Atos on March 1, 2015. *Id.* at ¶ 56. To perform the contract, Maximus created a separate entity called the Center for Health and Disability Assessments ("CHDA"). *Id.* at ¶ 58. Maximus's total payment under the contract would vary from $919 million to $1 billion over three years, depending on how close it would get to its

contractual targets of one million assessments in the first year and 1.2 million assessments in the following years. *Id.* at ¶ 59.

The HAAS Contract was one of the largest contracts Maximus had ever obtained and represented 9–10% of its total revenue in 2016 and 25.9–30.6% of its international revenue in 2015. When Maximus announced that it won the contract, it indicated that it expected the HAAS contract "to contribute revenue of approximately $140 million to $160 million during its seven months of operation in fiscal year 2015," and that it "expected [the HAAS Contract] to be accretive in fiscal year 2015." *Id.* at ¶ 60. However, shortly thereafter, during Maximus's November 2014 earnings call, the company noted that "the [HAAS Contract] faces significant challenges out of the gate that will take some time to improve," and that "there is a meaningful backlog that we're seeking to reduce." Defs.' Ex. 4 ("Nov. 2014 Earnings Call") 15, 28.[1] During the question and answer portion of that call, Caswell stated in greater detail that "[t]he biggest [challenge] is really the conversion of the existing staff over from Atos . . . and then the hiring of additional staff, so that we can hit the peak requirement . . . to meet the volume targets and objectives for the first year of the program." *Id.* at 28.

Maximus's performance on the HAAS Contract was measured by the number of assessments performed, and therefore Maximus's success was dependent to a large extent on its ability to recruit, train, and retain HCPs to conduct the assessments. The HAAS Contract was a "cost-plus" contract, such that Maximus would be reimbursed for expenses up to a ceiling and also receive an Award Fee for exceeding the Contract's assessment targets. *Id.* at ¶ 71. The assessment targets were subdivided into two categories: paper-based assessments and face-to-

---

[1] While the Amended Complaint does not reference specifically this portion of the earnings call, it references the November 2014 earnings call generally, as well as several others. Because the allegations in the Amended Complaint primarily concern Maximus's statements during these earnings calls, these earnings calls, in their entirety, are "integral to the complaint" and may be considered by the Court. *Philips v. Pitt County Mem. Hosp.*, 572, F.3d 176, 180 (4th Cir. 2009).

face assessments. Under the Award Fee scheme set out in the Contract, Award fees would be paid only if Maximus met its face-to-face assessment volume target for the month. Any paper-based assessment Award Fees would be forfeited if the Company did not also meet the face-to-face target for that month. *Id.* Since many of the HCPs expected to work on the HAAS Contract for Maximus were those already working for Atos, the Contract required the two companies to "negotiate in good faith to agree to a list of Transferring Employees within two (2) weeks of the date of execution of this Agreement . . . ." Am. Compl. at ¶ 72 (quoting HAAS Contract § 6.2).

The Amended Complaint alleges that several internal documents produced by Maximus during the Class Period informed the Individual Defendants of the company's inadequate performance on these vital metrics. "CHDA staff . . . regularly generated Operation Reports, which provided metrics on recruitment, training, productivity, and quality of assessments." Am. Comp. ¶ 193. These Operations Reports were "frequently" sent to Maximus's headquarters in Reston, Virginia, although the Amended Complaint does not specifically allege that the Individual Defendants read them, saw them, or where made aware of their contents. *Id.* Plaintiff also alleges that an internal "Risk Register" was maintained and available to the Individual Defendants. This Risk Register consisted of an Excel spreadsheet that "was compiled and maintained by CHDA's Project Management Office . . . , which would send these Risk Registers to . . . other Maximus employees who were expected to update them with their relevant areas." *Id.* at ¶ 154. However, this "Risk Register did not just track possible risks, but also MAXIMUS' efforts to mitigate them." Defs.' Mem. in Supp. 18.

The Amended Complaint alleges that, despite these internal warnings, Maximus and its leadership mislead the investing public concerning the performance of the HAAS Contract.

Specifically, the Amended Complaint relies on eleven alleged misrepresentations during the Class Period made during earnings calls and in SEC filings.

Statement 1 was made by Maximus President Caswell in response to a reporter's question during Maximus's February 5, 2015 earnings call, approximately one month before Maximus officially took over the Contract from Atos. In describing "how [the HAAS Contract]'s going," Caswell stated that Maximus was "continu[ing] to work on ramping up for th[e] contract," and that "*we feel very much that it's going as expected*." Defs.' Mem. in Supp., Ex. 5 ("Feb. 5, 2015 Call") 21 (emphasis added). Plaintiff alleges in contrast that shortly after Maximus took over the HAAS contract, in a March 2015 internal teleconference between Caswell and CHDA employees in the UK, "Caswell stressed that Maximus' performance in these categories needed to be improved" and discussed "the difficulties that Maximus was experiencing with the HAAS Contract, including its poor performance in the following categories: (1) HCP recruitment; (2) HCP training; (3) HCP productivity, including assessment volumes; and (4) assessment quality." *Id.* at ¶ 192.

Statements 2, 3, and 4 were made by Maximus CEO Montoni during Maximus's May 7, 2015 earnings call. While discussing the HAAS Contract, Montoni said that the company was "working hard to achieve the program's goals related to improved service to UK citizens, including increasing the overall number of healthcare professionals who support the program." Defs.' Mem. in Supp., Ex. 6 ("May 7, 2015 Call") 7. Regarding Maximus's recruitment and training of the HCPs, Montoni said

> [2] *Nearly all of the employees transferred over from the previous provider,* and [3] *early indications are that we are meeting our recruitment targets for health care professionals.* This is key in helping us bring about positive change, and although it's early days, [4] *we're also on track to meet our requirements for assessment volumes.* As a rem[]inder, our longer-term goals for the

> program include reducing the long lead times, improving the quality of the assessment and making the assessment process less intimidating.

*Id.*

Statements 5 and 6 are based on Maximus's Form 10-Q quarterly report for the second quarter of 2015, filed the next day, May 8, 2015, the first such report after Maximus began administering the HAAS Contract (the "May 2015 10-Q"). Defs.' Mem. in Supp. Ex. 22. When discussing the company's "risk factors," the report did not identify new risks, but instead incorporated by reference "the factors discussed under 'Risk Factors' in [Maximus's] Form 10-K for fiscal year ended September 30, 2014 . . . ." *Id.* at 20. Among the seven pages of risks identified in that 10-K (none of which were specifically associated with the HAAS Contract), Plaintiff identifies the following as materially misleading ("Statement 5"):

> If we fail to accurately estimate the factors upon which we base our contract pricing, we may generate less profit than expected or incur losses on those contracts.
>
> If our estimates prove to be inaccurate, we may not achieve the level of profit we expected or we may incur a net loss on a contract.
>
> We may be unable to attract and retain sufficient qualified personnel to sustain our business.

Am. Compl. ¶ 322 (emphasis removed). Statement 6 is based on Maximus's failure to include in the May 2015 10-Q what Plaintiff contends were required disclosures under Item 303 of Regulation S-K, 17 C.F.R. § 229.303.

Statements 7, 8, and 9 and 10 are based on an August 6, 2015 earnings call and the 10-Q filed the next day, August 7, 2015. While the company generally reported strong revenue growth overall for the third quarter of 2015, its Health Segment (which included the HAAS Contract) reported an operating margin of 13.7 percent, compared to 14.2 percent in the same quarter the

prior year. Am. Compl. ¶ 334. On the call, Maximus Chief Financial Officer Richard Nadeau said the fall in operating margin was "expected" and "due to the anticipated volume decline in our U.S. appeals business, a larger share of lower-margin cost reimbursable contracts and new contracts [such as HAAS] in start-up phase." Defs.' Mem. in Supp. Ex. 7 ("Aug. 6, 2015 Earnings Call") 3. Nadeau elaborated that additional revenue from the Health Services Segment generated by its U.S. ventures "will be offset by start-up challenges that we are experiencing with the [HAAS] contract in the UK." *Id.* (Maximus "operate[s] a portfolio of contracts that are in various stages of maturity. As a result, at any given time, our more matured contracts offset our newer programs.")

As to the HAAS Contract specifically, Nadeau reminded investors that "at the time of takeover, [HAAS] was a very troubled program," but stated that "we remain confident that we can bring about positive change to the program over time." *Id.* More specifically as to the HAAS Contract, Nadeau noted:

> Since our last earnings call, the recruiting and retaining of healthcare professionals has proved to be tougher than we anticipated. As a result, we are experiencing volume and, to a lesser extent, quality variances from our plan. This means lower revenue and profit contributions from the contract at this time. *The project is still expected to be profitable for both fiscal 2015* and fiscal 2016.

*Id.* (emphasis added). During his portion of the call, Montoni likewise confirmed that the HAAS "contract is facing some start-up challenges," and that "[a]ll along, we've recognized it would take some time to bring meaningful improvements to the program," but that "[w]e believe that our efforts to drive recruitment and improve retention [of HCPs] are gaining traction and are the right course of action." *Id.* at 5. During the question and answer portion of the call, Montoni further explained that the HCP recruitment problem was due to the fact that HCPs in the UK "are

[already] gainfully employed, so recruiting them is tougher than some other types of professionals." *Id.* at 9. Montoni explained that

> [o]ur original thought was that all of fiscal 2015 would be a ramp period. We took this over in the spring. In all of fiscal 2015 and throughout a good portion of 2016, our original plan [was that] this would be in ramp mode. So, our plan was that this would stabilize in fiscal 2016 and that's still our plan. *So, we're a bit behind where we wanted to be.* But we have actions in place such that we think we can stay on course and get this stabilized in fiscal 2015.

*Id.* (emphasis added). The August 7, 2015 10-Q filing with the SEC contained the same statement of risk factors as the May, 2015 10-Q and is alleged to contain the same omissions.

Statement 11 is based on statements made during a November 12, 2015 conference call to discuss Maximus's fourth quarter and full year 2015 earnings. In the fourth quarter, Maximus's overall operating margin for the quarter was 10.3%, compared to 13.5% in the same quarter the previous year. Am. Compl. ¶ 372. Operating income for the quarter was $30.5 million, compared to $31.2 million the previous year and operating income for the year totaled $154.3 million, compared to $115.6 million for fiscal year 2014. *Id.* In a press release before the call, Maximus reported that "[o]perating margins for the fourth quarter and full fiscal year 2015 were tempered by new programs in start-up, most notably the U.K. Health Assessment Advisory Service contract, which is not performing to the Company's previous expectations." *Id.* Maximus also revised its earnings projections for fiscal year 2016 downward. *Id.* On the call, Nadeau explained these revisions as being solely due to the HAAS Contract, stating that "the ramp-up to contract volume targets has been slower than originally planned." [Doc. No. 50-8] ("Nov. 2015 Earnings Call") 3. More specifically, Nadeau told investors that the HAAS Contract "delivered approximately $105 million in revenue, and an operating loss of $4 million," compared to an initial projected range of $140 to $165 million in revenue. *Id.* at 6. Nadeau attributed this shortfall to two factors: "First, our staffing levels are running lower than our plan . . . . Second,

we are not achieving certain performance metrics, most notably volume targets. As a result, we are not earning the performance-based incentive fees." *Id.* Montoni echoed this analysis: "Our ability to hit the volume targets is tied directly to three areas: the number of health care professionals that we recruit; the number that complete training and graduate; and the productivity of these new recruits. . . . What has changed is the amount of time it is taking [us] to recruit, graduate and ramp-up the new staff, but we feel confident that, over time, we can achieve our goals." *Id.* at 12.

Montoni announced several steps the company was taking to address these concerns. "The first area is recruitment. . . . We have expanded our network of recruitment partners and enhanced our employee referral program. We implemented an advertising and social media campaign, launched a recruitment portal website and have been exhibiting at a number of recruitment fairs across the country. Through these efforts we have seen a sizable uptick in the number of new recruits." *Id.* at 12. With respect to training, Montoni announced several initiatives to provide greater training to recruits, including individualized training support to new recruits who struggle with the initial competency examination. "This is already yielding results in keeping more candidates in the process. . . . With this extra support, we expect that more candidates will successfully graduate to full accreditation." *Id.* Finally, on productivity, Montoni acknowledged that once trained, "it may take between six and eight months for [HCPs] to achieve full productivity levels," but that they had seen increased productivity by "optimiz[ing] the work schedules of our staff and offer[ing] voluntary overtime incentives . . . to increase the number of assessments we can complete each day." *Id.* at 13. Based on these initiatives, Montoni reported that "[o]ver the last eight months, we've already made significant progress and realized several early accomplishments [which] demonstrate that, over time, we can bring about the

necessary changes to put this program on the path to success." *Id.* Montoni summarized that "we are making meaningful improvements [on the HAAS Contract] and it's on an upward trajectory," and that "this is not a matter of loss mitigation but rather o[f] bringing the start-up to a mature operation level . . . ." *Id.* at 15.

During the question and answer portion of the call, an investor asked whether the HAAS Contract's recruiting problems were "being driven by a shortage of qualified health care professionals in the market . . . ." *Id.* at 23. Caswell responded by first reiterating that "recruiting has improved quite a bit over the course of the last several months . . . . . and *we're now reaching a level of recruiting that, from a rate perspective, is an appropriate level.*" *Id.* at 24 (emphasis added). However, Caswell noted, "[t]he real issue that we've been facing is our ability to graduate those trainees that we bring into the system on a timely basis . . . ." *Id.* Later in the call, an investor asked "how many health care professionals do you have on . . . the assessment contract right now, and what does the current workload require?" *Id.* at 36. Caswell responded that

> we can't actually speak to the detailed metrics in terms of the number of health care professionals that we have on board, but I would remind you that we feel like we've made very significant progress in expanding our supply chain of qualified health professionals. . . . [W]e feel that we're at the right rate for recruiting and we feel that we just need to keep it going for the foreseeable future.

*Id.* at 37 (emphasis added).

On January 8, 2016, the U.K. government's National Audit Office ("NAO") released a public audit report entitled "Contracted-out Health and Disability Assessments." Am. Compl. ¶ 55; *see* [Doc. No. 50-3] ("NAO Report"). The NAO Report contained more detailed information about Maximus's performance on the HAAS Contract and the process by which the Contract was awarded. Specifically, the Report showed that Maximus only met its overall

assessment volume targets the first two months of the Contract and "concluded that Maximus still faced a backlog of at least 280,000 claims as of August 2015." Am. Compl. ¶ 110. The Report also criticized DWP's contracting processes, observing that despite knowing that Atos had a staff retention rate of 70%, DWP did not contest during the bidding process Maximus's use of "a capacity model that assumed 95% of staff would still be in post after one month." NAO Report 19. The Report also observed that as of August 2015, only "around half of those recruited by [Maximus] completed their training." *Id.* The Report characterized DWP's target of one million assessments in the first year of the HAAS Contract as "ambitious" since DWP "did not base its target on the modeling of available resources, and did not consider revising the target following bidders' requests, although it did make changes after contract award." *Id.* at 9. Overall, the Report concluded that Maximus was "not on track to complete the expected number of ESA assessments for 2015[,] largely due to problems of reaching the full staff complement . . . ." *Id.* at 7.

On the February 4, 2016, Maximus made what Plaintiff alleges were its "final corrective disclosures." On that day, it reported that its Health Services Segment operating margin fell during the first 2016 quarter from 15.5% to 9.2%, and again attributed the result to "programs in the start-up phase . . . including the Health Assessment Advisory Service." Am. Compl. ¶ 113. In the earnings call the same day, Montoni stated that "we are still running below our volume targets [on the HAAS Contract] . . . . We continue to expect to have our productivity at the appropriate levels by late summer." *Id.* at ¶ 114. As for the National Audit Report, Mononi asserted that "[t]he NAO report echoed what we said in our November call as it relates to certain performance metrics, including volumes and quality." *Id.* at ¶ 115. Montoni also disclosed that "[d]uring the autumn timeframe, we were hiring approximately 100 new healthcare professionals

each month[,]" and that "graduation rates [for those HCPs] are north of 80%." Am. Compl. ¶¶ 117–18.

Following the February 2016 earnings call, the price of Maximus common stock dropped $5.53 per share, or 10.5%, closing at $46.92 per share on February 5. Maximus's stock price during the Class Period peaked at $70 per share on August 5, 2015, before the beginning of the alleged "partial corrective disclosures" in August and November, 2015. *Id.* at ¶ 20.

Count I of the Amended Complaint alleges a violation of Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. Count II alleges liability against the Individual Defendants as control persons under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t. As referenced above, all of these claims are based on the following eleven allegedly misleading statements or omissions by the Individual Defendants during the Class Period (February 5, 015 to February 3, 2016) regarding the performance of the HAAS Contract:

- Statement 1 (made by Caswell during the February 5, 2015 earnings call): "We feel very much that it's going as expected."

- Statement 2 (made by Montoni during the May 7, 2015 earnings call): "Nearly all of the employees transferred over from the previous provider."

- Statement 3 (made by Montoni during the May 7, 2015 earnings call): "Early indications are that we are meeting our recruitment targets for healthcare professionals."

- Statement 4 (made by Montoni during the May 7, 2015 earnings call): "We are also on track to meet our requirements for assessment volumes."

- Statement 5 (made in the May 8, 2015 10-Q filing):

  o "If we fail to accurately estimate the factors upon which we base our contract pricing, we may generate less profit than expected or incur losses on those contracts."

  o "If our estimates prove to be inaccurate, we may not achieve the level of profit we expected or we may incur a net loss on a contract."

- o "We may be unable to attract and retain sufficient qualified personnel to sustain our business."

- Statement 6, based on omissions contained in Maximus's response to Item 303 of Regulation S-K, 17 C.F.R. § 229.303 of the May 8, 2015 10-Q filing.

- Statement 7 (made by Nadeau during the August 6, 2015 earnings call): "The project is still expected to be profitable for [fiscal year] '15."

- Statement 8 (made by Montoni, August 6, 2015 earnings call): "We're a bit behind where we wanted to be."

- Statement 9 (made in the August 7, 2015 10-Q filing):

  - o "If we fail to accurately estimate the factors upon which we base our contract pricing, we may generate less profit than expected t or incur losses on those contracts."

  - o "If our estimates prove to be inaccurate, we may not achieve the level of profit we expected or we may incur a net loss on a contract."

  - o "We may be unable to attract and retain sufficient qualified personnel to sustain our business."

- Statement 10, based on omissions in its response to Item 303 of Regulation S-K, 17 C.F.R. § 229.303, contained in Maximus's August 7, 2015 10-Q.

- Statement 11 (made by Caswell during the November 12, 2015 earnings call): "We're now reaching a level of recruiting that, from a rate perspective, is an appropriate level . . . we're at the right rate for recruiting."

## II. LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint. *See Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994); *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1994). A claim should be dismissed "if, after accepting all well-pleaded allegations in the plaintiff's complaint as true . . . it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999); *see also Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001). In considering a motion to dismiss, "the material allegations of the complaint are

taken as admitted," *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969) (citations omitted), and the court may consider exhibits attached to the complaint, *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F. 2d 1462, 1465 (4th Cir. 1991).

Moreover, "the complaint is to be liberally construed in favor of plaintiff." *Id.*; *see also Bd. of Trustees v. Sullivant Ave. Props., LLC*, 508 F. Supp. 2d 473, 475 (E.D. Va. 2007). In addition, a motion to dismiss must be assessed in light of Rule 8's liberal pleading standards, which require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. Nevertheless, while Rule 8 does not require "detailed factual allegations," a plaintiff must still provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (the complaint "must be enough to raise a right to relief above the speculative level" to one that is "plausible on its face"); *see also Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). As the Supreme Court stated in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2008), "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw a reasonable inference that the defendant is liable for the conduct alleged." As discussed below, however, the PSLRA has imposed certain heightened pleading requirements with respect to certain elements of plaintiff's causes of action, including specifically scienter. *See* § 78u-4(b)(2).

## III. ANALYSIS

Section 10(b) of the Securities Exchange Act of 1934 provides that it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of" the rules propounded by the SEC. 15 U.S.C. § 78j(b). Rule 10b-5 similarly provides in relevant part that "[i]t shall be unlawful for any person

. . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). For a plaintiff to succeed on a § 10(b) claim, it must establish "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge, Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008) (citations omitted). Section 20(a) provides for joint and several liability for individuals who "control" others who are liable under the Exchange Act. Individuals in positions of "control" are liable to the same extent as those that they control. 15 U.S.C. § 78t.

### a. None of the relied upon statements are actionable.

Plaintiff contends that the Defendants made each of the relied upon statements or omissions with the requisite scienter. With respect to the element of scienter, the PSLRA requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." § 78u-4(b)(2). The "required state of mind" under Section 10(b) is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). "Severe recklessness" can also suffice to meet the scienter requirement. *Ottmann v. Hanger Ortho. Group., Inc.*, 353 F.3d 338, 344 (4th Cir. 2003). However, this "slightly lesser species of intentional misconduct," *id.* (internal citations and quotation marks omitted), must be "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it," *Phillips v. LCI Intern., Inc.*, 190 F.3d 609, 621 (4th Cir.

1999). Moreover, under the PSLRA, allegations of scienter must satisfy the heightened standards applicable to fraud allegations rather than the traditional Rule 8 "short and plain statement of the claim" standard. *See Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 885 ("The PSLRA imposes a heighted pleading standard of fraud allegations in private securities complaints."); *see also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). Accordingly, the complaint must plead specific facts that, when taken collectively, give rise to an inference of scienter that "a reasonable person would deem . . . at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 322-324. As discussed below, the Plaintiff's allegations are insufficient to meet this burden as to scienter. Additionally, some of the relied upon statements are non-actionable statements of belief or opinion, protected forward looking statements, or otherwise immaterial statements that do not support a claim under 10b-5. The requirement of "[m]ateriality is an objective concept, involving the significance of an omitted or misrepresented fact to a reasonable investor." *Longmon v. Food Lion, Inc.*, 197 F.3d 675, 682 (4th Cir. 1999) (internal citations and quotation marks omitted). For a statement to be "material," "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic v. Levinson*, 485 U.S. 224, 231–232 (1988) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). In order to assess a statement's effect on the "total mix" of information available to the reasonable investor, it "must be considered in the full context in which [it] w[as] made." *Gasner v. Bd. of Supervisors of the Cnty of Dinwiddie, Va.*, 103 F.3d 351, 358 (4th Cir. 1996).

Plaintiff's claims revolve around the adequacy of their disclosures concerning the risks associated with the HAAS Contract and the difficulties experienced in performing under the HAAS Contract. Accordingly, the adequacy of the Plaintiff's allegations as to Defendants' scienter, and the permissible inferences of scienter, must be assessed with respect to the substance of those specific relied upon statements, the Individual Defendants' knowledge of contrary internal information, as well as the public statements in November 2014 in connection with Maximus's announcement of the HAAS Contract.

      i.     *Statement 1: "We feel very much that it's going as expected." (made on February 5, 2015)*

Plaintiff alleges that Caswell's statement during the February 5, 2015 earnings call that "we feel very much that [the HAAS Contract]'s going as expected" was misleading "because the transition was **not** going as Maximus expected in February 2015 given that Maximus had not successfully achieved a key goal of the transition . . . the transfer of a sufficient number of HCPs from Atos." Am. Compl. ¶ 302. However, the Plaintiff has failed to allege facts sufficient to draw the required inference that the statement was made "with the intent to deceive." First, this statement was made before Maximus began performance under the contract and does not state that Maximus would be successful in its performance, but merely that the pre-contract ramp-up process is "going as expected." Caswell did not claim that Maximus was meeting or exceeding some concrete target necessary for the contract's success. Second, the statement must be assessed within the context of what Maximus had already told investors concerning its "expectations." In that regard, when Maximus first announced the HAAS Contract in its November 2014 earnings call, it advised callers "[a]s [they] may have read, the program faces significant challenges out of the gate that will take some time to improve," and that among the most important factors to a successful transition was "the conversion of the existing staff over

from Atos . . . ." Nov. 2014 Earnings Call 16, 28. Similarly, at the beginning of the February 2015 call, Montoni reminded callers that Maximus was "working towards addressing some of the challenges that exist[] today, but recognize[d] that it will take time to improve key aspects of the customer experience." Feb. 2015 Earnings Call 10. Along those lines, "one of [Maximus's] primary goals [wa]s to increase the overall number of healthcare professionals . . . ." *Id.* Given this overall context, the Plaintiffs have failed to allege facts that sufficiently allege that the "going as expected" statement was either false or misleading or made with an intent to deceive. For the same reasons, Plaintiff has failed to adequately allege that Statement 1 significantly changed the "total mix" of information available to investors and was therefore material.

        ii.    *Statement 2: "Nearly all of the employees transferred over from [Atos]."* (*made on May 7, 2015*)

In support of its claim that Statement 2 was false or misleading, Plaintiff does not allege the number of Atos employees previously working on the contract as compared to the number that actually transferred over to Maximus.[2] Instead, Plaintiff relies on (1) the initial assumption of the HAAS Contract that "[a] minimum of 753.8 . . . FTE HPCs will transfer to [Maximus]." [Doc. No. 50-15] ("HAAS Contract Schedule 7.1") 27–28; (2) the HAAS Contract's requirement that "no later than 10 Working Days after the Operational Service Commencement Date, the Parties shall agree whether each Allowable Assumption is accurate[,]" *id.* at 14; (3) Maximus and DWP's agreement in July 2015 to reduce the number of assessments in the first year from

---

[2] While the Amended Complaint does not purport to allege specifically how many Atos employees transferred to Maximus, Plaintiff does claim that "Maximus transferred only 500 Atos HCPs, 34% below the Contract's target of 745." Pl.'s Resp. 2 (emphasis omitted) (citing Am. Compl. ¶¶ 139–45). This claim is based on a January 18, 2015 news article based on an interview with Leslie Wolfe, head of Maximus's UK operations. The article states that Maximus "is increasing the number of staff, by roughly an extra 1,000 people, bringing the total employed on the contract to around 1,500 to help clear the backlog . . . ." Am. Compl. ¶ 139 (emphasis omitted). The Amended Complaint relies on this statement for the proposition that Maximus had a target to recruit and train 1,000 additional HCPs and that only 500 HCPs transferred from Atos. The statement is not attributed to Wolfe, does not reveal the basis for its conclusion, and lacks the specificity to support an inference that Wolfe acknowledged that only 500 Atos employees had transferred to Maximus.

one million to 980,000; and (4) the NAO Report's statement that the assessment target reduction occurred because "fewer staff transferred from the previous provider than the contractual assumption agreed" to by the parties. NAO Report 39.

The "Operational Commencement Date" was March 1, 2015; and Maximus and DWP were therefore contractually obligated to agree by March 13, 2015 whether the initial assumption of one million assessments during the Contract's first year was accurate. Because Maximus and DWP agreed to reduce the first year's assessments to 980,000, which the Report attributed to the fact that fewer than the assumed 753.8 FTE HCPs transferred from Atos, and Plaintiff plausibly alleges that the total number of Atos HCPs must have been greater than the number Maximus assumed would transfer, Plaintiff has sufficiently alleged that the statement that "nearly *all*" Atos HCPs had transferred was false, since it appears that not even all of the *anticipated* HCPs had transferred. The same cannot be said, however, with respect to Plaintiff's allegation that Montoni knew of the shortfall, and that he made Statement 2 with the intent to deceive.

Plaintiff plausibly contends that because of the contractual obligation to assess the accuracy of the 753.8 FTE HCPs by March 13, 2015, an inference can be drawn from the parties' subsequent downward adjustment in assessments that Montoni knew there was a shortfall in the assumed level of transfers necessary to meet the original target of one million assessments. *See* Am. Compl. ¶ 148. But there is no certainty, or allegation, concerning whether the July 2015 agreement to reduce the first year's assessment target was, in fact, the result of Maximus's questioning the assumed level of transfers by March 13, 2015. It is certainly possible, and not implausible, given the date of the actual agreement to reduce the first year's assessment, July 2015, that the parties did not, in fact, assess the accuracy of that initial transfer assumption by March 13, 2015, or indeed until after the May 2015 earnings call. In any event, the inference of

19

knowledge to be drawn from that contractual obligation is a relatively weak one; and the inference that Montoni not only knew of the shortfall by May 7 but also made Statement 2 with the intent to deceive is even weaker. Overall, Plaintiff's allegations do not raise the required strong inference of scienter with respect to Statement 2.

Moreover, even assuming that Statement 2 was false and that Montoni knew of the shortfall in transfers by the May 7 earnings call, the Amended Complaint fails to allege facts sufficient to support the inference that the misstatement was material. Statement 2 makes a claim about the number of HCP transfers relative to the *total* number of HCPs who had worked for Atos. While the total number of Atos HCPs must have been greater than the 753.8 FTE HCPs originally assumed would transfer, the Amended Complaint does not identify the magnitude of that shortfall, only that it was large enough to justify the parties' reducing the first year assessment target by 2%. Plaintiff essentially contends that Statement 2's materiality can be inferred from the 2% reduction, arguing that "even a relatively small reduction in the assessment requirement was a major concession by the DWP, given that it had previously set a 'non-negotiable' target of 1 million assessments." *See* Pl.'s Resp. 16. But notwithstanding DWP's non-negotiable requirements *during the bid process*, the HAAS Contract specifically allowed the parties to reassess their assumptions and make adjustments. There are no allegations that allow an assessment of the financial impact, if any, on Maximus as a result of the 2% reduction in its assessment target; and that Maximus took advantage of its contractual ability to reduce its target assessment (and thereby more easily qualify for an Award Fee) does not, by itself, allow the inference that there is a "substantial likelihood that the disclosure of the [shortfall causing the 2% reduction] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic,* 485 U.S. at 231–232.

*Statement 3: "Early indications are that we are meeting our recruitment targets for healthcare professionals."(made on May 7, 2015)*

Plaintiff first relies on the NAO Report to allege that the statement that Maximus was "meeting [its] recruitment targets" was false. NAO Report 25. Speaking generally, the Report notes that "[i]n April 2015, the Department estimated providers would need to increase the number of healthcare professionals by 84% from 2,220 in May 2015 to 4,050 in November 2016." *Id.* However, that total estimate related not just to Maximus, but to all of DWP's contractors, all of whom reported challenges with the "recruiting, training and retaining healthcare professionals and providing enough centres for training and assessments." *Id.* The Report does not break down how many HCPs each program managed by DWP would need. *Id.* The Report goes on to say that "all providers," including Maximus, "told us they identified healthcare professional capacity as a high risk," although the Report does not indicate when the providers generally, or Maximus in particular, communicated that recruitment was a risk. *Id.*[3]

Relying on information from a confidential witness, Plaintiff points to internal Maximus reports, known as Risk Registers, which in July 2015 "red flagged"[4] "Recruitment Capacity and Candidate Availability," saying that "[w]e will not be able to source and process sufficient recruits of appropriate quality to meet the demand profile." Am. Comp. ¶ 154 (emphasis omitted). The July 2015 Risk Register includes a "Risk Raised Date" of April 28, 2015. The Amended Complaint does not explain, however, to whom this risk was raised or in what fashion, beyond its inclusion in the Risk Register. The Risk Register does show that the risk was reported

---

[3] Based on these statements, Plaintiff argues that as of April 2015 "all providers told [DWP] they identified healthcare professional capacity as a high risk." However, the April 2015 date is associated with the DWP's internal analysis of its own needs in April 2015, not when the providers perceived recruitment as a risk. *See* NAO Report 25 ("In April 2015, the Department estimated providers would need to increase the number of healthcare professionals . . . .").

[4] The Amended Complaint explains that the Risk Registers used a "red-amber-green" risk rating system, with "red" risks meaning that "[s]uccessful delivery of the project/programme appears to be unachievable. There are major issues on the project/programme . . . which at this stage do[] not appear to be manageable or resolveable. The project/programme may need re-baselineing and/or overall viability reassessed." Am. Compl. ¶ 158.

to DWP, confirming the NAO Report, though again, it does not say when or exactly to whom it was reported. *Id.* at ¶ 162. In short, that a July 2015 Risk Register stated that the recruitment risk was "raised" on April 28, 2015, does not establish that Montoni, or any of the Individual Defendants, knew of the issue a week later. Indeed, the Amended Complaint alleges that the Risk Register identified Judith Whitaker, the director of HR at CHDA, as the "Risk Owner," and that Whitaker reported to Leslie Wolfe, the head of Maximus's UK operations, not one of the Individual Defendants. [5] *Id.* at ¶ 161. The Amended Complaint does not allege that Whitaker or Wolfe communicated this risk to the Individual Defendants before the May 2015 earnings call.

Plaintiff also relies on two other internal Maximus documents, a "Weekly Resource Report Week Ended 31 July 2015" and an August 2015 presentation titled "Recruitment and Retention CHDA Workstream Status Report." The August 2015 presentation states that Maximus's initial internal recruitment target was 120 HCPs per month. Am Compl. ¶ 170. Despite this goal, the July 2015 Resource Report states that Maximus missed this goal by a significant margin in February and March, recruiting just 48 and 45 HCPs, respectively. *Id.* at 169. However, in April 2015, immediately before Statement 3 was made, Maximus hit its recruiting goal for the first time, recruiting 121 HCPs. *Id.* Plaintiff argues that the April recruitment numbers did not make up for the shortfalls in February and March, and that overall

---

[5] Plaintiff also argues generally that Wolfe was aware of facts contradicting the Individual Defendants' statements, and that her knowledge can be imputed to them for the purpose of showing scienter. "[I]n order for a corporation to be liable for securities fraud, at least one corporate agent must have acted with the required state of mind." *In re Computer Sciences Corp. Sec. Litig.*, 890 F. Supp. 2d 650, 664 (E.D. Va. 2012) (cleaned up). But the knowledge of one corporate officer is not necessarily imputed to another for the purposes of establishing the second's scienter. "It is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud," but that task generally requires a highly material and blatant misrepresentation from which the Court can infer that there *must* have been scienter in order for this statement to have been made. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) *cited in Matrix Capital Mgmt. Fund, LP v. Bearingpoint, Inc.*, 576 F.3d 172, 190 (4th Cir. 2009). In that case, "[t]here would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *Id.* Here, the Amended Complaint alleges no facts to support an inference that Wolfe approved, or even had advance knowledge of, any of the relied upon statements by the Individual Defendants. Any knowledge she may have had contrary to those statements is insufficient to establish scienter on the part of Montoni.

Maximus was still behind where they should have been. But Montoni did not phrase the statement in terms of overall recruiting numbers, but instead in terms of Maximus's "meeting [its] recruitment targets." As of early May, it appeared that early ramp-up problems with recruiting were being addressed, as recruiting had more than doubled from March to April and was at the company's target.

To demonstrate scienter, a reasonable person would need to conclude from the facts alleged that Montoni's scienter is "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 322-324. For the above reasons, Plaintiff's allegations do not sufficiently allege facts that raise the strong inference that Montoni knew that Statement 3 was false and that he made it with the intent to deceive.

    iv.    *Statement 4: "[W]e're also on track to meet our requirements for assessment volumes."*(*made on May 7, 2015*)

As with Statement 3, Plaintiff largely relies on internal Maximus documents that flagged assessment volumes as a risk to show that Statement 4 was made with the necessary scienter. As an initial matter, Plaintiff does not argue that Statement 4 is literally false. The NAO Report, as cited in the Amended Complaint, showed that Maximus met its overall assessment targets in March and April, the only two months it managed the contract before the May earnings call. *See id.* at ¶ 259. Instead, Plaintiff argues that Statement 4 is a materially misleading half-truth, based on the fact that "Maximus materially missed (by over 5,000 assessments or 14%) its crucial target for face-to-face assessments in April, which was Maximus' most important metric . . . ." Pl.'s Resp. 21 (emphasis and citations omitted). Additionally, Plaintiff argues that because Maximus had a downward trajectory in assessment volume from March to April, while assessment targets were increasing each month, it was materially misleading to state that Maximus was "on track" to meet its assessment volume requirements. Finally, Plaintiff contends

that, contrary to Statements 2 and 3, Maximus was experiencing problems with the transfer and recruitment of HCPs that precluded its being "on track" for assessment volume.

As with Statements 2 and 3, Maximus relies almost entirely on internal reports that highlight these risks, without sufficient factual allegations to connect these reports to the Individual Defendants. *See* Am. Compl. ¶ 193 ("Operation Reports, which provided metrics on recruitment, training, productivity, and quality of assessments," were "'frequently' sent to Maximus' headquarters in Reston, VA."), ¶ 419 ("Montoni admitted that he and the entire 'Executive team' of Maximus had been spending 'a lot of time' on monitoring the Contract."). Based on the alleged inconsistencies between the Defendants' statements and information in the Operation Reports, Plaintiff contends Montoni must have had the "intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319. As with Statements 2 and 3, that contrary information existed somewhere in the company does not sufficiently show that Montoni had scienter with respect to Statement 4,[6] particularly since Statement 4 was literally true with respect to Maximus's March and April 2015 assessment targets.

The parties dispute whether Statement 4 falls into the statutory safe harbor for forward-looking statements or whether the "bespeaks caution" doctrine applies based on Montoni's caveat of "although it's early days." Regardless whether those doctrines apply, Statement 4 was not material, since Montoni's "early days" and "on track" language reflected a subjective, less than certain assessment. While Statement 3 suggests that early signs were positive, it does not convey, as Plaintiff implies, that Maximus had actually hit its assessment volume targets in both

---

[6] Plaintiff also contends that the scienter of the Individual Defendants (and particularly their awareness of the information in the Operation Reports and the Risk Register) can be inferred from their seniority and the importance to the company of the HAAS Contract. However, the Fourth Circuit has specifically rejected inferring scienter based on the seniority of the actors or the importance of the subject matter to the company's business. *See Yates v. Municipal Mortg. & Equity, LLC*, 744 F.3d 874, 890 (4th Cir. 2014) ("[W]e reject plaintiffs' contention that the individual defendants must have acted intentionally or recklessly . . . merely because (1) they were senior executives, and (2) the [funds at issue] represented a core business of the Company." (citations omitted)).

March and April or that it had hit all of hits sub-targets, only that there were good prospects that

Maximus would meet its requirements for assessment volumes on the Contract as a whole.

> v.     Statements 7 and 8: *"The project is still expected to be profitable for . . .
> fiscal 2015 . . ."; "[W]e're a bit behind where we wanted to be."*(made on
> August 6, 2015)

Statement 7 relays Nadeau's subjective expectations for the success of the HAAS

Contract, given that, as he said on the same call, "the recruiting and retaining of healthcare

professionals has proved to be tougher than we anticipated." Aug. 2015 Earnings Call 2. Plaintiff

argues that this statement "falsely reassured investors that the challenges disclosed that day were

minor and already being resolved such that they would not have a material impact on the

Contract's profitability for fiscal 2015." Pl.'s Resp. 30. However, this characterization overstates

Nadeau's statement. Statement 7 does not say that the HAAS Contract would be as profitable as

originally expected, only that it is still expected to be at least somewhat profitable. In the

sentence immediately before Statement 7, Nadeau explains that the disclosed challenges would

"mean[] lower revenue and profit contributions from the contract at this time." Aug. 2015

Earnings Call. 2. Additionally, Nadeau noted that the company had "already implemented many

initiatives to drive recruitment and increase new applicant retention," which Montoni explained

in greater detail during his portion of the call. *Id.* at 2, 4. Further, the HAAS Contract was in part

a cost-plus contract. Maximus did not have to hit all of its assessment volume targets to break

even or generate some profit, only to achieve performance awards. Losses due to a significant

shortfall in assessment volume were thereforelimited. In this context, it is more plausible that

Nadeau genuinely believed that the remedial measures the company had identified and put in

place would be sufficient to allow for at least some profit by the end of the fiscal year than he

intended to deceive investors

Similarly, Plaintiff has failed to allege facts sufficient to imply scienter with respect to Statement 8 (that Maximus was "*a bit* behind where we wanted to be"), even if that statement were otherwise actionable or material. Montoni, like Nadeau, affirmatively disclosed in the call that the contract was not where they wanted it to be and that Maximus had planned on a much quicker ramp-up period. *See id.* at 8 ("Our original thought was that all of fiscal 2015 would be a ramp period. . . . So, our plan was that this would stabilize in fiscal 2016, and that's still our plan."). The Individual Defendants could reasonably have believed that the risks they faced were surmountable and that the strategies put in place to combat those risks were likely to succeed. Within context, and absent other facts not alleged, the statement that Maximus was "a bit behind where [they] wanted to be," reflects, more than any other explanation, an optimistic business analysis without an intent to deceive.[7] *See In re Worlds of Wonder Secs. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994) ("Plaintiffs cannot use the benefit of 20-20 hindsight to turn management's business judgment into securities fraud.") (internal citations and quotation marks omitted).

> vi.    *Statement 11: "We are now reaching a level of recruiting that, from a rate perspective, is an appropriate level."; "We're at the right rate for recruiting."*(made on November 12, 2016)

Like Statements 7 and 8, Statement 11—which is composed of essentially two statements from different parts of the same earnings call—reflects Caswell's business judgment about what the "right rate for recruiting" is and whether the initiatives Maximus had put in place were likely to be sufficient to maintain that rate going forward. Relying on a confidential witness, Plaintiff alleges in support of materiality and scienter that in July 2015 Maximus increased its recruitment targets to 211 HCPs per month, but never recruited more than 130 HCPs per month. Am. Compl. ¶ 178, 183. However, the Recruiting Workstream Report in which this increase in recruiting

---

[7] For that reason, this case is unlike in *Singer v. Reali*, __ F.3d __, No. 15-25729, No. 16-1019, 2018 WL 1004978 (4th Cir. Feb. 22, 2018), which Plaintiff relies on, where there was no plausible legal explanations for the intentional and illegal coding of experimental surgeries in order to ensure full reimbursement from insurance companies.

goals is discussed stated that the increased target was necessary "partly" because Maximus had not been meeting its prior target and needed to make up that shortfall. The increase was "more broadly . . . a result of higher levels of training attrition than expected . . . ." *Id.* at ¶ 179. Within that context, the reference to the "right rate for recruiting" appears to be a reference to the appropriate level of recruiting if the company could make significant progress in reducing the attrition rate. As noted above, after saying that "[w]e are now reaching a level of recruiting that . . . is an appropriate level," Caswell went on to tell the caller who asked the question that "[t]he real issue that we've been facing is our ability to graduate those trainees that we bring into the system on a timely basis and ensure that we have a high level of graduation rate, and obviously, a correspondingly low attrition." Nov. 2015 Earnings Call 24. This affirmative disclosure of the "real issue," which Caswell made repeatedly during the call, belies an inference of scienter and shows that, in context, the statement did not change the "overall mix" of information in a way that would mislead the reasonable investor. Instead, it is more plausible that this statement reflected his business judgment that, regardless of the company's internal goals, reducing attrition would be a more effective way to increase staffing levels than increasing recruitment. This judgment appears to have been confirmed by the NAO Report, which concluded that increasing HCP staffing "will be challenging given market pressures. . . . [O]nly 3% of 3,970 [HCP] vacancies are advertised for more than 30 days, suggesting there are relatively few long-term [HCP] vacancies." NAO Report 25. In that environment, where HCPs are in high demand in the labor market generally and, as Caswell noted on the call, Maximus is asking them to do "a very different type of work" than they are used to, it was a rational judgment to focus on training and retaining the HCPs they recruit, rather than focusing on recruiting more HCPs to go through a high-attrition training process.

      *vii.*    *Statements 5 and 9: "If . . . may" risk disclosures in Maximus's May 2015 and August 2015 10-Q filings.*

Plaintiff argues that Maximus's disclosure of certain risks in its May and August 2015 10-Qs was materially misleading because of their "if . . . may" formulation, since Maximus knew that these risks had already materialized and were threatening the performance of the HAAS Contract. However, as discussed above with respect to the May and August 2015 statements, Plaintiff has failed to allege facts sufficient to infer that at the time of the May 2015 10-Q the Individual Defendants were actually aware of internal information inconsistent with their statements. Even if they were, in both May and August 2015, Plaintiff has not pleaded facts showing a more plausible inference than that the Individual Defendants genuinely believed that the initiatives they had put in place were sufficient to correct the problems in the HAAS Contract and accelerate the ramp-up to full profitability.

      *viii.*    *Statements 6 and 10: Omissions in Maximus's May 2015 and August 2015 10-Q filings.*

Plaintiff asserts that Maximus made material omissions in its May and August 2015 10-Q filings that are "actionable pursuant to Item 303 of Regulation S-K . . . ." Am. Compl. ¶ 329. That regulation requires, among other things, that 10-Q filings "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). However, Regulation S-K does not create an independent cause of action, *see Oran v. Stafford*, 226 F.3d 275, 287 (3d Cir. 2000) (Alito, J.), and some courts to consider the question, including this one, have concluded that "a violation of Regulation S-K does not lead to a failure to disclose under 10b-5," *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp.2d 571, 578 (E.D. Va. 2006); s*ee also In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054–56 (9th Cir. 2014) ("We have never directly decided whether Item's

303 disclosure duty is actionable under Section10(b) and Rule 10b-5. We now hold that it is not."); *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 402–03 (6th Cir. 1997).

The Fourth Circuit has not ruled on this question and other circuits that have considered the issue have reached different conclusions. But even the Second Circuit, which has held that Item 303 omissions can give rise to 10b-5 liability, *see Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 103–04 (2d Cir. 2015), has *not* held that an Item 303 violation is a *per se* material omission under 10b-5, but that "failure to comply with Item 303 . . . *can* give rise to liability under Rule 10b-5 *so long as* the omission is material under *Basic*, and the other elements of Rule 10b-5 have been established." *Id.* (emphasis added). For that reason, Item 303 omissions must still be material and made with scienter.

Plaintiff has failed to sufficiently allege that any of the Individual Defendants knew of or believed in any unfavorable trend as of the May 2015 10-Q. At the time of the May 2015 10-Q, Maximus had been running the HAAS Contract for only two months and met its overall assessment volume targets for both of those months. Additionally, as of early May, it appeared that Maximus's problems with recruiting were being addressed; HCP recruiting doubled from March to April to meet the company's internal recruiting goals. The Contract simply had not been running long enough to draw the inference that the Individual Defendants knew there was, and should have disclosed, a "trend" and that their failure to do so was with the intent to deceive investors. By the time of the August 2015 10-Q, Maximus had made affirmative disclosures of the problems facing the Contract in its earnings call the day before, cutting against the inference that the omission of an Item 303 disclosure was material or made with the intent to deceive investors. *See, e.g.*, August 2015 Earnings Call 2 ("[T]he recruiting and retaining of healthcare

professionals has proved to be tougher than we anticipated. As a result we are experiencing volume and to a lesser extent quality variances from our plan.").

For the reasons previously stated by this Court and the Sixth and Ninth Circuits, a failure to comply Item 303 of Regulation S-K does not give rise to liability under Section 10(b) or Rule 10b-5. Alternatively, the Amended Complaint fails to adequately allege scienter or materiality for any alleged omissions in the May 2015 or August 2015 10-Qs.

b.    **The Amended Complaint fails to adequately plead loss causation.**

The Amended Complaint also fails to plead adequately loss causation. To prevail on a § 10(b) claim, a plaintiff must show that "the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-(b)(4). For this reason, a plaintiff in a fraud-on-the-market case must show not only that the alleged material misrepresentations artificially inflated the price of the security, but also that the price dropped to the "correct" price after the truth came out, causing investors to bear a loss because of their purchase of the securities during the period that the misrepresentations tainted the market. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) ("[A]n inflated purchase price will not itself constitute or proximately cause the relevant economic loss."). "Loss causation must be pled with sufficient specificity, a standard largely consonant with Rule 9(b)'s requirement that averments of fraud be pled with particularity." *Carlucci v. Han*, 907 F. Supp. 2d 709, 723-24 (E.D. Va. 2012) (cleaned up). Here, Plaintiff argues that the Amended Complaint adequately pleads loss causation on two theories: the corrective disclosure theory and the materialization of the risk theory.

Under a corrective disclosure theory, a plaintiff "must provide a basis on which to conclude the . . . alleged corrective disclosures . . . revealed 'new facts' suggesting [the

defendant] had perpetrated a fraud on the market by omitting" or misrepresenting material information in its prior statements to the market. *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011). "Such disclosures need not precisely identify the misrepresentation or omission . . . [b]ut they must reveal to the market in some sense the fraudulent nature of the practices about which a plaintiff complains [and] must 'at least relate back to the misrepresentation and not to some other negative information about the company.'" *Id.* (quoting *In re Williams Sec. Litig.*, 558 F.3d at 1140); *see Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008) ("[T]he complaint must allege that the practices the plaintiff contends are fraudulent were revealed to the market and caused the resulting losses."). A corrective disclosure need not reveal the "fraudulent nature" of a prior statement by admitting to it. "The 'relevant truth' required . . . is not that a fraud was committed *per se* . . . ." *Fruedenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010). Rather, a corrective disclosure can reveal the fraudulent nature of a prior statement by revealing "the 'truth' about the company's underlying condition, [which,] when revealed, causes the economic loss." *Id.*

Plaintiff contends that it has adequately alleged loss causation based on (1) the alleged misstatements and omissions in the February and May 2015 statements (Statements 1 through 6) pertaining to the transfer and retention of HCPs and Maximus's ability to meet its monthly assessment volume targets; (2) the "partial corrective statements" in the August and November 2015 earnings calls (during which plaintiff also contends the Defendant issued further false and misleading Statements 7 through 11), which disclosed the true economic health of the HAAS Contract; and (3) Maximus's "final corrective statement" in February 2016, at the end of the Class Period, when the full truth "finally came out." Specifically, the Amended Complaint alleges that the February, 2016 earnings call was the first time Maximus revealed that it was

"hiring approximately 100 new healthcare professionals each month," which was less than half its target of 211 HCPs; that graduation rates of HCPs was "north of 80%," as opposed to the 95% rate set by the HAAS contract; that the HCP graduation rate was 30% when they received the Contract in March, 2015; and that "the learning curve to full productivity [for new HCPs] can take between six and eight months." Am. Compl. ¶¶ 118-119. After the February 2016 earnings call, the price of Maximus common stock dropped $5.53 per share, or 10.5%, closing at $46.92 per share on February 5. Maximus's stock price during the Class Period peaked at $70 per share in August 2015, before the beginning of these alleged "partial corrective disclosures." *Id.* at ¶ 20.

The Amended Complaint fails to allege facts sufficient to establish that the August 2015, November 2015, and February 2016 statements were, as Plaintiff contends, corrective disclosures. The relied upon disclosures, starting with the August 2015 statement reporting disappointing earnings on the HAAS Contract, related to risks that had been previously disclosed. The shortfalls in HCP recruiting and assessment volume discussed in the August 2015 statements occurred *after* the May 2015 call and were the result of the risks associated with the HAAS Contract that Maximus affirmatively disclosed as early as November 2014. *See* Nov. 2014 Earnings Call 15, ("[T]he [HAAS Contract] faces significant challenges out of the gate that will take some time to improve."), 28 ("[T]here is a meaningful backlog that we're seeking to reduce."). While the information disclosed in the August and November 2015 earnings calls indicates that the Individual Defendants' earlier statements may have been overly optimistic, those disclosures do not sufficiently allow the inference that they *knew* in February and May of 2015 that the Contract would perform at the level that it did. *See Katyle*, 637 F.3d at 477.

Likewise, during the August 2015 earnings call, Maximus spoke at length about the "start-up challenges" affecting the Contract. Aug. 2015 Earnings Call 8. Analysts asked the

Individual Defendants specifically about the recruiting and assessment problems that had been disclosed. *Id.* at 9 (Analyst: "I'm curious why you think you're having trouble recruiting on the HAAS contract?"). Similarly, the November 2015 earnings call and statements merely reported further the disappointing performance of the HAAS Contract because of the previously disclosed risks.[8] The November 2015 call was the first earnings call where Maximus had the final financial reports for fiscal year 2015; and the November 2015 earnings call reflects the recruitment and assessment problems that had worsened since the last earnings call. Notably, Plaintiff points to no analyst statement on the earnings calls or in the post-call analysis suggesting that the November 2015 statements revealed some fraud or deception in the earlier statements. The 21.9% stock drop associated with the November 2015 earnings call is adequately explained by the poor performance of the HAAS Contract disclosed in the call, rather than the perceived disclosure of some previous fraud.

Finally, the February 2016 statements—Plaintiff's alleged "final corrective disclosures"—do not disclose new risks that had been previously concealed or any other past fraud. Instead, like the November 2015 statements, they reflect the same performance risks, issues, and problems as those disclosed in November and August 2015 and shortly after Maximus won the contract. In fact, the February 2016 earnings call referenced the November 2015 call, saying that the previously disclosed problems were ongoing, not revealing some previous fraud: "At this time, we are *still* running below our volume targets . . . . The NAO

---

[8] Even though the November 2015 statements do not explicitly "relate back" to any early statement alleged to be fraudulent, Plaintiff contends that the November 2015 statements implicitly "'relate back' to the alleged misstatements, including those about recruiting and volume targets that Defendants had told investors Maximus had been successfully 'meeting' or [was] 'on track to meet (Statement Nos. 2–4).'" Pl.'s Resp. 47. However, as discussed above, the May 2015 statements were couched as predictions based on progress on the relevant metrics up to that point. The May statements were also preceded by the disclosures of the risks that were again disclosed in the November 2014 earnings call. The August 2015 disclosures also repeated and made clear those pre-May 2015 disclosures of the risks associated with the Contract.

report *echoed what we said in our November call* as it relates to certain performance metrics, including volumes and quality." Am. Compl. ¶¶ 114–115 (emphasis added).

Plaintiff also contends that loss causation is shown under the "materialization of the risk theory." Under that theory, a plaintiff can show loss causation by alleging facts showing that the drop in stock price was the "foreseeable consequence[] of the alleged fraud" and was caused by the "revel[ation of] new information previously concealed by defendants' alleged fraud." *Caplin v. TranS1, Inc.*, 973 F. Supp. 2d 596, 611-12 (E.D.N.C. 2013). This theory of loss causation does not rely on the defendant's disclosure of its own fraud through later statements. Instead "the news of the materialized risk would itself be the revelation of the fraud that caused plaintiffs' loss." *Teachers Ret. Sys. of Louisiana v. Hunter*, 477 F.3d 162, 187 n.3 (4th Cir. 2007); *see also In re Omnicom Group Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010) ("Appellant seeks to . . . argu[e] the existence of proximate cause on the ground that negative investor inferences drawn from [a director]'s resignation and from the news stories in June 2002 caused the loss and were a foreseeable materialization of the risk . . . .").

What Plaintiff posits as a "materialization of the risk" theory is simply a restatement of its corrective disclosure argument, since Plaintiff relies only on risks associated with the HAAS Contract that it contends were "concealed by alleged misstatements and omissions during the Class Period and w[ere] revealed through partial disclosures showing that Defendants had misled the market about Maximus's Contract performance and profitability." Pl.'s Resp. 49. As discussed above, there is nothing about the alleged partial or final corrective disclosures that on their face reveal a fraud that had been perpetrated on investors. For the above reasons, the Amended Complaint fails to adequately plead loss causation.

**c.  Plaintiff fails to plead adequately a claim under Section 20(a).**

Count II of the Amended Complaint asserts a cause of action under Section 20(a) of the Exchange Act. That section creates joint and several liability for "control persons" who "directly or indirectly, control[] any person liable under any provision of" the Exchange Act. 15 U.S.C. § 78t(a). Because the Amended Complaint fails to adequately state a claim under § 10(b) of the Exchange Act, it also fails to state a claim under § 20(a), and Count II must also be dismissed.

## IV. CONCLUSION

For the foregoing reasons, the Amended Complaint fails to allege facts sufficient to support plaintiff's claims under Sections 10(b) or 20(a) of the Securities Exchange Act of 1934. The Motion to Dismiss will therefore be GRANTED and the Amended Complaint DISMISSED.

The Court will issue an appropriate order.

The Clerk is directed to forward copies of this Memorandum Opinion to all counsel of record.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
August 27, 2018